

# Office of the Inspector General
## U.S. Department of Justice

### OVERSIGHT ★ INTEGRITY ★ GUIDANCE



# Report of Investigation of Former Federal Bureau of Investigation Director James Comey's Disclosure of Sensitive Investigative Information and Handling of Certain Memoranda

GOVERNMENT
EXHIBIT

11

1:25-CR-272-MSN

Oversight and Review Division 19-02        August 2019

# TABLE OF CONTENTS

I.     Introduction ........................................................................................ 1

II.    Relevant Statutes and Policies ......................................................... 3

    A.    Federal Records and Official Information ....................................... 3

    B.    Disclosure of FBI Information for Non-Official Use Purposes ............ 5

    C.    Department and FBI Policies on Disclosure of Information about
        Pending Investigations ................................................................. 6

    D.    Statutes, Regulations, and Policies Regarding Classified Information
        and Documents Designated For Official Use Only .......................... 7

III.   Timeline of Relevant Events ............................................................ 10

IV.    Factual Findings .............................................................................. 14

    A.    Background Facts ...................................................................... 14

        1.    Comey's Professional Background ...................................... 14
        2.    Terms of Comey's FBI Employment Agreement ................... 15
        3.    Comey's Security Clearance History ................................... 15
        4.    Comey's Status as an Original Classification Authority and
              Responsibility for Designating Classified Material ................ 16

    B.    Comey's Creation and Handling of the Memos from January 6, 2017
        through May 9, 2017 ................................................................... 16

        1.    January 7, 2017 Memo (Memo 1) ...................................... 17
        2.    January 11, 2017 Telephone Call (No Memo) ..................... 19
        3.    January 28, 2017 Memo (Memo 2)..................................... 20
        4.    February 8, 2017 Memo (Memo 3) ..................................... 22
        5.    February 14, 2017 Memo (Memo 4) ................................... 23
        6.    March 1, 2017 Memo (Memo 5) ......................................... 25
        7.    March 9, 2017 Telephone Call (No Memo) .......................... 26
        8.    March 30, 2017 Memo (Memo 6) ....................................... 26
        9.    April 11, 2017 Memo (Memo 7) ......................................... 27
        10.   Handling, Storage, Distribution, and Discussion of the Memos
              While Comey was FBI Director............................................ 28

    C.    Comey's March 20, 2017 Congressional Testimony on FBI's Russia
        Investigation ............................................................................. 31

    D.    May 9, 2017 Removal of Comey as FBI Director............................ 33

    E.    FBI Efforts to Secure Information and Devices from Comey's Office
        and Home ................................................................................. 33

    F.    FBI Preservation of the Memos ................................................... 34

    G.    May 11, 2017 Article in The New York Times ................................ 35

    H.    President's Tweet on May 12, 2017 ............................................. 36

I.      Copies of the Memos are Provided to the OIG .............................. 37

J.      Comey Provides Scanned Copies of Memos 2, 4, 6, and 7 to His
        Attorneys via Email ................................................................. 37

K.      May 15, 2017 Comey's Chief of Staff Informs SSA of Existence of
        Comey Memos ........................................................................ 38

L.      Comey Provides Richman Digital Photographs of Memo 4 Via Text
        Message on May 16, 2017 ......................................................... 39

M.      May 16, 2017 Article in The New York Times ............................... 41

N.      The FBI's June 2017 Classification Review of the Memos ............... 42

        1.      OGC Review of the Memos ............................................. 42
        2.      OCA Classification of the Memos .................................... 46

O.      Comey's Preparation for and Testimony to the Senate Select
        Committee on Intelligence ........................................................ 47

        1.      Comey's June 7, 2017 Review of the Memos with the FBI's
                Classification Markings .................................................. 47
        2.      Comey Returns his Copies of the Memos to the FBI ............. 48
        3.      Comey's June 8, 2017 Testimony ..................................... 49

P.      FBI Retrieval of Memos from Comey's Attorneys .......................... 50

V.      OIG Analysis ................................................................................ 52

A.      The Memos were FBI Records ..................................................... 52

B.      Comey Violated Department and FBI Policies Pertaining to the
        Retention, Handling, and Dissemination of FBI Records and
        Information ............................................................................. 54

        1.      Comey Failed to Return Memos 2, 4, 6, and 7 after Being
                Removed as FBI Director ................................................ 55
        2.      Comey Improperly Disclosed FBI Documents and Information 56

C.      Comey Failed to Immediately Alert the FBI to the Unauthorized
        Disclosure of Classified Information ............................................ 59

VI.     Conclusion ................................................................................... 59

APPENDIX A ........................................................................................ 62

APPENDIX B ........................................................................................ 79

# I.    Introduction

This report describes the investigation by the Department of Justice (DOJ or Department) Office of the Inspector General (OIG) into the creation, storage, and handling of certain memoranda (Memos) written by former Federal Bureau of Investigation (FBI) Director James B. Comey.  Between January 6, 2017, and April 11, 2017, while Comey was Director of the FBI, he memorialized seven one-on-one interactions that he had with President-elect and President Donald J. Trump.[1]  Throughout this report, these Memos are referred to as Memo 1 through Memo 7, numbered chronologically according to the date each Memo was written.  Comey, who had original classification authority as FBI Director, marked a small amount of information in Memo 1 as classified at the time that he wrote it.  Comey also believed that Memo 3 contained classified information when he wrote it, but did not mark the document as classified.  Comey kept signed originals of Memos 2, 4, 6, and 7 in a personal safe in his home and, following his May 2017 removal as FBI Director, provided his personal attorneys with copies of Memos 2, 4, and 6, and a redacted version of Memo 7; Comey never took copies of Memos 1, 3, and 5 to his home, and never shared these Memos with anyone outside the FBI.

In June 2017, following Comey's removal as FBI Director, the FBI reviewed the Memos to determine if any of the Memos contained classified information.  The FBI determined that Memos 1 and 3 contained information classified at the "SECRET" level, and that Memos 2 and 7 contained small amounts of information classified at the "CONFIDENTIAL" level.  The FBI designated Memos 4, 5, and 6 as unclassified, "For Official Use Only."

This matter was referred to the OIG for review in July 2017 by then-Acting FBI Director Andrew G. McCabe, consistent with Department regulations and the Inspector General Act, after the FBI determined that Comey may have shared with his attorneys Memos that contained classified information.  At the time, the OIG also was aware of Comey's June 8, 2017 congressional testimony that he had authorized a friend (who was also one of his personal attorneys) to provide the contents of Memo 4 — which did not contain any classified information — to a reporter for The New York Times.  The focus of the OIG's investigation was to determine whether Comey violated Department or FBI policies, or the terms of his FBI Employment Agreement, in his handling of the Memos during and after his tenure as FBI Director.  The OIG's investigation included review of the Memos as well as numerous additional documents, emails, and news articles; and forensic analysis of certain computer systems.  As part of this investigation, the OIG also interviewed 17 witnesses, including former Director Comey and Daniel Richman, the individual who, at Comey's request, shared the contents of one of the Memos with a reporter for The New York Times.

Through our investigation, we learned that Comey considered Memos 2 through 7 to be his personal documents.  He created Memo 2 and Memo 4 on his

---

[1]  Comey documented these conversations in either email or memorandum format.  For ease of reference we will refer to these documents as "Memos" regardless of their form.

personal laptop computer, and kept signed originals of four of the Memos — Memo 2, Memo 4, Memo 6, and Memo 7 — in his personal safe at home, while he was serving as FBI Director.  He also generated a duplicate set of "originals" of Memos 2 through 7 for his Chief of Staff, James Rybicki, to maintain at the FBI.  When Comey was removed as FBI Director on May 9, 2017, Comey still had copies of Memos 2, 4, 6, and 7 in his personal safe at home.  After being removed as Director, Comey did not report to the FBI that he had copies of these Memos.  Comey subsequently provided his copies of Memos 2, 4, 6, and 7 to the Office of Special Counsel Robert S. Mueller III on June 7, 2017. [2]

On May 14, 2017, Comey used his personal scanner and private email account to provide electronic copies of Memos 2, 4, 6, and 7 to one of his personal attorneys.  Three days later, on May 17, that attorney provided, via a personal email account, copies of these four Memos to two other attorneys, who were also part of Comey's legal team.  Of the Memos Comey shared with his attorneys, Memo 2 contained six words that the FBI determined in June 2017 to be classified at the "CONFIDENTIAL" level; [3] Memos 4 and 6 contained information that the FBI determined in June 2017 to be "For Official Use Only," but did not contain classified information; and Memo 7 was redacted by Comey before transmission, which obscured the information in Memo 7 that the FBI determined in June 2017 to be classified.  Comey did not seek authorization from the FBI before providing Memos 2, 4, 6, and 7 to his attorneys.

On May 16, 2017, Comey provided a separate copy of Memo 4 to Richman, who was one of Comey's attorneys and also a close personal friend.  Richman also had served as a Special Government Employee at the FBI during a portion of the time that Comey was FBI Director.  Comey sent photographs of both pages of Memo 4 to Richman via text message from Comey's personal cell phone.  Comey instructed Richman to share the contents of Memo 4, but not the Memo itself, with a specific reporter for The New York Times.  Comey did not seek FBI authorization before providing the contents of Memo 4, through Richman, to a reporter.  As noted above, the FBI later marked Memo 4 "For Official Use Only" and determined that it did not contain classified information.  We found no evidence that Comey or his attorneys released any of the classified information contained in any of the Memos to members of the media.

Upon completing our investigation, pursuant to Section 4(d) of the Inspector General Act of 1978, the OIG provided a copy of its factual findings to the Department for a prosecutorial decision regarding Comey's conduct.  *See* 5 U.S.C.A. App. 3 § 4(d) (2016).  After reviewing the matter, the Department declined prosecution.  Thereafter, we prepared this report to consider whether

---

[2]  Robert S. Mueller III was appointed Special Counsel by Deputy Attorney General Rod Rosenstein on May 17, 2017, to oversee the investigation into Russian interference in the 2016 Presidential election and related matters.

[3]  Four of the six words in Memo 2 that the FBI determined were classified were the names of foreign countries being discussed by the President.  As described later in this report, the President referenced the countries when he conveyed his personal views on the relative importance of promptly returning telephone calls from the leadership of the named countries.

Comey's actions violated Department or FBI policy, or the terms of Comey's FBI Employment Agreement.  As described in this report, we conclude that Comey's retention, handling, and dissemination of certain Memos violated Department and FBI policies, and his FBI Employment Agreement. [4]

## II.     Relevant Statutes and Policies

### A.     Federal Records and Official Information

The statutory definition of Federal records is broad, and includes:

> all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency…as evidence of the organization, function, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them. [5]

This definition includes any "act of creating and recording information by agency personnel in the course of their official duties, regardless of the method(s) or the medium involved." [6]  Working files, such as preliminary drafts or notes, may also qualify as official agency records if they were circulated or made available to other employees for official purposes, and contain "unique information" that assists in the understanding of an agency's policies, decisions, or actions. [7]

Department and FBI policies address what qualifies as a federal record and describe employee responsibilities regarding federal records. [8]  The

---

[4] On April 19, 2018, 11 months after Comey disclosed the contents of Memo 4 to The New York Times through Richman, the Department provided all of the Memos in redacted form to the House and Senate Judiciary Committees, the House Oversight and Government Reform Committee, the Senate Homeland Security and Governmental Affairs Committee, the House Permanent Select Committee on Intelligence, and the Senate Select Committee on Intelligence in response to requests from the Committees' Chairmen for the documents.  *See* Appendix A of this report.  Separately, in 2017, a Freedom of Information Act (FOIA) lawsuit was brought by a media organization in the U.S. District Court for the District of Columbia in an effort to obtain copies of the Memos.  *Cable News Network, Inc.* v. *FBI*, 293 F. Supp. 3d 59, 66 (D.D.C. 2018).  In 2018, the Court determined that the Memos were not subject to release at the time due to the Department's ongoing criminal investigation.  *Id.* at 65, 77.  More recently, in June 2019, following the conclusion of the Department's criminal investigation, the Court determined that the Memos should be released but permitted a limited number of redactions, including for classification.  *Cable News Network, Inc.* v. *FBI*, 384 F. Supp. 3d 19, 25-26, 38 (D.D.C. 2019).  In particular, as to Memo 2, the Court upheld the FBI's classification of one of the words redacted in Memo 2 (the name of a country) but ruled that the FBI had not carried its burden to support the redaction of the remaining words.  *Id.* at 36.

[5] 44 U.S.C. § 3301(a)(1)(A).

[6] 36 C.F.R. § 1222.10(b)(3).

[7] 36 C.F.R. § 1222.12(c).

[8] Because the FBI is a component of the Department of Justice, generally both the Department's policy statements and the FBI's policy guidance apply to FBI employees.

3

Department's policy states that "[a]ll DOJ employees are responsible for maintaining the information they generate, receive, or review while conducting Departmental business in accordance with Departmental and component policies."[9]  The FBI's policy includes in the definition of a record any items that "document or explain the basis of a significant action or decision involving the exercise of government authority" or items "[n]ecessary to document other significant operations or administrative matters."[10]

The Department and the FBI follow specific guidance provided by the National Archives and Records Administration (NARA) for permanent retention of materials of senior officials, also known as "capstone officials."  NARA approves the records management program for capstone officials, of which the FBI Director is one.  This program designates which documents are considered official Federal records, and provides specific records retention schedules for such capstone officials.[11]  The records retention schedule for FBI senior executives states that the FBI must maintain, as official FBI records, "the emails, *personal notes*, annotated briefings, not maintained elsewhere, and other documentation received or generated by the Director in the normal course of business."  (Emphasis added).[12]

In contrast, federal regulations define personal files or records as "documentary materials belonging to an individual that are not used to conduct agency business."[13]  Merely labeling a document as "personal" or "private" does not alter the official nature of a document if it is "used in the transaction of public business."[14]  The FBI's Records Management Policy adds that personal papers are "materials…not used to conduct FBI business" that are "primarily personal in nature."[15]  Documents containing both personal and official information "must be treated as a [Federal] record."[16]

Department and FBI policies require that employees use officially approved Department or FBI Information Technology (IT) systems to process, store, and

---

[9]  DOJ Policy Statement 0801.02, Removal of and Access to Department of Justice Information, § I (December 18, 2014) [hereinafter DOJ Policy Statement 0801.02].

[10]  FBI, Records Management Policy Guide, 0769PG, ¶ 4.2.1. (June 4, 2015) [hereinafter Records Management PG].

[11]  DOJ Instruction 0801.04.04, Records Processing for Capstone Officials, 8 (January 18, 2017).

[12]  DOJ/FBI Office of the Director Request for Records Disposition Authority to the National Archives & Records Administration, at 2, 1 (amended June 27, 2017).

[13]  36 C.F.R. § 1220.18.

[14]  36 C.F.R. § 1222.20(b)(3).

[15]  Records Management PG, ¶ 4.6.

[16]  Records Management PG, ¶ 4.6.

transmit official information.[17]  There are very few exceptions to this rule.  For example, FBI employees may use non-FBI systems such as GPS to navigate, personal devices to locate colleagues during an emergency, or personal devices to check official emails through an FBI-sponsored secure web page.[18]

Department policy states that employees may not, without agency permission, remove records from the Department—either during or after employment.[19]  Under Department policy, the only items that departing employees may remove without prior approval are personal information or documents that are unrelated to the Department and official business; copies of any unclassified information already officially in the public domain; and copies of the employee's email contacts.[20]  A departing employee must make a written request, receive approval from the appropriate official, and execute a nondisclosure agreement before removing any records or information.[21]  Before authorizing any such request, the approving official must ensure that the requested documents do not contain any prohibited categories of information, such as classified information.[22]  According to Department policy, if the head of a Department Component—for example, the FBI Director—seeks to remove Department information, he must receive approval from the Assistant Attorney General for Administration.[23]

The FBI policies are no different.  When FBI employees separate from the FBI, they are required to "surrender all materials in their possession that contain FBI information."[24]  Every employee signs an FBI Employment Agreement at the beginning of their employment acknowledging this requirement.  According to one Section Chief of the FBI's Records Management Division (RMD), this requirement covers "all [FBI] information,…whether it's a record or not, created or gotten by access or acquired during the course of their employment…, [it] is property of the U.S. government…."

### B.    Disclosure of FBI Information for Non-Official Use Purposes

Pursuant to FBI policy, all information acquired by FBI personnel "in connection with official FBI duties, as well as all official material to which FBI

---

[17]  DOJ Order 2640.2F, Information Technology Security, ch. I, ¶ 2 (November 26, 2008); FBI Mobile Devices and Mobile Applications Policy Guide, 0879PG, §§ 1.3, 3.3.1 (July 6, 2016) [hereinafter FBI Mobile Devices PG].

[18]  FBI Mobile Devices PG § 3.3.1.

[19]  DOJ Policy Statement 0801.02, §§ I.A., I.B.

[20]  DOJ Policy Statement 0801.02, § I.B.

[21]  DOJ Policy Statement 0801.02, § I.A.

[22]  DOJ Policy Statement 0801.02, §§ I.A, II.A.2.

[23]  DOJ Policy Statement 0801.02, § III.B.  The requestor would also have to fill out the appropriate request form and its accompanying nondisclosure agreement.  *Id.*

[24]  FBI, Prepublication Review Policy Guide, 0792PG, § 1.1 (June 4, 2015) [hereinafter Prepublication Review PG].

personnel have access, is the property of the United States."[25]  Accordingly, before disclosing FBI information outside of the FBI for non-official purposes, current or former FBI personnel must obtain, with limited exceptions such as for whistleblowing and disclosures to Congress, advance permission from the FBI.[26] This policy applies to any type of disclosure—whether oral, written, or electronic.[27] FBI employees agree to be bound by this requirement when they sign the FBI Employment Agreement.

In evaluating requests from current or former FBI employees to release FBI information for non-official purposes, the FBI reviews the proposed disclosure to ensure, among other things, that it does not include information that is classified, related to an ongoing investigation, or covered by the Privacy Act of 1974 (5 U.S.C. § 552a).[28]

### C.    Department and FBI Policies on Disclosure of Information about Pending Investigations

Section 3.4 of the FBI's then-existing Policy on Media Relations stated that disclosures to the media "must not address an ongoing investigation" except as indicated in that section.[29]  The section provided two examples of when it "may be permissible to selectively release [non-classified] information to assure the public that an investigation is in progress" with prior approval of specific components at FBI headquarters:

(1)  to protect the public interest, welfare or safety;

(2)  to solicit information from the public that might be relevant to an investigation.

Section 3.3 of the FBI policy also provided that all releases must be consistent with all applicable laws and regulations and policy, including the then-existing United States Attorneys' Manual (USAM), Title 1-7.000, "Media Relations."[30]  Title 1-7.000 of the USAM established specific guidelines for the release of information relating to criminal and civil cases by the FBI and other Department components.

Among other things, Section 1-7.530 of the USAM provided that:

---

[25]  Prepublication Review PG, § 1.1.

[26]  Prepublication Review PG, §§ 1.1, 4.2.1, 4.1.3.  *See also* 5 U.S.C. § 7211 (disclosures to Congress) and 5 U.S.C. § 2303 (Prohibited Personnel Practices in the Federal Bureau of Investigation) and 28 C.F.R. Part 27 (Whistleblower Protection for Federal Bureau of Investigation Employees).

[27]  Prepublication Review PG, § 4.1.1.  The only exception to this rule pertains to "disclosures by FBI personnel who are testifying as defendants in criminal cases."  *Id.*

[28]  Prepublication Review PG, § 1.1.

[29]  FBI, Media Relations at FBIHQ and in Field Offices Policy Guide, 0809PG, § 3.4 (October 13, 2015) [hereinafter Media Relations PG].

[30]  Media Relations PG, § 3.3.

A. Except as provided in subparagraph B. of this section, components and personnel of the Department of Justice shall not respond to questions about the existence of an ongoing investigation or comment on its nature or progress, including such things as the issuance or serving of a subpoena, prior to the public filing of the document.

B. In matters that have already received substantial publicity, or about which the community needs to be reassured that the appropriate law enforcement agency is investigating the incident, or where the release of information is necessary to protect the public interest, safety or welfare, comments about or confirmation of an ongoing investigation may need to be made.  In these unusual circumstances, the involved investigative agency will consult and obtain approval from the United States Attorney or Department Division handling the matter prior to disseminating any information to the media.

Comey told the OIG that, during his tenure as FBI Director, the authority to disclose the existence of a pending investigation was "confined to the Director and the Deputy Director" and that in making such decisions "the default [was] we don't talk" about pending investigations.

### D.    Statutes, Regulations, and Policies Regarding Classified Information and Documents Designated For Official Use Only

Current and former FBI employees have an ongoing responsibility to protect any classified information to which they are given access during the course of their employment.  Executive Order 13526 sets forth a uniform classification system to "prevent access by unauthorized persons; ensure the integrity of the information;" and provide a standardized marking system across the executive branch to facilitate the use and sharing of classified information.[31]  This system applies to all "information owned by, produced by or for, or...under the control of the United States Government."[32]  FBI employees must adhere to the policies promulgated by the Intelligence Community, the Department, and the FBI that implement this Executive Order.

Federal employees may only have access to classified information if they have a current security clearance, have signed a nondisclosure agreement (NDA), and have a need to know the classified information to carry out official duties.[33] Once granted access to classified information, authorized employees must properly

---

[31]  Exec. Order. No. 13526, § 4.1(f).  The implementing regulations underscore this purpose, stating that the application of uniform markings will "leave no doubt about the classification status of the information, the level of protection required, and the duration of classification."  32 C.F.R. § 2001.20.

[32]  Exec. Order No. 13526, § 1.1(a)(2).

[33]  Exec. Order No. 13526, § 4.1; FBI, Safeguarding Classified National Security Information Policy Guide, 0632PG, § 3.1 (August 5, 2013) [hereinafter Safeguarding Classified NSI PG].

handle it, protect it from unauthorized disclosures, and properly secure it in approved location.[34]  Likewise, FBI employees working with or discussing classified information must process, transmit, and store such information only on authorized systems and in approved facilities.[35]

Information is eligible for classification only if it falls into one of the categories listed in Executive Order 13526, which include intelligence activities, sources and methods, and "foreign relations or foreign activities of the United States."[36]  There are three basic levels for classified information, each based on the amount of harm unauthorized disclosure of the information could reasonably be expected to cause to national security.[37]  Information is classified "TOP SECRET," which is the highest level, if its unauthorized disclosure "reasonably could be expected to cause exceptionally grave damage" to national security.[38]  For information classified "SECRET," the standard is "reasonably could be expected to cause serious damage" to national security, while for "CONFIDENTIAL" information (the lowest level), the standard is "reasonably could be expected to cause damage" to national security.[39]

In addition to the basic levels of classification, there are several dissemination controls which restrict the distribution of a classified document.  The designation "NOFORN" or "No Foreign Nationals" means that the document cannot be provided to any foreign nationals.[40]  "ORCON" or "Originator Controlled" means that the document may not be provided to anyone without the express permission of the official or agency that originally drafted it.[41]

Some unclassified documents are subject to the "FOUO" dissemination control, which means they are "For Official Use Only."  This marking is "for UNCLASSIFIED official government information that is withheld from public release until approved for release by the originator."[42]  FBI guidance sets forth additional

---

[34]  32 C.F.R. § 2001.41.

[35]  *See* 32 C.F.R. § 2001.41; Safeguarding Classified NSI PG, ¶ 3.2.3.

[36]  Exec. Order No. 13526, § 1.4.

[37]  Exec. Order No. 13526, § 1.2.

[38]  Exec. Order No. 13526, § 1.2(a)(1).

[39]  Exec. Order No. 13526, §§ 1.2(a)(2) & 1.2(a)(3).

[40]  Office of the National Counterintelligence Executive (ONCIX) Special Security Directorate, Intelligence Community Markings System Register and Manual at 148 (December 31, 2013) [hereinafter IC Markings System Manual]; FBI, Information Security:  Identifying, Designating, and Marking Classified National Security Information at 23 (2013) [hereinafter Information Security Handbook].

[41]  ODNI, Intelligence Community Policy Guidance 710.1, Application of Dissemination Controls: Originator Control, §§ D.1, E.2 (July 5, 2012); IC Markings System Manual at 139.

[42]  IC Markings System Manual at 137; *see also* FBI, For Official Use Only Information Policy Guide, 0732PG, ¶ 4.1 (Dec. 15, 2014) [hereinafter FOUO Information PG].  Guidance on use of "FOUO" is specific to the agencies using that designation—not all agencies do so, especially

instructions for the use of the "FOUO" designation, limiting its use to information such as personnel files, items exempted from public release by statute, and materials that would only be discoverable during litigation against the agency.[43]  In addition, FBI policies include specific requirements for the manner of storage and processing of "FOUO" information to prevent disclosure to anyone without a need to know.[44]

Federal employees who are designated as Original Classification Authorities (OCAs) bear the responsibility for determining, in the first instance, whether to classify information "owned by, produced by or for, or...under the control of the United States Government...."[45]  An OCA's authority flows from the President of the United States through agency heads, and Executive Order 13526 directs agencies to maintain only a small number of OCAs.[46]  The FBI has 16 OCAs, including the Director, Deputy Director, General Counsel, and the Assistant Directors of certain FBI Divisions, such as the Counterintelligence Division.  These OCAs receive annual training, including "avoidance of over-classification,...instruction on the proper safeguarding of classified information and on the sanctions...that may be brought against an individual who fails to classify information properly or protect classified information from unauthorized disclosure."[47]  Within the FBI, OCAs may only make classification decisions for information within the programs they oversee.[48]  OCAs must document their classification decisions in writing, by either marking specific documents individually (which the FBI notes is "rare"), or by specifying the categories of classified information in a classification guide.[49]

FBI employees who author classified documents must also properly mark the documents.[50]  Federal regulations, Intelligence Community guidance, and FBI policies require classified documents to contain several types of markings: classification headers and footers on each page of the document; individual portion or paragraph markings (*i.e.*, the abbreviations in parentheticals at the beginning of paragraphs); and a classification authority block, which identifies who classified the document, the basis for the classification, and the declassification date after which

---

as the Information Security Oversight Office (ISOO) implements the Controlled Unclassified Information (CUI) program.  *See* IC Markings System Manual at 137.

[43]  Information Security Handbook at 66-67; FOUO Information PG, ¶ 4.1.1.

[44]  FOUO Information PG, ¶¶ 4.5.2 & 4.5.3.

[45]  Exec. Order No. 13526, § 1.1.

[46]  Exec. Order No. 13526, § 1.3(c)(1); FBI Policy Directive 0572D, Original Classification Authority (OCA) Program, ¶ 8.1 (December 21, 2012).

[47]  Exec. Order No. 13526 § 1.3(d); Department of Justice Security Program Operation Manual, § 4-102(i) [hereinafter SPOM].

[48]  Information Security Handbook at 6.

[49]  Information Security Handbook at 6.

[50]  FBI, Marking Classified National Security Policy Directive and Policy Guide, 0720DPG ¶ 4.2.1 (September 2, 2014) [hereinafter Marking Classified NSI PG].

release of the information no longer presents a danger to national security.[51]  The FBI's Safeguarding Classified National Security Information Policy Guide also requires that "[a]ny person who has knowledge that classified information has been or may have been lost, compromised, or disclosed to an unauthorized person must immediately report the circumstances to his or her security office."[52]

The Federal Criminal Code contains statutes addressing the mishandling or release of classified information.[53]  For example, 18 U.S.C. §§ 793(d) and (f) are felony statutes regarding the mishandling of classified information relating to the national defense.  Title 18 U.S.C. § 793(d) applies to individuals who have authorized access to such information, and willfully communicate, deliver, or transmit it, or cause it to be communicated, delivered, or transmitted to individuals who are not entitled to receive it.  Section 793(f)(1) addresses the removal, delivery, loss, theft, abstraction, or destruction of such information through gross negligence of the individual entrusted with it.  Section 793(f)(2) penalizes the failure to report the removal, loss, theft, abstraction or destruction of information relating to the national defense if an individual has knowledge that it has been removed from its proper place of custody.

As indicated above, the OIG provided a copy of its factual findings to the Department for a prosecutorial decision.  After reviewing the matter, the Department declined prosecution.


## III.    Timeline of Relevant Events

| January 6, 2017 | Intelligence Community Directors, including Comey, meet with President-elect Trump and his national security team at Trump Tower to discuss the Intelligence Community Assessment; Comey then meets with the President-elect one-on-one to alert Trump to "salacious and unverified" allegations about his 2013 trip to Moscow that the media may soon publish. |
|---|---|
| January 7, 2017 | Comey finishes drafting **Memo 1** on the FBI's secure computer system about the Trump Tower briefing and marks Memo 1 with the classification "SECRET//NOFORN/ORCON."  Comey emails Memo 1 to his Chief of Staff, the FBI Deputy Director, and the FBI General Counsel using the FBI's secure computer system.  Comey does not take a copy of Memo 1 home. |

---

[51] 32 C.F.R. § 2001.21; IC Markings System Manual at 19, 32; Information Security Handbook at 7-8.

[52] Safeguarding Classified NSI PG, ¶ 3.5.

[53] *See, e.g.,* 18 U.S.C. § 793(d), 18 U.S.C. § 793(e), 18 U.S.C. § 793(f), and 18 U.S.C. § 1924.

January 27, 2017     Comey has dinner with President Trump at the White
House.

January 28, 2017     Comey finishes writing **Memo 2** on his personal laptop
about his dinner the night before with President Trump. It
states that during dinner, among other things, Trump told
Comey he needed and expected "loyalty." Memo 2 also
describes an unrelated comment by the President about
the relative importance of returning telephone calls from
three different countries, one of which the Memo notes the
President mentioned twice. Comey does not mark Memo 2
as classified. Comey places a signed printout of Memo 2 in
his personal safe at home and gives a second signed
printout to his Chief of Staff to keep at the FBI. During a
classification review in June 2017, the FBI determines that
six words in the Memo recounting the President's comment
about returning telephone calls are classified
"CONFIDENTIAL//NOFORN" because of the potential impact
on foreign relations.

February 8, 2017     Comey writes **Memo 3** on a classified FBI computer system
because he believes Memo 3 contains classified FISA
information. Memo 3 summarizes Comey's interactions
that afternoon with Trump's then-Chief of Staff Reince
Preibus, then-National Security Advisor Michael Flynn, and
President Trump. Comey does not mark the printout of
Memo 3 as classified before sharing it with others at the
FBI. Comey does not take a copy of Memo 3 home. The
FBI determines in June 2017 that Memo 3 contains
information classified as "SECRET//NOFORN."

February 14, 2017     Comey writes **Memo 4** on his personal laptop describing,
among other things, a one-on-one meeting that day with
President Trump. According to Memo 4, Trump stated that
he hoped Comey could "see [his] way clear…to letting
[Michael] Flynn go." At the time, Flynn was the subject of
a non-public FBI investigation. Comey does not mark
Memo 4 as classified. Comey places one signed printout of
Memo 4 in his personal safe at home and gives a second
signed printout to his Chief of Staff to keep at the FBI. The
FBI determines in June 2017 that Memo 4 does not contain
classified information, but marks it as "FOUO."

March 1, 2017     Comey drafts **Memo 5,** a 4-line email to his Chief of Staff,
on his unclassified FBI mobile device to summarize a
non-substantive telephone call that day with President
Trump. Comey does not mark Memo 5 as classified, and
does not take a copy of Memo 5 home. In June 2017, the
FBI determines it is not classified, but marks it as "FOUO."

11

| March 20, 2017 | Comey testifies before the House Permanent Select Committee on Intelligence (HPSCI) at a hearing titled the Russian Active Measures Investigation.  Comey acknowledges the FBI's open investigation into Russian interference in the 2016 presidential election, but repeatedly refuses to answer questions about the scope of the investigation or specify who was under investigation, referencing the need to protect the integrity of the investigation and the privacy rights of those under investigation. |
|---|---|
| March 30, 2017 | Comey writes **Memo 6** on the unclassified FBI system in his office to describe a 10-minute telephone call with President Trump that morning.  According to the Memo, Trump asked what Comey "could do to lift the cloud" of the FBI's Russia investigation.  Comey gives a signed printout of Memo 6 to his Chief of Staff to keep at the FBI, and takes a second signed printout home to store in his personal safe.  Comey does not mark Memo 6 as classified.  In June 2017, the FBI determines that Memo 6 is not classified, but marks it as "FOUO." |
| April 11, 2017 | Comey drafts **Memo 7,** a 2-paragraph memo, on the unclassified FBI system in his office to summarize a brief telephone call with President Trump that morning.  According to the Memo, Trump said he was "following up to see if [Comey] did what [Trump] had asked last time— getting out that [Trump] is not personally under investigation."  Paragraph 2 of Memo 7 summarizes an unrelated foreign policy discussion.  Comey signs two printouts of Memo 7.  Comey gives one to his Chief of Staff to keep at the FBI, and he stores the other in his personal safe at his house.  Comey does not mark Memo 7 classified, but as described below, redacts the second paragraph of Memo 7 before sending it to his attorneys on May 14.  The FBI determined in June 2017 that the second paragraph of Memo 2 contained Presidential comments about foreign affairs that are classified "CONFIDENTIAL//NOFORN." |
| May 9, 2017 | President Trump removes Comey as FBI Director and orders that Comey be barred from entering FBI Headquarters. |
| May 11, 2017 | The New York Times publishes an article regarding the January 27 dinner meeting described in **Memo 2,** stating that Trump asked for Comey's "loyalty."  Richman acknowledged that he was a source for the article, and that Comey had described to him what Comey said was President Trump's request for loyalty at the dinner.  At that time, Richman had not yet seen Memo 2. |

12

| May 12, 2017 | President Trump tweets about the possible existence of "tapes" of his conversations with Comey. |
|---|---|
| May 14, 2017 | Comey sends scanned copies of **Memos 2, 4, 6, and 7** from his personal email account to the personal email account of one of his attorneys, Patrick Fitzgerald. Before sending, Comey redacts the second paragraph from **Memo 7** involving foreign affairs because Comey deems it irrelevant. On May 17 Fitzgerald forwards these four Memos to Comey's other attorneys, David Kelley and Richman. |
| May 16, 2017 | Comey sends a digital photograph of **Memo 4** (describing the meeting in which Comey wrote that President Trump made the statement about "letting Flynn go") to Richman via text message from Comey's personal phone. Comey asks Richman to share the contents, but not the Memo itself, with a specific reporter for The New York Times. Comey's stated purpose is to cause the appointment of a Special Counsel to ensure that any tape recordings that may exist of his conversations with President Trump are not destroyed. Richman conveys the substance of Memo 4 to the reporter. |
|  | The New York Times publishes an article entitled "Comey Memo Says Trump Asked Him to End Flynn Investigation." |
| May 17, 2017 | Deputy Attorney General Rod Rosenstein appoints Robert S. Mueller III as Special Counsel. |
| June 1-6, 2017 | FBI conducts a classification review of Comey's Memos. The FBI determines that Comey correctly classified **Memo 1** (which Comey did not share with anyone outside the FBI); that **Memos 4, 5, and 6** are unclassified but "FOUO"; and that portions of **Memos 2, 3, and 7** are classified, as follows: |
|  | **Memo 2:** Six words from a statement by President Trump comparing the relative importance of returning telephone calls from three countries, one of which the Memo notes the President mentioned twice, are classified as "CONFIDENTIAL//NOFORN." Comey did not redact this information before sharing Memo 2 with his attorneys. |
|  | **Memo 3:** Information about sources, methods, investigative activity, and foreign relations is classified as "SECRET//NOFORN." Comey did not share Memo 3 with anyone outside the FBI. |

**Memo 7:** An assessment of a foreign leader by President Trump and discussion of foreign relations is classified as "CONFIDENTIAL//NOFORN." Comey redacted this paragraph before he sent Memo 7 to his attorneys.

June 7, 2017    Comey reviews the FBI's marked copies of all seven Memos in preparation for his congressional testimony. Comey returns to the FBI the unmarked copies of Memos 2, 4, 6, and 7 that he had kept at his home, but does not tell the FBI that he sent copies of Memos 2, 4, 6, and 7 to his three attorneys.

June 8, 2017    Comey testifies to Congress that he shared a copy of one Memo, regarding "letting Flynn go" (Memo 4), with a friend (Richman), with instructions that the friend share the contents with a reporter. The FBI has multiple telephone calls with Richman over the next several days and learns from Richman, on or before June 9, that he and Comey's other two attorneys also have copies of three other Memos.

June 13, 2017    FBI begins the process of recovering or deleting the Memos from the computer systems of Richman, Fitzgerald, and Kelley, a process that is completed in January 2018.

## IV.    Factual Findings

### A.    Background Facts

#### 1.    Comey's Professional Background

Comey received a law degree from the University of Chicago Law School in 1985 and held a number of positions within the Department prior to being appointed FBI Director. Early in his career, from 1987 to 1993, Comey served in the office of the U.S. Attorney for the Southern District of New York, where he was promoted to Deputy Chief of the Criminal Division. From 1996 to 2001, Comey served as the Managing Assistant U.S. Attorney in charge of the Richmond Division of the U.S. Attorney's Office for the Eastern District of Virginia. Starting in January 2002, Comey served as the U.S. Attorney for the Southern District of New York, a position he held until December 2003, when Comey was appointed Deputy Attorney General for the Department of Justice. Comey served as Deputy Attorney General until 2005, after which he worked in the private sector. In 2013, Comey was nominated by then-President Obama to serve as FBI Director and was confirmed by the Senate to serve a ten-year term. On May 9, 2017, Comey was removed from his position as FBI Director by President Trump.

14

### 2.    Terms of Comey's FBI Employment Agreement

As a condition of his employment as Director of the FBI, Comey signed an FBI Employment Agreement, through which he agreed to be governed by a number of provisions, including:

- An acknowledgement that all information acquired by him in connection with his official duties and all official material to which he has access to remain the property of the United States;

- An agreement to surrender, upon separation from the FBI, all materials containing FBI information in his possession;

- A commitment not "to reveal, by any means, any information or material from or related to FBI files or any other information acquired by virtue of [his] official employment to any unauthorized recipient without official written authorization by the FBI";

- An agreement to "seek determination whether…information may be disclosed" prior to any disclosure, using the guidelines found in the FBI Manual of Administrative Operations and Procedure;

- An agreement to be bound by the FBI's guidelines governing prepublication review, with the understanding that the term "'publication' includes the disclosure of information to anyone by any means"; and

- An acknowledgment that these provisions are "conditions of…employment" and apply "both during [his] employment in the FBI and following termination of such employment."

In his interview with the OIG, Comey verified his signature on his FBI Employment Agreement.

### 3.    Comey's Security Clearance History

Throughout Comey's employment at the Department of Justice, including his tenure as FBI Director, Comey held security clearances that provided him access to classified information pursuant to nondisclosure agreements (NDAs). Under the terms of these NDAs, Comey acknowledged that he had been advised about the nature of and need to protect classified information, and agreed to "never divulge" classified information to anyone not authorized to receive it unless Comey had obtained prior written authorization for the disclosure from the U.S. government Department or Agency responsible for the classification. The NDAs that Comey signed clearly stated that "any unauthorized disclosure of classified information by me may constitute a violation, or violations, of United States criminal laws" and the NDAs referenced 18 U.S.C. § 793 and 18 U.S.C. § 1924, among other provisions. Pursuant to the NDAs, Comey also agreed that if he was uncertain about the classification status of information, it was his responsibility to consult with appropriate officials for clarification. The NDAs also stated that all of the classified information provided to Comey during his employment "is now and will remain the property of…the United States Government unless and until otherwise determined

15

by an authorized official or final ruling of a court of law." Further, Comey agreed
to return all classified materials "upon the conclusion of my employment," and
acknowledged that his obligation to protect classified information applied during his
employment "and at all times thereafter."

During his OIG interview, Comey verified his signature on a number of NDAs
he had signed during his tenure as FBI Director and at other times while employed
by the U.S. government, and told the OIG he was aware of his obligations to
protect classified information under those agreements. He also acknowledged that
he had "an obligation, lifelong, to protect classified information."

### 4.    Comey's Status as an Original Classification Authority and Responsibility for Designating Classified Material

As FBI Director, Comey was one of the officials designated by the FBI as an
Original Classification Authority (OCA). Comey's FBI training records show that he
received initial training on his responsibilities as an OCA on January 9, 2014, and
annual training most recently on March 28, 2017.

Comey told the OIG that, during his tenure as FBI Director, it was often the
case that he was reviewing reports that had a known classification, or replying to
emails that had been classified by others.[54] He said that the amount of his written
work as FBI Director that involved exercising his OCA responsibility was a "distinct
minority." Other FBI witnesses confirmed that while he was FBI Director, Comey
did not generate a lot of documents that required marking through use of his
original classification authority. Comey told the OIG that the "essence of being an
OCA is exercising a judgment about...the appropriate level of classification for the
information," and that in making such a "judgment call" he used his experience
and knowledge of the content of the document he was creating to make the best
judgment he could about the level of harm that might flow from unauthorized
disclosure of the information. He also acknowledged that, as FBI Director, "[t]here
were plenty of people [he] could ask if [he] wanted to," and that the "resources
would be available to him" to make those determinations, although he told the OIG
he did not remember ever using those resources.

### B.    Comey's Creation and Handling of the Memos from January 6, 2017 through May 9, 2017

Comey told the OIG that from January 6, 2017, through his removal as FBI
Director on May 9, 2017, he had a total of nine one-on-one conversations with
President-elect and President Trump. For seven of the nine conversations, Comey

---

[54] As one example, the FBI's computer systems are designed to require that when any
FBI employee creates an email, that employee must designate the classification level before the
email can be sent. Then-FBI General Counsel James Baker told the OIG that "everybody has to
do that, whether you actually are an [OCA] or not."

said he created written records, which are collectively referred to throughout this report as the Memos. [55]

### 1.    January 7, 2017 Memo (Memo 1)

Comey's first one-on-one meeting with Trump occurred on January 6, 2017, at Trump Tower as part of a briefing to the President-elect on an Intelligence Community Assessment (ICA) of Russian efforts to interfere in the 2016 presidential election. The ICA was jointly prepared by the FBI, National Security Agency (NSA), and Central Intelligence Agency (CIA), with oversight from the Office of the Director of National Intelligence (ODNI). [56]

According to Comey, the plan for the ICA briefing of President-elect Trump had two parts, both of which Comey said he was concerned would be "controversial and difficult conversations." The first part of the briefing, jointly conducted by the Intelligence Community Directors, involved briefing the President-elect on the overall conclusions of the ICA. The second part of the briefing concerned notifying the President-elect of "salacious and unverified" information about Trump's alleged conduct in Moscow several years earlier. Prior to the January 6, 2017 briefing, the FBI learned that several media outlets also had this information, and were intending to publish it. Multiple witnesses told the OIG that the Intelligence Community Directors agreed that Trump must be briefed on this information, and that the Director of National Intelligence (DNI) decided the briefing should be done by Comey "in a small group or one-on-one."

Before briefing President-elect Trump, Comey met with senior leaders of the FBI, including his Chief of Staff James Rybicki, then-FBI Deputy Director Andrew McCabe, then-FBI General Counsel James Baker, and the supervisors of the FBI's investigation into Russian interference with the 2016 presidential election.

Baker and McCabe told the OIG that they raised and discussed with Comey a number of concerns about Comey meeting alone with President-elect Trump. Baker and McCabe said that they agreed that the briefing needed to be one-on-one, so that Comey could present the "salacious" information in the most discreet and least embarrassing way. At the same time, we were told, they did not want the President-elect to perceive the one-on-one briefing as an effort to hold information over him like a "Hoover-esque type of plot." Witnesses interviewed by the OIG also said that they discussed Trump's potential responses to being told about the "salacious" information, including that Trump might make statements about, or provide information of value to, the pending Russian interference

---

[55] As described below, Comey received a telephone call from Trump on January 11, 2017, which Comey did not memorialize. He did, however, send an email to his administrative assistant requesting that it be noted on his calendar. Comey also told the OIG about a one-on-one interaction he had with the President on March 9, 2017, which is described below. Comey told the OIG that he did not create a Memo for the March 9, 2017 telephone call because it was a classified call, and it was "only business."

[56] The FBI, CIA, NSA, and ODNI are all members of the Intelligence Community. The Directors of these agencies are collectively referred to as "Intelligence Community Directors" in this report.

investigation. That FBI counterintelligence investigation, known as "Crossfire Hurricane," concerned whether individuals associated with the Trump campaign during the 2016 presidential election were coordinating with, or had been unwittingly co-opted by, the Russian government.

Multiple FBI witnesses recalled agreeing ahead of time that Comey should memorialize his meeting with Trump immediately after it occurred. Comey told the OIG that, in his view, it was important for FBI executive managers to be "able to share in [Comey's] recall of the…salient details of those conversations." Comey also said that an additional concern, shared by the members of his management team, was that if the briefing became "a source of controversy" it would be important to have a clear, contemporaneous record because Trump might "misrepresent what happened in the encounter." McCabe told the OIG that, in his view, it made sense for Comey "to capture his…contemporaneous recollection" because there were "millions of ways that [the FBI] could get follow-up questions, or criticism…and [Comey] wanted to recollect exactly, from his perspective, how it had taken place."

Comey told the OIG he began writing Memo 1 immediately following his meeting with Trump on January 6, 2017. Comey said he had a secure FBI laptop waiting for him in his FBI vehicle and that when he got into the vehicle, he was handed the laptop and "began typing [Memo 1] as the vehicle moved." He said he continued working on Memo 1 until he arrived at the FBI's New York field office, where Comey gave a "quick download" of his conversation with President-elect Trump to Rybicki, McCabe, Baker, and supervisors of the FBI's Crossfire Hurricane investigative team via secure video teleconference (SVTC). Comey said he probably told the SVTC participants that he would send them his "detailed notes" of the interaction. Comey told the OIG he could not remember whether he completed Memo 1 on January 6, 2017, or whether he continued drafting it on January 7, 2017, before sending it through the FBI's classified email system to Rybicki, McCabe, and Baker on January 7, 2017 at 1:42 p.m.[57]

Memo 1 documented both the larger discussion of the ICA with the President-elect's national security team (regarding Russian interference in the 2016 presidential election), and the one-on-one meeting that followed between Trump and Comey (concerning the "salacious" information). Memo 1 was the only one of the Memos on which Comey placed any classification, dissemination controls, or other handling markings. Comey placed an overall classification

---

[57] During the course of our investigation, we determined that there are actually two versions of Memo 1. The first version was dated January 6, 2017, and was drafted by Comey as a document on an FBI classified laptop in the car departing Trump Tower. A member of Comey's protective detail emailed this document to Comey, Rybicki, and McCabe on the evening of January 6, 2017, using the FBI's classified email system. This version was not marked with a classification banner/header, portion markings, or a classification authority block. The second version of Memo 1, dated January 7, 2017, at 1:42 p.m., is an email that Comey sent to Rybicki, McCabe, and Baker through the FBI's classified computer system. Comey used the electronic classification marking tool in the FBI's computer system to mark this version of Memo 1 "SECRET//NOFORN/ORCON" before sending it. These two versions of Memo 1 are substantively very similar. In this report, our references to Memo 1 refer to the final version sent by Comey on January 7, 2017.

marking of "SECRET//ORCON/NOFORN" at the top and bottom of the email. He also placed the following classification block before the substantive text of the email:

Classified by:        Director
Derived From:      FBI NSIC dated 20130301[58]
Declassify On:      20271231

In the email's introductory note, Comey also wrote "I am not sure of the proper classification here so have chosen SECRET. Please let me know [i]f it should be higher or lower than that."

Comey told the OIG that he classified Memo 1 in this way because his judgment was that the information "ought to be treated...[like] FISA derived information or information in a [counterintelligence] investigation," the "standard classification" for which is "SECRET//ORCON/NOFORN," according to Comey. Comey said he did not remember any of the email recipients responding to his question about whether Memo 1 should be classified at a higher or lower level. Comey also said he did not keep a copy of Memo 1 for himself, did not take a copy to his home, and did not share it with anyone other than the recipients listed on the email. He also told us he did not remember giving instructions to anyone to preserve Memo 1 or share Memo 1 with anyone else, and to his knowledge Memo 1 had not been shared outside the FBI.[59]

Comey told the OIG that at the time he created Memo 1, "it wasn't [his] plan to write a memo every time [he] had any meeting...with President Trump." Comey said that, after that first meeting, he was "optimistic that [he] wasn't going to have any further encounters with the President...that were up close and personal." Baker told the OIG that based on his experience as FBI General Counsel, one-on-one meetings were "quite outside the norm of interactions between the FBI Director and a President of the United States."

## 2.    January 11, 2017 Telephone Call (No Memo)

Comey's second one-on-one interaction with President-elect Trump was a telephone call on January 11, 2017. Comey told us that, on that date, he received a call at approximately 1:30 p.m. from the President-elect's Chief of Staff, Reince Priebus. According to Comey, Priebus informed him that the "President-elect would like to speak to you today." Comey told the OIG he did not remember there being any other substance to the call from Priebus.

According to Comey, President-elect Trump called him at 5:00 p.m. that day. Comey told the OIG that he "vividly" remembered the conversation, during which they discussed a media report that had disclosed the "salacious" information,

---

[58] FBI NSIC stands for the FBI's National Security Information Classification Guide, 0827CG, dated March 1, 2013.

[59] On January 7, 2017, Comey wrote a classified email to the other Intelligence Community Directors to let them know that his "follow-up session with [the President-elect] went well" and provided them a brief summary of the conversation that was less detailed than Memo 1.

and Trump's concern about how that had been "leaked." Comey said that, among other things, he remembered telling Trump that the source of the information was "not a government document, and it's not classified." Comey also remembered telling Trump that to "speak of it as a leak doesn't make sense" because "a lot of people in Washington had [the information]," and Comey said he told Trump that he had previously warned Trump that it might soon be published by the media. Following the call, Comey told Rybicki about the conversation and drafted an unclassified email to his administrative assistant stating "Please note on today's calendar that I received a phone call from Reince Priebus at 1:30 and one from President Elect Trump at 5 pm. Thanks."[60]

### 3.    January 28, 2017 Memo (Memo 2)

The interaction between Comey and President Trump that resulted in Comey drafting a second memo (Memo 2) occurred on January 27, 2017. Comey told the OIG that President Trump called him at lunchtime on Friday, January 27, 2017, to invite Comey to the White House for dinner. Comey said that he assumed this would be a group dinner, similar to the Trump administration's January 22, 2017 group reception for law enforcement officials in the Blue Room of the White House, which Comey attended. Comey said he was not initially thinking in terms of memorializing any interaction between himself and the President on January 27, 2017. Comey told the OIG he was "very surprised" when he arrived at the White House that evening and discovered that he and the President would be dining alone. When we asked Comey whether the dinner invitation had been extended because of Comey's position as FBI Director or because of a personal relationship with Trump, Comey told the OIG he "did not have a personal relationship" with President Trump and that if he had not been the FBI Director, he would not have been invited to dinner by the President.

Memo 2 states that Comey's dinner with President Trump lasted 1 hour and 20 minutes, during which they discussed a broad range of topics. Memo 2 states that, in writing the Memo, Comey was "attempt[ing] to recount in some detail only those parts that related in some way to [his] work."

A portion of Memo 2 summarizes a discussion between Trump and Comey concerning the "salacious" material and Trump's wondering whether "he should ask [Comey] to investigate the whole thing to prove it was a lie." According to Memo 2, Comey replied that the decision about whether to initiate an investigation was up to Trump, but that Comey said he "wouldn't want to create a narrative that [the FBI was] investigating him, because [the FBI was] not, and [Comey] worried such a thing would be misconstrued."

Another portion of Memo 2 states that Trump "touched on [Comey's] future at various points," without any acknowledgement by Trump or Comey "that we had

---

[60]  Comey's email records also reflect that on January 12, 2017, Comey replied to an email from the DNI, who apparently had a similar telephone call with President-elect Trump on January 11, 2017, about the "leak" of the "salacious" information.

already talked about this twice."[61]  According to Memo 2, at one point during the conversation, Trump stated that he needed loyalty and expected loyalty, and then later stated again "'I need loyalty.'"  Memo 2 reflects that the second time Trump stated his need for loyalty, Comey responded that the President would always get honesty from Comey.  Memo 2 states that Trump then "paused and said that's what he wants, 'honest loyalty,'" and Comey replied "'you will get that from me.'"  Memo 2 also notes that it was possible that Comey and Trump "understood that phrase differently" but that Comey "decided it would not be productive to push the subject further."

Comey told the OIG that it was "this utterly unexpected one-on-one dinner" that "start[ed] him into the practice of" drafting memos to document his one-on-one interactions with President Trump.  Comey said that, after dinner ended at about 8:00 p.m., he went home, opened his personal laptop, and started typing Memo 2.  Comey told the OIG that he finished drafting Memo 2 before going to bed that evening, but "went back in the morning and looked at it.  And [he was] sure there were minor corrections that [he] made, based on a night's sleep" because he dated it January 28, 2017.  Comey placed no classification, dissemination controls, or other handling markings on Memo 2, and told the OIG that in drafting Memo 2, he "intended to write an unclassified summary of the encounter with...President Trump."

Comey said that, after reviewing Memo 2 on his personal laptop on January 28, 2017, he used his personal printer to generate two paper copies of Memo 2 (which he referred to as "two originals"), placed handwritten page numbers in the upper right-hand corner of each page, initialed the last page of each original, added a handwritten date (January 28, 2017), and then deleted the electronic file from his personal laptop.  Comey explained to the OIG that he is "a maniac...about hacking of [his] personal devices" and that he is "obsessive" about deleting files from his personal accounts.  He told us that he "never keep[s] any emails, personal emails" and tries "to maintain almost a maniacal hygiene about records."

When asked why, in light of these concerns, he did not write this Memo on the FBI unclassified or classified computers available in the Sensitive Compartmented Information Facility (SCIF) the FBI had installed in Comey's home,[62] Comey stated that he "wasn't thinking about it...[belonging to the] Government—[he] thought...this is for me" so he used his "personal unclass system."

---

[61]  According to Comey, President-elect Trump told Comey that he hoped Comey would stay on as FBI Director during the January 6, 2017 ICA briefing, and again during their January 11, 2017 telephone call.

[62]  The FBI had outfitted Comey's home with a SCIF, which is an access-controlled facility used for review of information derived from intelligences sources or methods referred to as Sensitive Compartmentated Information (SCI).  Comey's home SCIF contained Unclassified, Secret, and Top Secret/SCI enclaves, with a secure printer and a safe, in what Comey described as a "very, very small" windowless closet in his basement, where he said it "was always about 110 degrees." Comey said that when he was working at home on unclassified material, for example a speech, he would draft it on his personal laptop, then forward the draft to his FBI account, instead of working in the SCIF (which he described as a "sweat box").

Comey told us that he put one original in his personal safe at home, where he stored personal, family-related "things that mean the most" to him. Comey acknowledged that "[i]n theory" his wife also had access to this safe, but told us that at the time, she did not have a key and did not know where he kept his key. Comey told us he took the other original to FBI Headquarters the following Monday morning, and gave it to Rybicki, with instructions for Rybicki to show Memo 2 to McCabe and Baker, then retrieve it and keep it at FBI Headquarters in Rybicki's possession. Comey told the OIG that he gave the second original to Rybicki because Comey thought the Memo might be necessary "at some point to protect myself and to protect the FBI." Comey explained that because he was "also thinking about the FBI,…[he made] sure a copy [was] kept by Jim Rybicki."

Comey told the OIG that he drafted Memo 2 in a different style than Memo 1 because he "thought about it differently." Comey said that, in his mind, Memo 2 was "for me. Also for the FBI. But honestly, at this point I was thinking first about me, close second the FBI." He told us that he viewed Memo 2 as

> a personal aide-mémoire. And, and that's why I did it like this. On my personal device, non-FBI systems; and that I kept one of the originals in my safe, my personal safe, not the Bureau's. I had a Bureau safe. But I didn't put it in the Bureau safe, because I didn't think of it that way.

Comey told the OIG he created Memo 2 because he viewed Trump as "fundamentally dishonest" and was "worried very much that [Trump] would say I had said things at this dinner that were not true; that I had promised him something; that I had given him assurances about something." Comey said he saw that possibility as "dangerous,…to me, but also to the FBI." Comey told the OIG that during the dinner, the President asked for his loyalty, and that in that moment, Trump was not

> asking me for my loyalty because I'm a Government employee. He want[ed] my loyalty, personally. And if President Trump were sitting here, I think he would consider that a personal conversation [—]["]I want you lashed to me.["]

When pressed on why he viewed the dinner at the White House as a personal interaction, as opposed to an official interaction, Comey characterized it as a "mix" because he was "Director of the FBI…and a human being" and he felt that he needed to protect himself and the FBI by being "able to remember what [Trump] said to me; what I said to him; for both of those purposes." Comey also acknowledged that it was "hard to separate [himself] from the FBI," because the personal assurances that Trump sought from Comey were linked to the power Comey held as FBI Director.

### 4.    February 8, 2017 Memo (Memo 3)

On February 8, 2017, Comey authored a third memo (Memo 3), which summarized Comey's interactions at the West Wing earlier that afternoon with Preibus, then-National Security Advisor Michael Flynn, and President Trump. Comey told the OIG he went to the White House on that day because Priebus had

invited him.  According to Memo 3, Priebus said that the meeting was "a chance to get acquainted."  Memo 3 states that, at one point, Priebus asked Comey whether their conversation was "private" and then Priebus asked a question about FISA that Priebus said Comey could "decide whether it was appropriate to answer."  Memo 3 states that Comey "paused for a few seconds and then said that [he] would answer here, but that this illustrated the kind of question that had to be asked and answered through established channels."  According to Memo 3, Comey went on to explain that the "normal channel was from DOJ leadership to the WH Counsel," and that "it was important that communications about any particular case go through that channel to protect [the FBI] and to protect the WH from any accusations of improper influence," and that Priebus responded by saying he understood.  Memo 3 states that, after meeting with Priebus, Priebus took Comey "to the Oval Office to greet the President on [Comey's] way out," and described Comey's ensuing conversation with the President, which included a variety of topics.

Comey told the OIG that he could not remember "for sure," but thought he drafted Memo 3 shortly after the February 8, 2017 meeting.  Comey told the OIG he could not remember which of his two classified systems he used to draft Memo 3, but said Memo 3 was "[d]efinitely not" drafted on any of Comey's personal devices.

Comey told the OIG that at the time that he wrote Memo 3, he considered it "to be a classified memo" because it contained "some discussion...about FISA orders."  However, Comey placed no classification, dissemination controls, or other handling markings on Memo 3 when he wrote it, and told the OIG he could not remember why he did not mark any portion of Memo 3 as classified when he created it.  Comey also said he did not ask anyone else at the FBI to review Memo 3 for classification once he finished writing it.

Comey told the OIG that, after he finished Memo 3, he printed two originals from an FBI printer, initialed each one, kept one original in his desk at the FBI and gave the other original to Rybicki with instructions to show it to McCabe and Baker, then retrieve it and keep it.  Comey told the OIG that, other than providing the original to Rybicki to show to McCabe and Baker, he did not give a copy of Memo 3 to anyone else.  Comey also said that, because he considered Memo 3 to be classified, he "did not store it at home; [but] stored it in [his] desk" at FBI Headquarters.  Comey told the OIG that the desk drawer where he kept Memo 3 had no lock, but that his whole office at FBI Headquarters was a SCIF that was "alarmed, locked," and approved for "open storage," so he "never had to put away classified information."

## 5.    February 14, 2017 Memo (Memo 4)

On February 14, 2017, Comey drafted a 2-page memo (Memo 4) regarding his interactions in the Oval Office that day during a multi-person briefing and a subsequent one-on-one meeting with President Trump.  These meetings occurred one day after Michael Flynn resigned as President Trump's National Security Advisor.  Comey told the OIG that he was at the White House on February 14 for a homeland threat briefing, and that he had "no expectation" that he would be meeting alone with the President and having a one-on-one conversation.  Memo 4

summarizes Comey's recollection of the individuals who attended the homeland threat briefing, how the President dismissed those individuals after the briefing concluded (including then-Attorney General Jeff Sessions) which left Comey alone with the President, and the subsequent conversation that transpired.

According to Memo 4, once Comey and Trump were alone, Trump said that he wanted to "'talk about Mike Flynn,'" and that "Flynn 'hadn't done anything wrong' in his call with the Russians."[63]  Memo 4 further states that Trump said he "had to let [Flynn] go because he misled the Vice President."  The President, according to Memo 4, then asked Comey about leaks of intelligence and other sensitive information, and Trump went on to state that the leaks concerning Flynn's communications with the Russian Ambassador were "terrible."  Memo 4 states that Comey responded in part by stating, "if people run around telling the press what we do, [the FBI's intelligence-gathering] ability will be compromised."

After the discussion of leaks, Memo 4 states that Trump "returned to the topic of Mike Flynn."  According to Memo 4, Trump stated, "[Flynn] misled the Vice President but he didn't do anything wrong in the call."  Memo 4 further states that the President then said he "hope[d]" Comey could "see [his] way clear to letting this go, to letting Flynn go."  Trump continued, "[Flynn] is a good guy.  I hope you can let this go."  Memo 4 states that Comey "replied by saying, 'I agree he is a good guy,' but said no more."  In his June 8, 2017 written statement to the Senate Select Committee on Intelligence (SSCI), Comey said that he "understood the President to be requesting that we drop any investigation of Flynn in connection with false statements about his conversations with the Russian ambassador in December.  I did not understand the President to be talking about the broader investigation into Russia or possible links to his campaign."

Comey told the OIG that, after the meeting with Trump, he went home and drafted Memo 4 on his personal laptop, in a way that was "[v]ery similar to [Memo 2 from] the post-January 27 dinner."  Comey said that, after he finished drafting Memo 4, he printed two originals on his personal printer, initialed both, then put one in his personal safe and took the other to his office and gave it to Rybicki with instructions to show it to McCabe and Baker, and then keep the original.

Comey placed no classification, dissemination controls, or other handling markings on Memo 4.  However, on the last line of the first page of Memo 4 Comey typed into the text "[NOTE:  because this is an unclassified document, I will be limited in how I describe what I said next.]"  Comey told the OIG he included this note because he

> knew that there might come a day when [he] needed [Memo 4] to protect [himself] and/or the FBI.  And it would be easier to accomplish that goal if it was unclassified....  And so if [he] wrote it and included...[information] that would've triggered classification [he]

---

[63] On January 24, 2017, several weeks before this interaction, the FBI had interviewed Flynn in connection with its ongoing investigation of him and asked him about his communications with the Russian Ambassador.  On December 1, 2017, Flynn pleaded guilty to making false statements to FBI agents during that January 24 interview about his communications with the Russian Ambassador.

couldn't keep it at home.  And [he] was keen to make sure that [he] could keep this recollection recorded at home.

He said he wrote Memo 4 in this way so that it would be clear that he "was intentionally leaving something out" if he was later questioned about the contents of the document.

In his June 8, 2017 written statement to SSCI, Comey said he discussed with the leadership team at the FBI his February 14, 2017 interaction with the President.  Comey said that he and the FBI leadership team decided not to report this conversation to the Attorney General or the Deputy Attorney General.  Their reasoning was that

> Attorney General Sessions…would likely recuse himself from involvement in Russia-related investigations.  (He did so two weeks later).  The Deputy Attorney General's role was then filled in an acting capacity by a United States Attorney, who would also not be long in the role.  After discussing the matter, we decided to keep it very closely held, resolving to figure out what to do with it down the road as our investigation progressed.

According to Comey's June 8, 2017 written statement, shortly after February 14, 2017, Comey spoke with Attorney General Sessions and

> took the opportunity to implore the Attorney General to prevent any future direct communication between the President and me.  I told the AG that what had just happened—him being asked to leave while the FBI Director, who reports to the AG, remained behind—was inappropriate and should never happen.

### 6.     March 1, 2017 Memo (Memo 5)

On March 1, 2017, Comey drafted a four-line email (Memo 5) to Rybicki memorializing a telephone call he had with President Trump that day.  Comey told the OIG that Trump called him as Comey was about to get on a helicopter to travel to an event in Richmond, Virginia with his former Chief of Staff Chuck Rosenberg, who was serving as the Acting Administrator of the Drug Enforcement Administration at that time.  Comey said he did not know in advance that the President would be calling him that day.  According to Comey, it was "a very short conversation" that happened while Comey was in still in the car at the helipad.  Comey said he "didn't consider it substantive."

Comey told the OIG that he drafted Memo 5 on his unclassified FBI mobile device either from the car or at some point during the helicopter trip, and that it was just "a few sentences" advising Rybicki that there was not "any interaction he needed to follow up on."  Comey did not place any classification, dissemination controls, or other handling markings on Memo 5, and sent Memo 5 to Rybicki via the FBI's unclassified email system.

According to Rybicki's emails for March 2, 2017, Rybicki contacted the Attorney General's Chief of Staff to "relay[] the substance" of the March 1, 2017 telephone call between Comey and Trump, and then emailed Comey to report that the Attorney General's Chief of Staff had "expressed his appreciation for the readout."

### 7.    March 9, 2017 Telephone Call (No Memo)

On March 9, 2017, Comey had a secure one-on-one telephone call with President Trump.  Comey told the OIG that the secure telephone call was "only business," and that there was "nothing untoward" about the call, other than it was "unusual for the President to call the Director directly."  Comey said he did not prepare a memo to document this call with the President, but said he had Rybicki arrange a secure call to Attorney General Sessions immediately afterwards to inform the Attorney General about the telephone call from the President in an effort "to keep the Attorney General in the chain of command between [Comey] and the President."

### 8.    March 30, 2017 Memo (Memo 6)

On March 30, 2017, Comey wrote a 2-page memo (Memo 6) describing a 10-minute telephone call with President Trump at 8:13 a.m.  Comey said that there was no "lead-up" to this telephone call.  Comey told the OIG that he was having a conversation with Rybicki prior to a morning staff meeting when "the phone rang.  And it was the White House switchboard.  And they connected the President."  Comey said that Rybicki "stayed sitting there throughout the call" but only heard Comey's end of the conversation.

According to Memo 6, early in the conversation, Trump said that he was "trying to run the country and the cloud of this Russia business was making that difficult."  Memo 6 states that Trump "asked what he could do to lift the cloud" and that Comey explained the FBI was working as quickly as possible on the investigation.  Memo 6 also states that Comey told Trump that "we weren't investigating him and that [Comey] had told the congressional leadership the same thing," and that Trump asked Comey several times to "find a way to get that out." Memo 6 ends by noting that at 10:05 a.m. Comey "called the Acting Attorney General [Dana Boente] and relayed the substance of the [conversation]...so he could decide what guidance to give [Comey] if any."[64]

Comey told the OIG that he drafted Memo 6 on his unclassified FBI system. Comey said he intended to write Memo 6 in an unclassified way, the "same as [he] would have done if [he] was home."  Comey placed no classification, dissemination controls, or other handling markings on Memo 6.  Comey told us that when he finished typing Memo 6, he printed two originals, dated and initialed them, and

---

[64] At the time, Boente was the Acting Attorney General overseeing the Russian interference investigation because Attorney General Sessions had recused himself from the investigation, and Rod Rosenstein had not yet been confirmed as Deputy Attorney General.

gave one to Rybicki. He said it was "highly likely" he told Rybicki to "do what you've done before; show it to Baker, show it to McCabe, retrieve it, hold onto it."

Comey said he thought of Memo 6 as a personal record, and thus took the second original home and stored it in his personal safe. Comey said that he likely deleted the electronic copy from the FBI's unclassified system, although he acknowledged it was possible that the electronic copy was still on the FBI's unclassified system. Comey said that by printing two hard copies, then storing one with Rybicki at the FBI and the other in his personal safe at home, he was trying to accomplish two goals, which "were protect myself, [and] protect the FBI."

### 9.    April 11, 2017 Memo (Memo 7)

On April 11, 2017, Comey authored a 1-page memo (Memo 7) containing a two-paragraph description of a telephone call with President Trump. Comey told the OIG that he had no advance notice of this telephone call. Instead, Comey said that, on that day, he was in a meeting when his administrative assistant told him "'the President wants you to call him.' And so I called him." Memo 7 states that Comey returned the President's telephone call at 8:26 a.m., and that they spoke for approximately 4 minutes.

According to Memo 7, Trump said that he was "following up to see if [Comey] did what [Trump] had asked last time—getting out that [Trump] is not personally under investigation." Memo 7 states that Comey responded by saying that he had "passed the request to the Acting AG and had not heard back." In response, Trump explained that "any cloud, even a little cloud" interferes with the work he is trying to do for the country, according to Memo 7. Memo 7 states that Comey then told Trump how that type of request should be made by the White House Counsel to Dana Boente, who was at the time serving both as the Acting Deputy Attorney General and the Acting Attorney General for the Russia investigation in light of Attorney General Session's recusal.

Comey told the OIG that, similar to Memo 6, when the telephone call was finished, he typed Memo 7 on his unclassified FBI system at the desk in his office. Comey told the OIG that, at the time he wrote Memo 7, he "didn't consider it to contain classified information." He said that, once Memo 7 was finished, he printed two originals, deleted the electronic file from the FBI system, gave one original to Rybicki, and took the other original home to store in his personal safe. Comey placed no classification, dissemination controls, or other handling markings on Memo 7. Comey told the OIG that Memo 7 was the last memo he wrote about any interactions with President Trump.

Comey also wrote in Memo 7 that he was still awaiting the guidance from Acting AG Boente that he had sought on March 30, 2017, as reflected in Memo 6. An email communication from Rybicki to Comey dated April 11, 2017, states that Rybicki "notified the A/DAG of [Comey's] call with POTUS this morning, including the detail that the WH counsel may reach out to DOJ today."

**10.    Handling, Storage, Distribution, and Discussion of the Memos While Comey was FBI Director**

As described above, with the exception of Memo 1 and Memo 5 (which Comey sent as emails), after drafting the Memos, Comey printed and delivered an "original" of each Memo to Rybicki to keep at the FBI.  Comey told the OIG he considered Memos 2, 3, 4, 5, 6, and 7 to be personal documents, rather than official records of the FBI.  However, because Comey considered Memo 3 "to be a classified memo," Comey said he never took a copy of Memo 3 home.  Comey said he kept his copy of Memo 3 in his desk at FBI Headquarters because he knew he did not have a legal way of maintaining and preserving classified information in his personal safe at home, and he said he was trying "to be very careful about [his] obligation to safeguard classified information."

Comey told us that, while he was the FBI Director, he did not have a conversation with anyone in the FBI about his view that the Memos were personal documents.  Comey also told the OIG that he did not remember discussing classification of the Memos with anyone at the FBI.  He said that it never occurred to him to put the Memos through a classification review to confirm his belief that they contained no classified information.

As part of this investigation, we interviewed multiple senior FBI officials, including Rybicki, Baker, and McCabe, to determine who had access to the Memos, and how they were handled by FBI personnel.  McCabe told the OIG that he believed Comey was trying to limit knowledge about Comey's communications with Trump to a "very, very small group" of close advisors.  McCabe said he thought Comey "didn't want these [Memos] floating around and…widely distributed."  McCabe's Special Counsel Lisa Page told the OIG that she thought Comey's "objective in keeping the [number of] people exposed to [the Memos] incredibly small was an effort to insulate the core team, who was doing the Russian investigation,…from knowing any of this, so that it didn't, ultimately, impact…their investigative steps…."  Baker said that Comey told him his concern at the time was the President's perceived "effort to influence the investigation filtering down to the people actually working on the case" and impacting the ongoing investigation and therefore only a very small group was informed about the interactions.

Rybicki told the OIG that, when Comey finished each Memo, he gave Rybicki an original of each, which Comey initialed in blue ink, so that Rybicki could maintain originals of the Memos at the FBI.  According to Rybicki, he kept the originals "in a locked drawer in [his] desk" for which he had the only key, even though his office was approved for open storage of classified information.  Rybicki told the OIG that Comey said he also made a copy of each Memo, which Comey marked "Copy."  Rybicki said Comey, in each instance, either gave the copy to McCabe, or gave the copy to Rybicki to give to McCabe.  Rybicki told the OIG he also thought Comey showed some of the Memos to Baker.  Rybicki also said he did not know at the time that "the copy instructions were…for those folks to read it and give it back to the Director."  Rybicki said he did not know "if [Comey] maintained these copies or destroyed them" after McCabe and Baker had seen them, and did not know that Comey was keeping copies of some of the Memos in his personal safe at home.  Rybicki also said he was not aware, at that time, whether McCabe

28

or Baker kept any copies of the Memos. Rybicki said Comey authorized him to show the Deputy Chief of Staff at least some of the Memos, but that, to Rybicki's knowledge, she did not maintain separate copies.

Baker told the OIG that with respect to Comey's interactions with Trump, Baker "would have an oral conversation [with Comey] about what had happened and [Comey would] say something along the lines of Rybicki has the Memo,...if you want to look at it, go get a copy from him." Baker said that sometimes Rybicki would give him a copy of a Memo, and sometimes Rybicki would give him the original, which Baker would read and give back to Rybicki. According to Baker, prior to Comey's removal as Director, Rybicki "had the complete set and...[Baker] had a copy of some of them," which Baker said he kept in his office safe. Baker said if he wanted to review one of the Memos he would take it out of his safe and read it in his SCIF. He told the OIG that, at the time, it was his understanding that the small group of people who had access to the Memos "really didn't want anyone to know the Director...was recording at this level of detail his interactions with the President" because any perception that Comey was "keeping...book" on the President would upset any effort to have an effective and ongoing working relationship. According to Baker, one of the reasons no one conducted a contemporaneous classification review of the Memos was that, as a practical matter, only four or five people actually knew about them before Comey was removed. Baker said he did not "worry about the classification" of the Memos because, he believed, they were not "going to go out the door" of the FBI. Baker also said that, at that time, he "presumed" Comey was keeping copies of the Memos "in his office somewhere" and did not know that Comey was storing any copies of the Memos at his home. Baker told the OIG he "just assumed [the Memos] were Government records, because they're related to official business."

Baker told the OIG that he remembered having a "series of conversations" with Comey concerning how to handle the one-on-one interactions with the President, during which Comey and Baker discussed

> what [Comey] should be saying; what he shouldn't be saying; should he be having these interactions; should he not; what should the role be of the Department with respect to interactions with the President; and what should the Director insist upon...with respect to interactions...with the President. In other words, should [Comey] insist that these conversations go through the Department; should he insist that the DAG and the AG be aware of them;...or should he quickly notify the DAG and the AG about what was going on and the substance of these conversations.

Baker said that eventually he urged Comey to tell the President that "if the President believed he needed information or wanted to communicate something to the FBI about a pending matter, such a communication had to go through the Attorney General or the Deputy Attorney General." Baker thought that Comey communicated this to Trump "toward the end of these interactions."

McCabe told the OIG that he remembered seeing all but one of the Memos at the time they were written.[65]  He said Comey showed him copies of the Memos, and they discussed them.  McCabe told the OIG he thought Comey was also sharing the Memos with Rybicki and Baker.  McCabe said his practice was to read each Memo, then give it back to Comey or shred it because "[i]t wasn't necessary for [him] to retain a copy."  His understanding "at that time was that [Comey] was going to preserve a copy, and that [Comey's Chief of Staff] was going to preserve a copy."  McCabe told the OIG he assumed that Comey was keeping his copies at the FBI, and never discussed with Comey whether he had a set at home.

McCabe forwarded Memo 1 to Page.  Page told the OIG that Comey had met with the "team conducting the Russia investigation, after [his January 6, 2017] meeting [with Trump] and both told us of the substance, and…also forwarded [Memo 1] to members of the team, to upload into the case file" because it was "central to investigative activity."  Page told the OIG that McCabe also allowed her to look at Memos 2, 3, and 4, but asked her not to share them with anybody.  Page said that, on her own, she decided to make and keep copies of these Memos because they were "just of the nature that [she] felt like there should be one other copy somewhere else."  She told the OIG that she did not know if others in the FBI were keeping copies of the Memos.  Page told us that she kept her copies of these Memos in her office, which was a SCIF, inside her safe.

FBI Assistant Director for the Counterintelligence Division E.W. Priestap told us that Comey orally described some of his conversations with Trump without showing Priestap copies of the Memos.  Priestap told the OIG that it was his impression that Comey briefed him on these conversations because "these were extremely important topics" that could impact the work of the FBI.  Priestap said he believed Comey was telling him about these interactions with President Trump not because Comey was "loose lipped and wants [Priestap] to find this interesting. He's communicating with [Priestap] because of our responsibility in looking at all of the things we're looking at [in an open investigation]."

In addition, while he was FBI Director, Comey allowed his former Chief of Staff Chuck Rosenberg to review Memo 2, which described Comey's dinner at the White House with President Trump.  At that time, Rosenberg was serving as Acting Administrator of the Drug Enforcement Administration and held an active TS/SCI security clearance, but had no official need to know about Comey's interactions with President Trump.  Rosenberg told the OIG he did not know whether the version of Memo 2 he reviewed was a draft or the final version.  He said that he was at Comey's house during the weekend after the January 27, 2017 White House dinner.  According to Rosenberg, Comey handed him a laptop, Rosenberg read the Memo on the laptop screen, and then handed the laptop back to Comey.  Comey told the OIG that it was "possible" he allowed Rosenberg to review Memo 2, but stated that he did not remember sharing it with him.  However, Comey told the OIG that he remembered telling Rosenberg about the telephone call with President Trump on March 1, 2017, which was memorialized in Memo 5.  Comey said that

---

[65]  McCabe told the OIG he did not remember seeing a copy of Memo 5 (the March 1, 2017 four-line email from Comey to Rybicki) at the time it was created.

during the telephone call with Trump, Rosenberg was waiting for Comey in a helicopter to travel to Richmond, Virginia.

Comey said he told Richman about the January 27, 2017 dinner with Trump at the White House when Comey and Richman met for lunch in late January or early February 2017. Comey told the OIG that Richman was a close friend of his who had been "on-site at the FBI a lot" because Richman worked as a Special Government Employee (SGE) until February 2017.[66] Comey said he did not show Richman the January 28, 2017 Memo at that time, but just described to Richman the "crazy story about the President wanting [Comey's] loyalty."

Benjamin Wittes, the editor-in-chief of the Lawfare Blog, wrote an article on May 18, 2017, describing what Comey had told him about Comey's interactions with President Trump.[67] In the article, Wittes described a lunch he had with Comey on March 27, 2017, during which Comey told Wittes about the "hug" Comey received from Trump during the January 22, 2017 reception for law enforcement officials in the Blue Room of the White House, the March 1, 2017 telephone call Comey received from Trump prior to boarding the helicopter, and a more general comment that "Trump had 'asked for loyalty' and that Comey had promised him only honesty." Wittes' article stated that "Comey never told [Wittes] the details of the dinner meeting," and that Wittes only learned that there had been a dinner meeting later, from published media reports. Comey told the OIG that he remembered having "lunch with Ben [Wittes] in March, and told him the Blue Room story, because it was an amusing story." However, Comey told the OIG he did not think he told Wittes about the dinner with Trump at the White House.

### C. Comey's March 20, 2017 Congressional Testimony on FBI's Russia Investigation

On March 20, 2017, Comey testified before the House Permanent Select Committee on Intelligence (HPSCI) at a hearing titled the Russian Active Measures Investigation. During the hearing, Comey acknowledged that the FBI had an open investigation involving Russian interference in the 2016 election, but refused on at least a dozen occasions to answer questions about the scope of the investigation or to specify who was under investigation. For example, in his opening statement, Comey said the following:

> I have been authorized by the Department of Justice to confirm that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election and that includes investigating the nature of any links

---

[66] Richman's appointment date as an SGE was June 30, 2015. Richman said his work as an SGE involved assisting in matters related to "challenges to law enforcement and intelligence collection from increasing end-to-end encryption and automatization practices across various tech spaces." He said he received "no money" for this work and "stopped doing any outside work in order…[to comply with] the requirements of an SGE status." As an SGE, Richman had an active security clearance up to the TS/SCI level. Richman's resigned as an SGE in February 2017, but his security clearance remained active until he was debriefed and "read out" by the FBI on July 12, 2017.

[67] *See* https://www.lawfareblog.com/what-james-comey-told-me-about-donald-trump.

between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts.…  Because it is an open ongoing investigation and is classified, I cannot say more about what we are doing and whose conduct we are examining.…  I know that is extremely frustrating to some folks.  I hope you and the American people can understand.  The FBI is very careful in how we handle information about our cases and about the people we are investigating.…  Our ability to share details with the Congress and the American people is limited when those investigations are still open, which I hope makes sense.  We need to protect people's privacy.… We just cannot do our work well or fairly if we start talking about it while we're doing it.

When questioned by a member of Congress as to whether the FBI was investigating Flynn's conduct, Comey acknowledged the public's "intense interest" in the FBI's work but noted "we can't do it well or fairly to the people we investigate if we talk about it.  So I can't comment."

At another point in the hearing, when Comey was asked by another member of Congress whether FBI investigations sometimes conclude without a finding of wrongdoing, Comey replied, "[t]hat's one of the reasons we don't talk about it, so we don't smear people who don't end up charged with anything."[68]

---

[68] HPSCI invited Former Deputy Attorney General Sally Yates to testify on March 28, 2017, at an open hearing into the Russian active measures campaign targeting the 2016 presidential election. In advance of her scheduled appearance, counsel for Yates contacted the Department regarding the congressional hearing and her ability to testify about her communications, while she was Deputy Attorney General, with the Office of Counsel to the President regarding Flynn.  The Department advised Yates's counsel that Yates should maintain the confidences of Department internal communications and decisions.  The Department further told Yates's counsel that Yates should consult with the White House about the scope of her testimony regarding communications with the White House because such communications implicated privileges owned by the President, and that Yates did not need to obtain separate consent from the Department to testify regarding her White House communications.  Subsequently, Yates's counsel informed the Office of Counsel to the President by letter of the HPSCI invitation to Yates to testify, Yates's willingness to testify, and that Yates would not disclose during her testimony any classified information, nor any information that could interfere with any ongoing criminal or intelligence investigations.  The letter concluded by stating that if Yates's counsel did not receive a response by the morning prior to the scheduled hearing, he would conclude that the White House was not asserting executive privilege over Yates's communications with the White House regarding Flynn.  Yates's counsel received no response from the White House.  The HPSCI hearing was ultimately cancelled.

On May 8, 2017, Yates testified at the Senate Judiciary Committee's public hearing on Russian Interference in the 2016 United States Election.  Yates was not given any further instruction in advance of the hearing by either the Department or the Office of Counsel to the President.  During her testimony, Yates described non-classified aspects of communications she had with White House Counsel Don McGahn about the risk of Flynn being subject to blackmail by the Russians as a result of his providing false information to Vice President Pence.  In response to questions from a Committee member regarding both the timing of the disclosure to McGahn concerning Flynn and the discussion that Yates had with McGahn about Flynn, Yates made reference to the related fact of an FBI investigation of Flynn.  Yates, however, did not provide during her testimony information about the then-ongoing Flynn investigation, or any internal Department discussions or decisions.  In testimony

### D.    May 9, 2017 Removal of Comey as FBI Director

On Tuesday, May 9, 2017, at 5:03 p.m., President Trump removed Comey as Director of the FBI.  Comey was visiting the FBI's Los Angeles Division when he was removed.  He returned to Washington, D.C., on the FBI aircraft that night, and at approximately 2:00 a.m. on May 10, 2017, Comey's protective detail drove him to his home.  Comey reported to Rybicki that he locked his FBI devices and materials into his SCIF at home around noon on May 10, 2017, and took nothing out of the SCIF.

FBI witnesses told the OIG that, as part of Comey's removal, President Trump directed that Comey not be allowed back into FBI Headquarters.  The FBI complied with that directive and, according to Rybicki, "made sure [the Director's office] was locked down" the evening of May 9, 2017.

Comey told the OIG that, when he was removed as FBI Director, he had four memos—Memo 2, Memo 4, Memo 6, and Memo 7—in his personal safe at home. He stated that he did not notify anyone at the FBI that he had retained these documents.  He told the OIG that he had "had them there for quite a while," and that because he viewed them as personal documents, like his will or his passport, it "never would've occurred to [him]" to give those back to the FBI.  He also stated that he did not seek permission of the FBI to retain these Memos, because he did not consider them to be FBI records.

Comey told the OIG that the day after his removal, or "very shortly thereafter," he retained attorneys Patrick Fitzgerald, David Kelley, and Daniel Richman to provide "advice and counsel in connection with [Comey's] termination" as FBI Director and any post-termination legal issues that might arise.

### E.    FBI Efforts to Secure Information and Devices from Comey's Office and Home

On May 10, 2017, the morning after Comey was removed, a Supervisory Special Agent (SSA) was appointed to secure and inventory Comey's office.  The SSA told the OIG that he confirmed the office had not been accessed by Comey or anyone else after Comey's removal, and thereafter he positioned himself so that "no one [from the inventory team] could leave the office with any items that didn't come past [him]."  The SSA told the OIG that "every item that came out of that office went on an inventory sheet."  At the time that the SSA conducted the inventory, he was not aware that Comey had drafted the Memos.  According to the inventory, no hard copies of any of the Memos were found in Comey's office.

During a portion of the inventory, the FBI Assistant Director for the Office of Integrity and Compliance provided guidance to the inventory team about which items were government property and which items were Comey's personal property.

---

before the same Committee five days earlier, on May 3, 2017, when asked about notification to the White House regarding Flynn, Comey also acknowledged that Flynn had been interviewed by the FBI, in response to questions from a Committee member.  At the time of this testimony, Comey was still FBI Director.  Like Yates, he did not provide during his testimony information about the then-ongoing Flynn investigation, or any internal Department discussions or decisions.

The types of personal items found in Comey's office included photographs, books, coffee mugs, and a hockey puck.

The items designated "Director records/government property" were detailed on 12 pages of inventory sheets, sealed in 10 boxes, and delivered to the FBI's Records Management Division (RMD). Items determined to be personal property were detailed on 24 pages of inventory sheets, sealed in 23 boxes, and placed in a separate secure storage area at FBI Headquarters until they could be returned to Comey. Following removal of these items, the inventory team re-secured Comey's office.

On May 11, 2017, the SSA returned to Comey's office to inventory, remove, and secure the electronic equipment.

On May 12, 2017, the SSA and two other SSAs went to Comey's residence to inventory and retrieve all FBI property from Comey's home SCIF. They were accompanied by Rybicki and the then-FBI Associate Deputy Director, David Bowdich, who went to another area of the house with Comey while the SSAs inventoried and removed the government property, including electronic devices and documents. No hard copy versions of the Memos were found in Comey's home SCIF and Comey did not tell the FBI that he had copies of Memos 2, 4, 6, and 7 in his personal safe.

## F.     FBI Preservation of the Memos

Rybicki told the OIG that, on the morning of Wednesday, May 10, 2017, Page contacted him to request a full set of the Memos. Rybicki said he "asked her if [the request] was coming from McCabe…and she said yes."[69] Rybicki said that he was "surprised" when he learned that Page already had copies of some of the Memos because he "didn't think anybody maintained a copy" other than him, and didn't know how she got them. Rybicki told the OIG that in response to Page's request, he made three sets of copies: one for himself, one for Page to give to McCabe, and one for Baker. He said he distributed the copies, but kept one set of the copies and the originals in the locked drawer in his office desk. Rybicki told the OIG that other than Memo 1, none of these originals or copies had any classification markings on them.

Priestap told the OIG that he received copies of the Memos from Page. Priestap's then-Deputy Assistant Director for the Counterintelligence Division, Peter Strzok, told the OIG that Priestap instructed him to upload the Memos into the FBI's Sentinel case management system, an instruction Strzok said he understood to be relayed from McCabe and Baker. Strzok told the OIG that he participated in "getting [the Memos], reading them, scanning them, and making sure they were serialized into Sentinel—into our case file so that there's a record there." Strzok said he thought he did this "a night or two after" Comey was removed, but told the OIG that the Memos he uploaded were the "raw ones" without classification

---

[69] Page told the OIG that she did not think McCabe had asked her to assemble copies of the Memos; she said she thought she did it on her own because she "knew that it needed to get done."

markings. Strzok also said that the set of Memos he initially uploaded was missing one or more of the Memos, and that he did not have a "complete set" until later.[70] Strzok told the OIG that he helped enter the Memos into the FBI's document management system as part of an electronic communication that was marked "SECRET."

All of the FBI senior leaders interviewed by the OIG stated that the Memos were official government records. For example, McCabe described the set of Memos as a "record of [Comey's] official engagement with the President" that was created by Comey in his role as FBI Director. McCabe told the OIG further that, after Comey's removal, the FBI took steps to ensure that the Memos "were preserved in FBI systems as FBI records." Baker told us that the Memos were "related to official business" and that "they were discussed in the office in connection with [Comey's] official responsibilities." Rybicki told the OIG that, since Comey's removal, Rybicki had treated the Memos as FBI records. Rybicki also said he could not remember Comey ever indicating to him that Comey viewed the Memos as personal papers. Priestap characterized the Memos as documents "produced by the Director in his capacity as Director...they're FBI work product." FBI personnel with paper copies of the Memos told the OIG that they kept them locked in safes in their offices.

### G.    May 11, 2017 Article in The New York Times

On May 11, 2017, The New York Times published an article entitled "In a Private Dinner, Trump Demanded Loyalty. Comey Demurred." The May 11 article described the January 27, 2017 one-on-one dinner between Comey and President Trump in the Green Room of the White House (which Comey had memorialized in Memo 2). The New York Times cited as its source "two people who have heard [Comey's] account of the dinner" and reported that, during dinner, Trump asked Comey for a pledge of loyalty.

The May 11 article stated that, according to the account of the conversation from Comey's associates, Comey told Trump that Comey would give him "honesty" but Trump pressed Comey on whether it would be "honest loyalty." The May 11 article then stated that, according to Comey's associates, Comey stated "You will have that." The May 11 article also reported on other details of the dinner, including that Comey tried to explain his role as FBI Director, and told Trump that the United States was best served by an independent FBI and Department of Justice. The May 11 article also reported that

> Comey described the details of his refusal to pledge loyalty to Mr.
> Trump to several people close to him on the condition that they not
> discuss it publicly while he was F.B.I. Director. But now that Comey
> has been fired, they felt free to discuss it on the condition of
> anonymity.

---

[70] Strzok's recollection matches Rybicki's statement that he did not print out a copy of Memo 5 (the March 1, 2017 unclassified email he received from Comey) and distribute it as part of the set of Memos until after Comey reminded him of the email during a May 15, 2017 telephone call, as described below.

In addition, the May 11 article referred to the January 6, 2017 briefing at Trump Tower, which was memorialized in Memo 1. The article's description of the Trump Tower briefing did not contain any classified information that is referenced in Memo 1.

Richman confirmed to the OIG that he was one of the sources for the May 11 article, although he said he was not the source of the information in the article about the Trump Tower briefing.[71] Richman said he knew about Comey's January 27, 2017 dinner at the White House because Comey had told Richman about it sometime in the winter of 2017 while discussing "job challenges [Comey] was facing...and how hard his job was getting." Richman told the OIG that he learned Comey had been fired when a reporter for The New York Times called Richman's cell phone on the evening of May 9, 2017 to ask "what the hell is going on?" Richman said he and the reporter had "been friends for some time," and the reporter was one of several journalists who frequently called Richman to ask questions about "various news stories in the federal criminal world." Richman said he told the reporter what he remembered about Comey's dinner with President Trump, including "the honest loyalty piece." Richman also said that at that time, he had not seen a copy of Memo 2, and the information Richman provided to the reporter did not involve reading from a Memo.

During his interview with the OIG, Richman was asked to review the last page of Memo 2, which described the President's comments about returning telephone calls from leaders of foreign countries. The copy of Memo 2 shown to Richman by the OIG was redacted so that the names of the countries, which the FBI determined to be classified, as discussed below in Section IV.N, were not identified. Richman told the OIG that he had not disclosed any information to anyone from Memo 2 about the President's statements regarding returning telephone calls from foreign leaders or any specific country names.

We showed Baker, McCabe, and Page the portion of the May 11, 2017 article that says the information came from "two people who have heard [Comey's] account of the dinner" and asked them if they knew who those two people were. They each told us that they did not. Rybicki similarly told the OIG that he did not provide the contents of any Memos to anyone outside the FBI.

When we asked Comey whether he knew who the two sources were for the article, he said that he was "highly confident" Richman was one of them but that "I don't think I know who the other one is." Comey further stated that Richman was not speaking to The New York Times at Comey's direction for the May 11 article.

## H.  President's Tweet on May 12, 2017

On May 12, 2017, President Trump released a tweet stating, "James Comey better hope that there are no 'tapes' of our conversation before he starts leaking to the press!" Comey told the OIG that he was "aware of the tweet...[but] didn't pay

---

[71]  Richman told the OIG that Memo 1 was not one of the Memos that Comey shared with him.

much attention to it" because at that point in time he was "trying to block it all out."

## I.     Copies of the Memos are Provided to the OIG

Shortly after Comey's removal, a set of the seven Memos was provided to the OIG by a Department employee, who claimed whistleblower status.  This individual viewed the Memos as extremely sensitive documents and was concerned that there should be a separate set deposited somewhere for safekeeping.  The OIG handled and stored all seven Memos consistent with the requirements for classified information, even though only Memo 1 had any classification markings at that time.

## J.     Comey Provides Scanned Copies of Memos 2, 4, 6, and 7 to His Attorneys via Email

As described in this section, on May 14, 2017, Comey transmitted copies of Memos 2, 4, and 6, and a partially redacted copy of Memo 7 to Fitzgerald, who was one of Comey's personal attorneys.  Comey told the OIG he thought of these Memos as his "recollection recorded," like a diary or personal notes.  Comey also said he believed "there's nothing classified in here," and so he thought he could share them with his personal attorneys.

Comey told the OIG that, before sharing these Memos with his attorneys, he redacted the second paragraph of Memo 7, which contained a discussion of foreign affairs during which Trump asked Comey to "follow up" on a specific matter.  Comey told the OIG he redacted this paragraph because it was "utterly unrelated to what I was seeking their advice and counsel about."  He "did not consider that paragraph classified," he just thought that "it was irrelevant."  Comey said that he used the personal scanner at his home to make a copy of Memo 7, then used a marker to black out fifteen lines from the second paragraph of the copy of Memo 7.  Comey also placed an index card on which he handwritten  the word "Redacted" over the center portion of the blacked-out paragraph, further obscuring most of the second paragraph of Memo 7.  When Comey was finished redacting, the second paragraph read "He then switched topics...[REDACTED]...then said that I was doing a great job and wished me well.  The call ended."  A copy of the redacted version of Memo 7 Comey created is contained in Appendix B to this report.[72]

Comey then used his personal scanner to create a Portable Document Format (PDF) file containing four of the Comey Memos:  un-redacted copies of Memos 2, 4, and 6, and the redacted copy of Memo 7.[73]  On May 14, 2017, Comey attached the PDF to an email from his personal email account, and sent the email and PDF attachment from his personal laptop to Fitzgerald's personal email

---

[72]  During the June 2017 classification review, the FBI marked fifteen words from this paragraph as classified, all of which had been obscured by Comey's redactions.  Compare the version of Memo 7 in Appendix A of this report with Comey's redacted version of Memo 7 in Appendix B.

[73]  Comey told the OIG that he used his personal shredder to shred the redacted copy of Memo 7 after he had scanned it, instead of returning the redacted copy to his personal safe with the other Memos.

account, with instructions for Fitzgerald to share the email and PDF attachment with Kelley and Richman.

Fitzgerald received the email and PDF attachment from Comey at 2:27 p.m. on May 14, 2017. Fitzgerald forwarded the email and attachments to Kelley on May 17, 2017, at 7:35 a.m., and to Richman on May 17, 2017, at 10:13 a.m. Richman told the OIG that, when he received the email and attachments from Fitzgerald, he accessed the files from his computer, read them, and downloaded a copy into a separate file on his computer. Richman said he did not make any paper copies of the Memos.

Fitzgerald also forwarded the email and attachments from his personal email account on May 17, 2017, at 4:47 p.m. to another email account belonging to Fitzgerald. Fitzgerald then saved the PDF attachment onto his computer, after which he said he placed the incoming email from his personal email account into the "deleted" items folder.

Comey told the OIG that he did not notify anyone at the FBI that he was going to share these Memos with anyone, and did not seek authorization from the FBI prior to emailing these four Memos to Fitzgerald. Comey told the OIG that he deleted his electronic versions of the email and the PDF attachment that he sent, and did not retain a hard copy of either.

### K.    May 15, 2017 Comey's Chief of Staff Informs SSA of Existence of Comey Memos

According to notes maintained by the SSA in charge of inventorying Comey's records, on May 15, 2017, Rybicki notified the SSA that there were additional documents belonging to Comey stored in the reception area near the former Director's office, in desk-drawer safes belonging to Comey's administrative assistant, and in Rybicki's office. These documents were collected into two boxes and, among other things, contained six of the original Memos. The SSA's notes reflect that Rybicki also told the SSA about a seventh document (Memo 5) that Comey had sent to Rybicki on March 1 via the FBI's unclassified email system, and Rybicki provided the SSA with a copy of the email.[74]

The SSA told the OIG that this was the first time he learned about the existence of the Memos. According to the SSA's notes, Rybicki told the SSA that he did not tell anyone about the Memos during the May 10 inventory because he

---

[74] Rybicki told the OIG that he had not kept Memo 5, which was in the form of an unclassified email, with the other Memos and did not remember Memo 5 until he spoke with Comey on the telephone on May 15, 2017. Rybicki said that during the telephone call he "was trying to describe to [Comey] how we were…being very careful about maintaining…records and things like that and then…[the Memos] came up." Rybicki said he could not "recall why or…for what purpose" they were discussing the Memos. Rybicki said that telephone call "sparked my memory that there was one document [Memo 5] that I didn't turn over, or I didn't maintain in the file and therefore didn't sort of turn over…" Rybicki told the OIG that, after his May 15 telephone call with Comey, he located an electronic copy of Memo 5, printed it out and gave copies of it to the SSA and McCabe to keep with the other Memos. Rybicki said that Comey did not refer to the Memos as personal files during the May 15 telephone call, and that Rybicki was not aware that Comey had a partial set of the Memos at his home.

understood that process to only include Comey's office.  The SSA inventoried the two additional boxes of documents, including the Memos, and then transferred these two boxes to RMD's custody.

### L.    Comey Provides Richman Digital Photographs of Memo 4 Via Text Message on May 16, 2017

Comey told the OIG that on Tuesday, May 16, 2017, he "w[o]ke up at 2 o'clock in the morning, like, struck by a lightning bolt."  He said he suddenly realized that if, as the President had said in his May 12, 2017 tweet, there were "tapes," then Comey's version of his one-on-one conversations with Trump could be corroborated.  In particular, Comey told us he thought that the President "would be heard on that tape asking [Comey] to let Flynn go" as Comey had documented in Memo 4.  Comey said he also realized that "Trump will eventually figure out he shouldn't have said that.  And he may well destroy the tapes," so somebody needed to preserve them.  Comey said he was

> lying there, playing this in my mind.  And I thought, you know what, I can actually do something.  That if I put out into the public square that encounter, that will force DOJ, likely to appoint a Special Counsel to go get the tapes.  Or even if they won't do that, it will force them to go get the tapes.

Comey told the OIG he lay awake thinking the tapes could be preserved, "[b]ut only if I spur [the appointment of a Special Counsel] by putting this out."

On the morning of May 16, Comey took digital photographs of both pages of Memo 4 with his personal cell phone.  Comey then sent both photographs, via text message, to Richman.[75]  Comey told the OIG that he transmitted this copy of Memo 4 to Richman on May 16 because Comey "had a specific assignment for him."  Comey told the OIG he knew Richman had a close relationship with a reporter for The New York Times.  According to Comey, he directed Richman "to share the content[s] of this memo, but not the memo itself, with [the reporter]."  Comey also said that, although Richman was his attorney at the time, Comey "didn't intend to assert any kind of privilege about the direction" he gave to Richman.  Comey told the OIG he directed Richman to share the contents of Memo 4 with The New York Times because

> I had a conversation with the President of the United States.  It was unclassified, on February the 14th.  I'm a private citizen.  I can talk about conversations I had with the President of the United States.  I happen to have that conversation enshrined in an accurate way in this memo.  So to ensure that the newspaper gets the most accurate account of my recollection, I'll send the memo to [Richman].  Tell him, use this; don't give them the memo, but use this to communicate the substance of it.

---

[75]  On May 16, 2017, Richman had not yet received copies of the Memos from Fitzgerald. Fitzgerald sent the email containing Memos 2, 4, 6, and a redacted copy of Memo 7 to Richman on May 17, 2017, at 10:13 a.m.

Comey told us he needed to do this because it was something he was "uniquely situated to do, because [he was] now a private citizen." He told us that by speaking out, or enabling someone else to speak out, it would "change the game" and create "extraordinary pressure on the leadership of the Department of Justice, which [Comey did] not trust, to appoint someone who the Country can trust, to go and get those tapes."

When asked whether he considered that his disclosure of this information would significantly affect FBI equities, he told the OIG that he would "frame it differently" as an issue of "incredible importance to the Nation, as a whole." Comey said he took the actions he took because he "was doing...something I [had] to do if I love this country...and I love the Department of Justice, and I love the FBI." Comey told the OIG that notifying the FBI and Department of Justice about his plans before disclosing the contents of Memo 4 was not something he could do "if I care about the Country." Comey said that he did not want to put the leadership of the FBI "in an impossible position" by notifying them ahead of time because if he asked them to approve what he was planning to do, "they'd have to tell the leadership of the Department of Justice that the...former Director is contemplating doing this" and Comey believed it was "better that [he] not engage them."[76] Accordingly, Comey stated that he did not notify anyone at the FBI that he was going to share the contents of the Memo 4 with Richman or the media, and that he did not seek authorization from FBI to provide Memo 4 to Richman.

We asked Comey why he used Richman rather than providing the information directly to the media. Comey told the OIG that, at that time, there "was an army of reporters and cameras at the end of [his] driveway." He said he thought about talking directly to them, but decided that would be "crazy," "like feeding seagulls at the beach" and would "create an expectation...that I will then be their media rep." Comey said he did not want to be interviewed or answer any follow-up questions. He told the OIG that, at the time, he thought the "the smartest thing for [him was] just to get the information out in a way that [he did not] have to answer questions" to avoid "creat[ing] even more of a storm than [was already] going on."

Richman told the OIG that he received a text from Comey containing "[o]ne Memo...whose substance [he]...very quickly thereafter passed on to [the reporter]." Richman said that the Memo he received from Comey did not have "any classification markings or designations connected with it," it "was not on government stationary," and in Richman's view "had all the markings of...a personal memo." Richman also told the OIG that he "knew" the Memo did not contain classified information because he "understood that [Comey] was an original classifying authority... [and] knew that [Comey] would not put [Richman] in a difficult position." Richman received the text on his personal cell phone, and told the OIG that he thought the text originated from Comey's personal cell phone. Richman told the OIG he did not give a copy of the Memo to the reporter; instead,

---

[76] Comey also told the OIG it was his belief that, even if he never created the Memos, as a private citizen he would be entitled to share the unclassified portions of his recollection of his one-on-one conversations with President Trump.

Richman "relayed to [the reporter] the contents of the Memo" in a telephone call. Richman said he conveyed the contents of the Memo to the reporter because Comey asked him to, and Richman

> felt that [he] was helping a client get information out that…was unclassified, unprivileged, that [the client] wanted to get out that was of enormous national importance.  And…[Richman] thought this was precisely the right thing to do.

When asked whether he was acting as Comey's attorney or as Comey's friend by contacting the reporter, Richman told the OIG that he "would have to say it was both" and that while "one could imagine situations where parsing of that sort was necessary, [Richman] never found those occasions arose."

Comey told the OIG that he did not share the photographs of Memo 4 with anyone else, and that after he texted the photographs to Richman, he deleted the text and photographs from his personal cell phone.

### M.    May 16, 2017 Article in The New York Times

On May 16, 2017, The New York Times published an article entitled "Comey Memo Says Trump Asked Him to End Flynn Investigation."  The May 16 article described a meeting in the Oval Office in February 2017 during which, "according to a memo…Comey wrote shortly after the meeting," President Trump asked Director Comey to end the federal investigation into Trump's former National Security Advisor, Michael Flynn.  The May 16 article described the meeting in detail, stating that "Comey had been in the Oval Office that day with other senior national security officials," but that "Trump told those present—including [Vice President] Pence and Attorney General Jeff Sessions—to leave the room."  The May 16 article stated that, once the President and Comey were alone, the President told Comey that Flynn had done nothing wrong, and stated "I hope you can see your way clear to letting this go, to letting Flynn go….  He's a good guy.  I hope you can let this go."  The words attributed to President Trump as direct quotes in the May 16 article are the same words that appear in quotation marks, and are attributed to Trump as direct quotes, in the text of Memo 2.

The sources for the May 16, 2017 article were described as "a memo…Comey wrote shortly after the meeting," and "two people who read the memo."  The May 16 article further stated that "The New York Times has not viewed a copy of the memo, which is unclassified, but one of…Comey's associates read parts of it to a Times reporter."  The May 16 article also reported that two people had confirmed that "Comey created similar memos—including some that are classified—about every phone call and meeting he had with the [P]resident…."

When asked who the two sources were, Comey said he did not know who the source was other than Richman, but told the OIG it "has to be somebody inside the FBI who saw the memos" and that the second individual did not share this information at Comey's request.  We asked Baker, McCabe, Rybicki, and Page whether they knew the identity of the second source.  Each told us that they were not the second source, and did not know who the second source was.

### N.    The FBI's June 2017 Classification Review of the Memos

Following the publication of the May 16, 2017 article in The New York Times, the FBI received numerous congressional requests for copies of the Memos, as well as congressional requests for testimony from the FBI concerning the Memos and the Russia investigation.  The FBI also received numerous requests for the Memos under the Freedom of Information Act (FOIA).

In this same general time frame, several congressional committees, including the Senate Select Committee on Intelligence (SSCI), asked Comey to testify.  Comey told the OIG he agreed to testify before SSCI and notified the FBI that he would be testifying.  The SSCI hearing was scheduled for June 8, 2017.

Because the SSCI hearing would be an open session, the FBI needed to make a clear determination whether there was any classified information in the Memos before Comey testified.  In addition, Comey requested that the FBI allow him to review the full set of his Memos prior to the hearing, so that he could prepare a written statement for submission to SSCI and refresh his recollection before testifying.  Comey told the OIG that his purpose in requesting to review the Memos was "to make sure, as [he] drafted the statement and testified, that [he] didn't reveal any classified information."

The FBI's classification review of the Memos occurred in two stages. First, on June 1, 2017, Baker met with the Unit Chief of the FBI's Counterintelligence Law Unit in the FBI's Office of General Counsel (the Unit Chief), Page, and Strzok to review the Memos and make recommendations as to whether any of the information in the Memos should be marked as classified.  Thereafter, on June 6, 2017, the Unit Chief met with Priestap to brief him on the recommendations, so that Priestap could make the final determination on whether any of the Memos contained classified information.  The Unit Chief told the OIG that the final classification decision was brought to Priestap as the OCA who had jurisdiction over the subject matter of the Memos, including the FBI's ongoing investigation into Russian interference in the 2016 presidential election.  We discuss these stages of the FBI's classification review in detail below.

#### 1.    OGC Review of the Memos

The initial review of the Memos to identify any potentially classified information was performed by Baker, the Unit Chief, Page, and Strzok.  Strzok characterized Baker, the Unit Chief, Page, and himself as "a logical subset to sit and go through" the Memos and review them for classification because these individuals had a lot of "history and experience of working investigations relating to…the disclosure of classified information," including the Chelsea Manning disclosures, the Edward Snowden matter, and the Clinton email investigation.  Baker was one of the designated OCAs for the FBI.  Baker also had substantial past experience working with the National Archives on disclosure of classified documents, and characterized that experience as having "sensitized" him to the State Department's concern that the release of candid assessments of foreign nations and their leaders might "be problematic with respect to our diplomatic relations," which was one of the issues involved in the classification review for the

Memos. The Unit Chief told the OIG that her day-to-day responsibilities in the FBI's General Counsel's office included "often reviewing the Classification Guide and helping the agents figure out what is classified," and said she had some experience assisting FBI OCAs in making formal classification decisions, but stated that she doesn't "do that very often." Page told the OIG that she had been "part of an extraordinary number of declassification reviews, over the course of the last five years post-Snowden."

Baker and the Unit Chief told the OIG that their classification review for the Memos differed from the FBI's normal process, which usually involves sending documents out to the agency whose equities are at issue, for their classification determination. One of the Unit Chief's subordinates, an Assistant General Counsel in the Counterintelligence Law Branch who participated in the classification review for Memo 2, told the OIG that "[g]iven the urgency of how quick they were looking at doing the…classification review" the Memos were not referred for State Department input. Instead, where the equities at issue belonged to the State Department, the FBI personnel involved in the classification review told us that they relied on their experiences in the Clinton email case and their familiarity with what the State Department classified in her emails, and used that to determine whether specific statements by the President about foreign leaders were classified.

On June 1, 2017, Baker, Strzok, the Unit Chief, and Page met to conduct a line-by-line review of the Memos. According to Baker, one of the overall issues these individuals discussed was whether it was appropriate to review Comey's decisions about whether the Memos contained any classified information because Comey was an FBI OCA at the time that he wrote the Memos. Baker told us that the decision to conduct the classification review was based on the fact that

> once [Comey] was gone, then the burden fell back onto other people
> to review this material and classify it or not. And so at that point in
> time, it was up to us to decide, not him…[whether] we think anything
> is classified because we're the ones who are going to hand it out….
> We're now the responsible parties.

Page told the OIG that they all believed Comey had intended to write the Memos in an unclassified way and that his intent was "meaningful" because he authored the documents. Page said "[b]ut our objective was to protect the FBI and not the Director. And so…it was our assessment" as to whether the information was classified. Baker told the OIG he remembered Comey mentioning that he thought he had written the Memos in an unclassified way. Strzok said his belief was that "given the…low level of this material…[Comey] simply didn't think it was classified." Strzok believed Comey "simply thought this was all, kind of, unclassified FOUO type of stuff." The Unit Chief said she similarly thought Comey "had not classified them. And he, himself, is an OCA. So he may not have known it was classified when he shared" the Memos.

Page told the OIG that they approached the Memos like a declassification review, and tried "to be as transparent as possible, while still protecting sources, methods, and other matters which…need to be properly classified." Page added that the group was "probably more conservative than not" but that they tried to be

43

"fair and thoughtful" as they went through the process.  Baker similarly said that they were "trying to make sure that we protect classified information" but "[o]n the other hand, we [did not] want to be accused of over classifying."  Baker added that they wanted to make sure that, whatever they recommended, Priestap would be able to "swear under oath, sign an affidavit, whatever, establishing and defending the classification."  Strzok said that, in reviewing the Memos for classified information, they tried to make sure they were being "rigorous" and "objective and by the book. And you know, neither too strict, nor too lenient...just, absolutely, straight down the line on this."

The Unit Chief told the OIG that, during the June 1, 2017 meeting, the participants had some "back and forth" discussions about what should be classified, and that "there was definitely a debate" over some of the issues.  According to Baker, "[s]ome of those discussions were lengthy" and that the group sometimes "started down one path and then reversed the course later....  So, it took a while to get through them."  Strzok characterized the meeting as involving "a lot of discussion about is this classified, and if so, why, and...where that would fall in the Classification Guidelines."  None of the participants kept notes of the meeting. Once the group reached agreement, Page placed handwritten brackets around the words in each of the Memos that they thought contained classified information.  As a result of their review, Baker, Strzok, the Unit Chief, and Page recommended classifying portions of Memo 2, Memo 3, and Memo 7, which had not been marked classified by Comey.  At the time they conducted this review, none of these individuals knew that Comey had shared copies of Memos 2, 4, 6 and 7 with his attorneys.

The portion of Memo 2 that the group recommended for classification involved a story Trump told Comey about Trump's then-National Security Advisor, Michael Flynn, to illustrate that Trump had concerns about Flynn's judgment.  As recounted by Trump, Flynn failed to immediately tell the President about a telephone call from a leader of a foreign country, and Flynn scheduled a return call six days later, which Trump viewed as an inappropriately long lag time in light of the country involved.  According to Memo 2, in conveying how upset he was with Flynn, Trump made a comparison of three countries, one of which the Memo notes Trump mentioned twice, reflecting Trump's personal views on the relative importance of promptly returning telephone calls from two of the countries, but not the third.  In its unredacted form, Memo 2 specifically identifies the countries in Trump's comparison, and attributes to Trump a direct quote about one of the countries.

Baker told the OIG that even if "it's self-evident that...[in the] geopolitical sense,...[that some] countries are more important than" others, a comment by the President to that effect could be viewed as "disparaging," and thus had the potential to harm the foreign relations of the United States.  Strzok said that while "to the average observer, a lot of people would look at this and say, well, that's not classified," the consensus was that the President's remark would be considered classified by the State Department.  The Unit Chief told the OIG she would "not be shocked" if someone else had a different opinion as to whether this was classified information, but that this was their "best guess in our attempts to protect as much

44

as possible…so we didn't accidentally cause a foreign incident."  Page told the OIG that the group "thought it was appropriate to simply redact just the [names of the] countries" from Memo 2, and that would protect "the President's…ability to speak about other countries and not have that be revealed."  The recommendation to Priestap for Memo 2 was to classify six words from three sentences in that paragraph as "CONFIDENTIAL//NOFORN," because that was the level of classification assigned by the State Department to the same type of information in the Clinton email case.

After the group agreed on the recommendation for Memo 2, the Unit Chief showed a copy of the proposed classifications to the Assistant General Counsel and asked for his opinion.  The Assistant General Counsel had served as one of the FBI's liaisons for resolving classification issues with the State Department during the Clinton email investigation.  The Assistant General Counsel said he agreed with classifying the President's references to the countries in Memo 2 because that was how he believed the State Department would classify these statements.  The Assistant General Counsel told the OIG that the FBI's classification guide "doesn't categorize this type of information in the same way," but that it is the FBI's practice to treat State Department information relating to foreign relations as classified until they can get a definitive ruling from the State Department.  He said that the FBI did not seek the input of the State Department on the classification of the Memos "[g]iven the urgency of how quick they were looking at doing the…classification review."

For Memo 3, Baker, Strzok, the Unit Chief, and Page recommended marking several sections as classified.  In their interviews with the OIG, each of these individuals explained that portions of Memo 3 were considered classified because they provided the name of an individual involved in a defensive briefing, discussed information from ongoing investigations, addressed FISA coverage, or implicated foreign relations.  In total, they recommended designating portions of seven paragraphs of Memo 3 as "SECRET//NOFORN."  As described earlier, Comey considered Memo 3 to be classified when he drafted it, but did not apply any classification markings to it.

With respect to Memo 7, Baker, Strzok, the Unit Chief, and Page evaluated the second paragraph of this two-paragraph memorandum, which contains the President's assessment of the leader of a foreign country and describes a foreign event that Comey was asked to "follow up" on by Trump.  Baker told the OIG that, in discussing Memo 7, the group spent a lot of time discussing whether disclosure of the information "could harm to the United States, the National Security…the United States or the foreign relations of the United States, in a way that [Priestap] could defend."  Baker told the OIG that, similar to Memo 2, the President's statements as recorded in Memo 7 had the potential to harm "the diplomatic relations of the United States; the foreign relations of the United States, by disclosing the  President's mental view of a foreign leader."  Baker said that "instead of taking out all of the words that the President said" they "tried to be circumspect with respect to what [they] were taking out and be sort of efficient and elegant with respect to [any] redactions."  Strzok, the Unit Chief, and Page likewise told the OIG that portions of Memo 7 were classified to protect the

45

President's assessment of a foreign leader, and prevent any impact on foreign relations. Baker, Strzok, the Unit Chief, and Page ultimately recommended redacting 15 words identifying specific countries or leaders from Memo 7. This recommendation was based on their familiarity with the information the State Department classified in the Clinton email case, and their belief that a "discussion about a foreign leader by the President would be classified at the 'CONFIDENTIAL' level" by the State Department.

### 2. OCA Classification of the Memos

On June 6, 2017, the Unit Chief met with Priestap to review the bracketed portions of the Memos and have Priestap determine appropriate classification levels for the information. Priestap told the OIG that he "wanted to have the classification review done...before [former] Director Comey testified, so that we'd know...what's classified on there and what's not."

Priestap told the OIG that the classification process was "done very carefully." He said that his role in the process was to determine whether the Memos contained classified information or not, but that by the time he made his determination, "every line would have been carefully reviewed to highlight for me...[any] potential concerns." In particular, Priestap said that he had often reviewed documents for classification with the Unit Chief, and that their process was to

> go through documents, and she'll point out where she might think it's classified. And I'll want to know the reasoning, so on and so forth. And then I can make a final determination. But I can get her, or other experts' input, before making that final determination.

Priestap told the OIG that in this case, he followed that "usual practice."

The Unit Chief told the OIG that Priestap "may have had a few questions, but he did not...question the decisions" about classification designations recommended to him. At Priestap's direction, the Unit Chief hand wrote in the classification levels next to the brackets in the text and appended the following hand-written classification block to Memo 1, Memo 2, Memo 3, and Memo 7:

| | |
|---|---|
| Classified by: | ADCD |
| Derived From: | FBI NSICG dated 20130301 |
| Declassify On: | 20421231[77] |

---

[77] The Unit Chief told the OIG that she later realized she used the incorrect declassification date on the Memos as the date should have been computed from the date of their review, resulting in a declassification date of "20420605."

On April 19, 2018, the National Security Council (NSC) redacted the Memos for release to Congress by marking out all of the words the FBI determined to be classified, and redacting five additional words from Memo 2 and fifteen additional words from Memo 7. The NSC labelled the redacted Memos "DECLASSIFIED IN PART," and cited Executive Order 13526 §§ 1.4(c) and 1.4(d) as the justification for the redactions. *See* Appendix A of this report.

According to the Unit Chief and Page, Strzok added type-written banner markings to the top and bottom of all seven Memos.

### O. Comey's Preparation for and Testimony to the Senate Select Committee on Intelligence

As described earlier, Comey agreed to testify before SSCI on June 8, 2017. On the day prior to that hearing, the FBI provided Comey with a set of seven Memos for him to review at home in preparation for the hearing, and Comey returned to the FBI the signed originals of Memos 2, 4, 6, and 7 that he had kept in his personal safe at his home.  We describe below the details of these events, as well as Comey's responses to questions from Senators about his sharing of the Memos with others.

#### 1. Comey's June 7, 2017 Review of the Memos with the FBI's Classification Markings

On June 7, 2017, the FBI provided a set of seven Memos with banner and classification markings to Comey to review at his home, so that he could prepare for his congressional testimony.  At that time, Comey still held a security clearance to review classified material.  The SSA who hand-carried the Memos to Comey said that Comey reviewed the set of seven Memos on the back porch at his house for approximately 20-30 minutes, but did not take notes.

Comey pointed out to the SSA that the copy of Memo 6 provided by the FBI was incorrectly marked "SECRET" on the second page, when it should have been marked unclassified.  The SSA did not recall Comey indicating that any of the other markings were inaccurate.

Comey told the OIG that this was the first time that he became aware that the Memos had undergone a classification review, and that when he reviewed the Memos that had been marked for classification, he remembered "being struck by the terms they had decided were 'CONFIDENTIAL.'"  Comey told us that his reaction to the classification markings he was shown was "some seemed reasonable.  Some seemed…overly conservative, in [his] judgment."  In particular, Comey took issue with the classification markings placed on Memo 2 because they "made no sense to [him] at all" because he "did not see how release of that [information] damages the security of the United States."  Comey told the OIG he did not understand the President to be insulting one of the countries named in Memo 2, but instead "to be saying it's simply a smaller country."  He told us that his reaction was "are you guys kidding me?" but that he did not engage with the agents who brought the Memos to him for review because those agents had no role in the classification determinations.[78]

---

[78] As described above, in *Cable News Network*, 384 F. Supp. 3d at 25-26, plaintiff sought public release of fully unredacted versions of the Memos through a Freedom of Information Act (FOIA) lawsuit.  In its recent decision, the Court addressed, among other things, the FBI's assertion of FOIA exemption 1, which protects from disclosure properly classified material in the interest of national defense or foreign policy.  The Court upheld the FBI's classification of one of the words

Comey also told the OIG that the fact that he was an OCA at the time he wrote the Memos was not necessarily determinative of whether the Memos were classified.  He said an OCA's role is to make an initial "judgment" but that "doesn't mean someone with equal good faith, and equal experience, or maybe different optics from experience, might not make a… [different] judgment."  According to Comey, after-the-fact classification reviews "happen[] all the time."  Comey said that he does not "begrudge" the classification review for the Memos, because "it's a legitimate part of the process for someone to go through."  Comey compared being an OCA to being an umpire, and said that as an OCA he had "to make the best judgment [he could] in the moment," but that it is "totally legitimate for people to dispute the call after that" or say "he blew that one; that was wrong."  Comey told the OIG that "it's the agency who owns the information" that gets to make the final judgment, and that he has "no standing to make decisions about that sort of thing" anymore.  Comey said he understood that the obligation to protect the classified information in the Memos existed even though he viewed the Memos as personal recollections.

## 2.     Comey Returns his Copies of the Memos to the FBI

Also on June 7, 2017, Comey provided the SSA who came to his home with Comey's signed originals of Memos 2, 4, 6, and 7, which were the only Memos that Comey said he had retained at his residence.  The SSA said he had been advised ahead of time that Comey had Memos to give to him.  The SSA said he took the four Memos from Comey and provided Comey with a property receipt.  The SSA told the OIG he executed a personal property receipt for the Memos because "anytime [he] collect[s] something from somebody, [he does] a property receipt…. Just to document the fact that [he] got it from that person."

The SSA told the OIG that Comey did not indicate that he had shared these Memos with anyone outside of the FBI, or that there might be an unauthorized disclosure of classified information.  The SSA also said that Comey did not indicate that he considered the Memos to be his personal property.

When asked whether the FBI's classification markings raised any concerns for Comey about his storage and transmission of the Memos, Comey stated:

> Sure.  Yeah.  Two things ran through my mind.  Immediately it's like, could I be wrong.  Which is something I'm always trying to ask myself; could my judgment have been wrong.  And if they're classified, what are the implications for that, because I stored and transmitted.  Sure.

Comey told the OIG that he understood that the FBI would likely conduct an investigation concerning the unauthorized disclosure of classified information, and he said he thought "that's totally reasonable."  However, Comey told the OIG that he voluntarily gave his signed originals of Memos 2, 4, 6, and 7 to the SSA at his

---

redacted in Memo 2 (the name of a country) but ruled that the FBI had not carried its burden to support the redaction of the remaining words.  *Id.* at 32-38.

house that day, not because he had concerns that they contained classified information, but "because Special Counsel [Robert Mueller] asked for them."

When asked if he told the agents that he had shared the Memos with his attorneys, Comey told the OIG he had no recollection of telling the agents at his home or anyone else in the FBI that he had shared Memos 2, 4, 6, and 7 with Fitzgerald, Kelley, and Richman.  Comey also said that, at some point the FBI learned that he had provided these Memos to his attorneys, but that Comey could not remember how the FBI learned that.  As described below, the FBI first learned that Comey had shared Memo 4 with Richman while watching Comey's public testimony before SSCI on June 8, 2017.  Comey also never informed the FBI that he had shared Memos 2, 4, 6, and 7 with Fitzgerald, Kelley, and Richman; rather, the FBI first learned this information from Richman.

### 3.    Comey's June 8, 2017 Testimony

On June 8, 2017, Comey testified before SSCI.  Comey answered a number of questions from Senators concerning the creation, handling, and sharing of the Memos, and provided the following information in response to questions from Senator Collins and Senator Blunt:

COLLINS:  And finally, did you show copies of your memos to anyone outside the Department of Justice?

COMEY:  Yes.

COLLINS:  And to whom did you show copies?

COMEY:  I asked—the president tweeted on Friday [May 12], after I got fired, that I better hope there's not tapes. I woke up in the middle of the night on Monday night, because it didn't dawn on me originally that there might be corroboration for our conversation.  There might be a tape.

And my judgment was, I needed to get that out into the public square. And so I asked a friend of mine to share the content of the memo with a reporter. Didn't do it myself, for a variety of reasons. But I asked him to, because I thought that might prompt the appointment of a special counsel. And so I asked a friend of mine to do it.

COLLINS:  And was that Mr. Wittes?

COMEY:  No, no.

COLLINS:  Who was that?

COMEY:  A good friend of mine who's a professor at Columbia Law School.

COLLINS:  Thank you.

....

49

> BLUNT:  But you said something earlier I don't want to fail to follow up on. You said, after you were dismissed, you gave information to a friend so that friend could get that information into the public media.
>
> COMEY:  Correct.
>
> BLUNT:  What kind of information was that?…[W]hat kind of information did you give to a friend?
>
> COMEY:  That the—the—the Flynn conversation, that the president asked me to let the—Flynn—I'm forgetting my exact own words, but the—the conversation in the Oval Office.

Comey told the OIG that he did not tell Senator Collins about sharing four of the Memos with his three attorneys because Comey was "trying to answer the question that [he] was asked, and not reveal confidential communications with my lawyers." Comey said that, in his view, there is a distinction between "[c]ommunications to [his] lawyers for the purpose of obtaining legal advice; and communications to another person, who happens to be one of [his] lawyers, to accomplish a task for [him]" which was "acting at [his] direction to release something to the media." Comey told the OIG that he referred to Richman as his "friend" rather than as his attorney in the SSCI testimony because Comey "didn't consider what [he] asked [Richman] to do privileged.  And [Comey] didn't intend to assert any kind of privilege about the direction to [Richman]."

Comey also said that the reason he did not clarify that he had shared more than one Memo with more than one person was that "they [SSCI] didn't ask any follow-up questions."  Comey told the OIG that "if they pressed and asked follow-up questions, [he] would have had to say something like, well, other than confidential communications with counsel, or something like that."

## P.    FBI Retrieval of Memos from Comey's Attorneys

All of the FBI witnesses told the OIG that the FBI first learned that Comey had shared at least one of the Memos with someone outside the FBI during Comey's June 8, 2017 congressional testimony.  Strzok told the OIG he was watching Comey's testimony with several people, including Baker and Rybicki, and that when Comey stated he gave a Memo to a friend "everybody [in the room] knew…oh, that's Richman."  Baker told the OIG he remembered "literally running down the hallway to [his] office" with Strzok, finding Richman's telephone number, and getting "Richman on the phone right away."  Baker, who knew Richman, said he introduced Strzok and then left the call to watch the remainder of Comey's SSCI testimony.

Strzok told the OIG that he asked Richman to "please preserve" anything that Comey had given him.  Strzok told the OIG that either during this call or a subsequent one, he told Richman that what he received might contain classified information.  Strzok said that sometime after the initial call with Richman, he learned that David Kelley and Patrick Fitzgerald might also have copies of some of the Memos.  Strzok's handwritten notes of his conversations with Richman establish that by no later than June 9, 2017, Strzok knew that all three of Comey's attorneys had electronic copies of four Memos.

Richman told the OIG that he remembered the initial telephone call with Baker and Strzok, but did not have an "extensive recollection" of what was said. He said the conversation "went along the lines of would you give us the Memo? Yes, I'll be happy to." Richman told the OIG that even though Comey did not reference the other Memos in his congressional testimony, at some point during this call or a follow-up call soon after, Richman "volunteered to the Bureau that if you're collecting the one, you should get the [other] three" Memos Richman had received from Comey. Richman recalled that, at some point during these conversations, he also told the FBI that Fitzgerald and Kelley had copies of the same Memos. Richman told the OIG that there was no indication on the Memos he received "that there was anything classified on them."

Richman said that, after the initial conversation with Strzok, he had multiple conversations with members of the FBI about the "mechanics" and "logistical complexities" of retrieving the Memos from his computer. One of those telephone calls was with Priestap and the Unit Chief on June 12, 2017. The Unit Chief told the OIG that, by that point, the FBI leaders were "probably" thinking of the situation as a "spill" of classified information, "[b]ut because of the sensitivity" of the Memos, they did not involve the FBI's Security Division. The Unit Chief said that she also learned from Richman during that call that Comey had shared four Memos with each of his three attorneys—Richman, Fitzgerald, and Kelley.

Priestap told the OIG that Richman was "courteous," "cooperative," and "willing to give [the FBI] whatever" he had. Priestap also said that, by this time, the classification review of the Memos "had been completed at least...from [his] end," and that he was concerned that "there could be classified information" contained in what Richman received from Comey. FBI witnesses told the OIG that the FBI's plan was "[t]o have agents go retrieve a...mirror copy of the hard drive and then return it to Mr. Richman with the classified information removed."

On June 13, 2017, FBI agents went to Richman's home in New York to remove his desktop computer. On June 22, 2017, FBI agents returned the desktop computer to Richman at his home in New York after taking steps to permanently remove the Memos from it. While at Richman's residence on June 22, 2017, the FBI agents also assisted Richman in deleting the text message with the photographs of Memo 4 from his cell phone.

The FBI also took steps, although not until several months later, to delete the Memos from Fitzgerald's and Kelley's computer accounts. In response to an October 31, 2017 request from the FBI, Fitzgerald voluntarily and promptly provided the FBI with addresses and identifying information for all of the email accounts belonging to Fitzgerald, Richman, and Kelley to which copies of Memos 2, 4, 6, and 7 had been sent. Between November 20, 2017, and January 16, 2018, FBI Agents met with the individuals and IT professionals associated with these

accounts, and confirmed that the emails and copies of the Memos were deleted from the computer systems that had received them.[79]

## V.    OIG Analysis

Consistent with the Inspector General Act and Department regulations, this matter was referred to the OIG in July 2017 by then-Acting FBI Director Andrew G. McCabe following the FBI's determination that Comey may have shared Memos that contained classified information with his personal attorneys.  At the time, the OIG also was aware of Comey's June 8, 2017 congressional testimony that he had authorized a friend (who was also one of his personal attorneys) to provide the contents of one of the Memos to a reporter for The New York Times.  Upon completing our investigation, we provided our factual findings to the Department for a prosecutorial decision regarding Comey's conduct.  *See* 5 U.S.C.A. App. 3 § 4(d).  After reviewing the matter, the Department declined prosecution.

In this analysis section, we address whether Comey's actions violated Department and FBI policies, or the terms of Comey's FBI Employment Agreement. We determined that several of his actions did.  We conclude that the Memos were official FBI records, rather than Comey's personal documents.  Accordingly, after his removal as FBI Director, Comey violated applicable policies and his Employment Agreement by failing to either surrender his copies of Memos 2, 4, 6, and 7 to the FBI or seek authorization to retain them; by releasing official FBI information and records to third parties without authorization; and by failing to immediately alert the FBI about his disclosures to his personal attorneys once he became aware in June 2017 that Memo 2 contained six words (four of which were names of foreign countries mentioned by the President) that the FBI had determined were classified at the "CONFIDENTIAL" level.

### A.    The Memos were FBI Records

Comey told the OIG that he considered Memos 2 through 7 to be his personal documents, rather than official FBI records.  He said he viewed these Memos as "a personal aide-mémoire," "like [his] diary" or "like [his] notes," which contained his "recollection[s]" of his conversations with President Trump.  Comey further stated that he kept Memos 2, 4, 6, and 7 in a personal safe at home because he believed the documents were personal records rather than FBI records.

Comey's characterization of the Memos as personal records finds no support in the law and is wholly incompatible with the plain language of the statutes, regulations, and policies defining Federal records, and the terms of Comey's FBI Employment Agreement.  By definition, Federal records include "all recorded information, regardless of form or characteristics, made or received by a Federal

---

[79] The OIG learned, as a result of a letter from the Senate Select Committee on Intelligence dated September 20, 2017, that the FBI had not yet taken the same actions to mitigate Comey's transmittal of the Memos to Kelley and Fitzgerald as it had taken with regard to the transmittal to Richman.  The OIG promptly brought to the FBI's attention the need to do so, resulting in the above-described actions being taken.

agency…in connection with the transaction of public business."[80]  This definition expressly covers any "act of creating and recording information by agency personnel in the course of their official duties, regardless of the method(s) or the medium involved."[81]  Comey's FBI Employment Agreement likewise acknowledged that "[a]ll information acquired by [Comey] in connection with [his] official duties with the FBI…remain[s] the property of the United States of America."

Comey's drafting of the Memos can only be viewed as the "act of creating and recording information by agency personnel in the course of their official duties."[82]  Each of Comey's meetings with President-elect or President Trump took place because of Comey's official position as the Director of the FBI.  Comey told the OIG he did not have any type of a "personal relationship" with Trump.  Comey's Memos documented discussions, meetings, and interactions between the President and the FBI Director that took place in official settings, such as the West Wing and the Oval Office of the White House, or during telephone conversations conducted on Comey's FBI telephone or FBI-issued mobile device.

Further, much of the content of the Memos was directly tied to FBI investigative activities.  For example, Memo 2 concerned whether, at the President's request, the FBI should open an investigation into the "salacious" information "to prove it was a lie."  Memo 4 included a reference to the President's statement that he hoped Comey could "'see [his] way clear…to letting Flynn go'" because the President believed Flynn "hadn't done anything wrong."  Memos 6 and 7 concerned whether Comey, in his role as FBI Director, was taking any action to "lift the cloud" created by the investigation into Russian interference in the 2016 presidential election.  The Memos also contained repeated assurances from Comey (as the FBI Director) to President Trump that Trump had not been named as a subject in an FBI investigation.

Comey's own statements and actions demonstrate the inherently governmental nature of the Memos.  Comey wrote in Memo 2 that he was "attempt[ing] to recount in some detail only those parts [of the January 27, 2017 dinner conversation] that related in some way to [his] work."  Comey told the OIG that at the time he wrote Memo 3 he knew it contained classified information and therefore never took a copy Memo 3 home.[83]  As Comey well knew, classified

---

[80]  44 U.S.C. § 3301(a)(1)(A).

[81]  36 C.F.R. § 1222.10(b)(3).

[82]  36 C.F.R. § 1222.10(b)(3).

[83]  Despite knowledge that Memo 3 contained classified information, Comey did not appropriately mark Memo 3 with classification banners, portion markings, or a classification authority block.  By failing to do so, Comey violated Executive Order 13526 and Intelligence Community, Department, and FBI policies governing marking of classified information.  *See* Exec. Order No. 13526 §§ 1.6 & 2.1; 32 C.F.R. §§ 2001.20 to 2001.26; Information Security Oversight Office, Marking Classified National Security Information at 1-28 (Dec. 2010); IC Markings System Manual at 19; SPOM, Chapter 5 ¶ 5-101.a.; Marking Classified NSI PG, ¶¶ 2.6-2.8, 3 & 4.2.1; Information Security Handbook at 23-29.  These requirements help to ensure that classified information is handled properly and to protect against inadvertent unauthorized disclosures.  However, as described in this report, we found no evidence that

information is never considered personal property; rather, it is the property of the U.S. government.[84]

Even if the Memos contained some amount of personal information, as Comey claimed, this would not change the Memos' status as Federal records. The FBI's Records Management Policy states that if a document contains both official and personal information, it "must be treated as a [Federal] record."[85] In addition, the format of the Memos as emails or informal documents does not alter their status as FBI records. Under FBI policy, so long as the records are created "in the course of…official duties"—as the Memos clearly were in this case—"the method(s) or the medium involved" does not affect their status as official records.[86]

None of the members of Comey's senior leadership team agreed with or defended Comey's view that these Memos were personal in nature. Instead, McCabe, Baker, Priestap, and Rybicki each told the OIG that they considered the Memos to be records of official FBI business between the President and the FBI Director. McCabe described the Memos as a "record of [Comey's] official engagement with the President"; Baker told the OIG that Comey's Memos "were discussed in the office in connection with [Comey's] official responsibilities"; and Priestap characterized the Memos as FBI work product "produced by the Director in his capacity as Director." After Comey was removed, the Memos were uploaded to the FBI's case management system in connection with an ongoing FBI investigation and Rybicki took steps to ensure that the original Memos were inventoried and preserved with the rest of the Director's official records.

For the above reasons, we conclude that the Memos are official FBI records as defined by statute, regulations, Department and FBI policies, and Comey's FBI Employment Agreement. Because they are official FBI records, Comey was required to handle the Memos in compliance with all applicable Department and FBI policies and the terms of his Employment Agreement.

## B.   Comey Violated Department and FBI Policies Pertaining to the Retention, Handling, and Dissemination of FBI Records and Information

Comey's actions with respect to the Memos violated Department and FBI policies concerning the retention, handling, and dissemination of FBI records and information, and violated the requirements of Comey's FBI Employment Agreement. Below, we discuss these violations.

---

Comey shared Memo 3 with anyone who was not authorized to see it, or that he or others inadvertently disclosed it.

[84]  Exec. Order No. 13526, § 1.1(a)(2).

[85]  Records Management PG, ¶ 4.6.

[86]  36 C.F.R. §§ 1222.10(b)(5)-(6); 36 C.F.R. §§ 1222.10(b)(2)-(3).

### 1.     Comey Failed to Return Memos 2, 4, 6, and 7 after Being Removed as FBI Director

Comey violated Department and FBI policies, and the terms of his FBI Employment Agreement, by retaining copies of Memos 2, 4, 6, and 7 after he was removed as Director, regardless of each Memo's classification level.  As a departing FBI employee, Comey was required to relinquish any official documents in his possession and to seek specific authorization from the FBI in order to personally retain any FBI documents.  Comey failed to comply with these requirements.

Under Department of Justice Policy Statement 0801.02, Removal of and Access to Department of Justice Information, the Department "owns the records and information…captured, created, or received during the conduct of official business."[87]  Likewise, the FBI designates all official records and material as "property of the United States" and requires departing employees to "surrender all materials in their possession that contain FBI information…upon separation from the FBI."[88]  This policy is reiterated in Comey's FBI Employment Agreement, which specifically states that he was required to surrender, upon termination of his employment, any materials in his possession "containing FBI information."

A Department employee who wants to retain Department records or information after their employment ends must make a written request, receive approval from the appropriate official, and execute a nondisclosure agreement.[89]  As the FBI Director and Head of a Department Component, Comey was required to apply for and obtain authorization from the Assistant Attorney General for Administration to retain any FBI records after his removal.[90]

Comey violated these Department and FBI policies by failing to surrender his copies of Memos 2, 4, 6, and 7 upon being removed as FBI Director and by failing to seek authorization to retain them.  Comey's explanation for his conduct was that he considered the Memos to be personal records, but for the reasons previously described, this assertion is without any legal basis.  In view of the clarity of relevant provisions of law, policies, and Comey's Employment Agreement, the assertion that the Memos were personal records was not reasonable.  We found it particularly concerning that Comey did not tell anyone from the FBI that he had retained copies of the Memos in his personal safe at home, even when his Chief of Staff, the FBI's Associate Deputy Director, and three SSAs came to Comey's house on May 12, 2017, to inventory and remove all FBI property.

---

[87]  DOJ Policy Statement 0801.02, § I.  The only items that departing employees may remove without Department permission are "[p]ersonal materials or information, in any format, that is not related to the business of the Department"; copies of any unclassified information that has officially been made public; and a copy of the employee's email contacts.  *Id.*  Comey's Memos were not within any of these categories.

[88]  Prepublication Review PG, § 1.1.

[89]  DOJ Policy Statement 0801.02, § II.A.

[90]  DOJ Policy Statement 0801.02, § III.B.

### 2.    Comey Improperly Disclosed FBI Documents and Information

Comey violated FBI policies and the requirements of his FBI Employment Agreement when he sent a copy of Memo 4 to Richman with instructions to provide the contents to a reporter, and when he transmitted copies of Memos 2, 4, 6, and a redacted version of 7 to his three attorneys.  We discuss these violations below.

### a.    Comey's Improper Disclosure of Memo 4's Contents, through Richman, to a Reporter

Comey told the OIG that he made the decision to provide the contents of Memo 4, through Richman, to The New York Times so that the President's request of Comey to "let[] Flynn go" would be in "the public square."  At the time, as Comey knew from his work as FBI Director, the FBI had an ongoing investigation of Flynn that included examining Flynn's contacts with the Russian Ambassador.[91] Comey said he believed disclosing the President's statement would "change the game" by creating "extraordinary pressure on the leadership of the Department of Justice, which [Comey did] not trust," to appoint a Special Counsel, who would preserve any potential tapes of his conversations with the President.  Comey said his view at the time was that "if the world knew there might be tapes of Donald Trump asking me to drop an investigation, there would be tremendous pressure for [the Deputy Attorney General] to hand it to an independent prosecutor."  Comey also said he believed that this was something he was "uniquely situated to do" as a private citizen, but that he chose to do this through an intermediary because he did not want to respond to questions from reporters.

Comey violated FBI policy and the requirements of his FBI Employment Agreement when he chose this path.  By disclosing the contents of Memo 4, through Richman, to The New York Times, Comey made public sensitive investigative information related to an ongoing FBI investigation, information he had properly declined to disclose while still FBI Director during his March 20, 2017 congressional testimony.  Comey was not authorized to disclose the statements he attributed to President Trump in Memo 4, which Comey viewed as evidence of an alleged attempt to obstruct the Flynn investigation and which were relevant to the ongoing Flynn investigation.[92]  Comey clearly considered the contents of Memo 4 highly sensitive—in fact, as he stated in his June 8, 2017 congressional testimony, Comey and other senior leaders of the FBI had decided not to report the President's statements to the Attorney General or Deputy Attorney General, and to keep the President's statements "very closely held," so that the FBI leadership could "figure out what to do with it down the road as our investigation progressed." Comey placed in the public domain evidence relevant to the investigation of Flynn, and what he clearly viewed as evidence of an attempt to obstruct justice by President Trump.  Rather than continuing to safeguard such evidence, Comey unilaterally and without authorization disclosed it to all.  By his own admission,

---

[91]  On December 1, 2017, Flynn pled guilty to making false statements to the FBI about his contacts with the Russian Ambassador.

[92]  Prepublication Review PG, §§ 1.1, 4.1.1, 4.2.1 & 4.3.

Comey disclosed the contents of Memo 4 in an attempt to force the Department to take official investigative actions—to appoint a Special Counsel and preserve any tapes as evidence.

When asked by the OIG whether he considered that disclosure of this information would significantly affect FBI equities, Comey stated that he would "frame it differently." He said he viewed the issue as one of "incredible importance to the Nation, as a whole" and told us he felt that taking action was "something I [had] to do if I love this country…and I love the Department of Justice, and I love the FBI." However, Comey's own, personal conception of what was necessary was not an appropriate basis for ignoring the policies and agreements governing the use of FBI records, especially given the other lawful and appropriate actions he could have taken to achieve his desired end.[93]

Members of Comey's senior leadership team used the adjectives "surprised," "stunned," "shocked," and "disappointment" to describe their reactions to learning that Comey acted on his own to provide the contents of Memo 4, through Richman, to a reporter. The unauthorized disclosure of this information—information that Comey knew only by virtue of his position as FBI Director—violated the terms of his FBI Employment Agreement and the FBI's Prepublication Review Policy.[94]

---

[93] For example, while the FBI Director is not a covered employee under the FBI Whistleblower Protection Act (WPA), 5 U.S.C. § 2303, Comey could have legally disclosed the information that concerned him to the OIG, the Department's Office of Professional Responsibility, the FBI Office of Professional Responsibility, the FBI Inspections Division, and Congress, in addition to the Acting FBI Director (who had been Comey's Deputy Director and with whom Comey had previously shared, through Comey's then-Chief of Staff, the contents of Memo 4). As noted above, a Department employee who was similarly concerned about the contents of the Memos provided copies of them to the OIG. Comey also was free to speak publicly, without disclosing law enforcement information, about his views of the trustworthiness of the Department's leadership, his belief that there needed to be a Special Counsel appointed, and his belief that comments made to him by President Trump, combined with Comey's removal as FBI Director, were an effort to obstruct justice.

[94] As noted earlier, former Deputy Attorney General Yates provided testimony at the Senate Judiciary Committee's May 8, 2017 oversight hearing on Russian Interference in the 2016 United States Election. Yates's counsel had consulted with the Department prior to related testimony that Yates had been scheduled to provide to another congressional committee, which was subsequently cancelled. During her testimony before the Senate Judiciary Committee, in response to questions from a Committee member, Yates made reference to an FBI investigation of Flynn. Yates's reference to the Flynn investigation concerned the timing of the Department's decision to notify the White House about Flynn and ensuing discussion between Yates and McGahn regarding the risk of Flynn being subject to blackmail by the Russians for providing false information to Vice President Pence. Neither Yates during her testimony, nor Comey in his May 3, 2017 testimony while still FBI Director, provided any details about the then-ongoing Flynn investigation, or described any internal Department discussions or decisions. By contrast, as described above, while Memo 4 did not describe internal Department discussions or decisions, Comey's disclosure of Memo 4 provided the public with details relevant to the Flynn investigation.

### b. Comey's Improper Disclosure of Memos 2, 4, 6, and 7 to His Attorneys

Comey told the OIG that he shared copies of Memos 2, 4, 6, and 7 with his attorneys to obtain legal representation in connection with his removal as FBI Director and any post-removal legal issues that might arise. However, Comey was not authorized to provide these Memos to his attorneys without prior approval from or coordination with the FBI.

As courts have made clear, a federal employee seeking legal advice does not have "*carte blanche* authority to disclose any and all confidential government information to the employee's attorney."[95]  Rather, Comey's interest in communicating with his counsel must be balanced against the government's legitimate interest in protecting its information and preventing disclosure of certain types of information, such as national security or Privacy Act-protected information.[96]  To strike this balance, courts have fashioned protective orders and required private attorneys to sign nondisclosure agreements; courts also have placed restrictions on the employee's or former employee's further distribution of government information through an attorney in order to prevent any "*de facto* public disclosure."[97]

The United States Supreme Court has also recognized the validity and enforceability of employment agreements—like the one signed by Comey—which require a public employee to submit to the prepublication review process before making disclosures.[98]  By providing Memos 2, 4, 6, and 7 to his attorneys without seeking FBI approval, Comey took for himself the "*carte blanche* authority" expressly denied by the courts, in clear violation of the FBI's Prepublication Review Policy and the requirements of Comey's FBI Employment Agreement.[99]  As a result, Comey not only disclosed sensitive law enforcement information to his personal counsel but also a small amount of information contained in Memo 2 that the FBI subsequently determined was classified at the "CONFIDENTIAL" level.[100]

---

[95]  *Jacobs* v. *Schiffer*, 204 F.3d 259, 265 (D.C. Cir. 2000) (original emphasis); *see also Martin* v. *Lauer*, 686 F.2d 24, 34 (D.C. Cir. 1982).

[96]  *Martin*, 686 F.2d at 34.

[97]  *Jacobs*, 204 F.3d at 265-66 (original emphasis); *Martin*, 686 F.2d at 34-35; *see also King* v. *United States*, 96 Fed. Cl. 99, 102, 104-05 (Fed. Cl. 2011).

[98]  *See Snepp* v. *United States*, 444 U.S. 507, 511-13 (1980) (finding that by not submitting his book to prepublication review, a former employee "deliberately and surreptitiously violated his obligation to submit all material for prepublication review" pursuant to his employment agreement).

[99]  *Jacobs*, 204 F.3d at 265 (original emphasis); Prepublication Review PG, §§ 1.1, 4.1.1, 4.1.4.

[100]  As described above, in its recent decision in *Cable News Network*, 384 F. Supp. 3d at 36, the Court upheld the FBI's classification of one of the words in Memo 2 (the name of a country) but ruled that the FBI had not carried its burden to support the classification of the remaining words.

**C.    Comey Failed to Immediately Alert the FBI to the Unauthorized Disclosure of Classified Information**

On June 7, 2017, Comey learned of the FBI's classification decision regarding Memo 2 when the FBI allowed him to review copies of all seven Memos, with classification banners and markings, in preparation for his June 8, 2017 congressional testimony.  Once he knew that the FBI had classified portions of Memo 2, Comey failed to immediately notify the FBI that he had previously given Memo 2 to his attorneys.[101]

The FBI's Safeguarding Classified National Security Information Policy Guide clearly states that "[a]ny person who has knowledge that classified information has been or may have been lost, compromised, or disclosed to an unauthorized person must immediately report the circumstances to his or her security office."[102]  Comey violated this requirement by failing to immediately inform the FBI that he provided Memo 2 to his attorneys.

The FBI did not learn that Comey had shared any of the Memos with anyone outside the FBI until Comey's June 8, 2017 congressional testimony.  During his testimony, Comey stated that he provided Memo 4 to a friend to share the contents with a reporter.  Comey did not mention that he provided Memos 2, 4, 6, and 7 to each of his three attorneys.  Based on Comey's testimony, FBI leadership knew that Richman was the friend to whom Comey had disclosed Memo 4 with instructions to provide its contents to The New York Times.  Baker and Strzok immediately called Richman, while Comey was still testifying, to make arrangements to retrieve Memo 4.  It was only through the FBI's conversations with Richman on June 8 or June 9 that the FBI learned of the need to retrieve classified information, contained in Memo 2, as well as other FBI records, Memos 6 and 7, from each of Comey's three attorneys.  We do not believe that Richman's volunteering to the FBI that he and Comey's other counsel had these other Memos, after the FBI initiated contact with Richman in an effort to retrieve Memo 4, fulfilled Comey's obligation to immediately report his disclosure of classified information to unauthorized persons.  By not immediately reporting that he had provided Memo 2 to his attorneys when Comey first learned that the FBI had designated a small portion of Memo 2 as classified at the "CONFIDENTIAL" level, Comey violated FBI policy.

**VI.    Conclusion**

Congress has provided the FBI with substantial powers and authorities to gather evidence as part of the FBI's criminal and counterintelligence mission.  The FBI uses these authorities every day in its many investigations into allegations of drug trafficking, terrorism, fraud, organized crime, public corruption, espionage,

---

[101]    As for the other three Memos that Comey provided to his attorneys, there was no classified information in Memos 4 and 6, and Comey redacted the entire paragraph of Memo 7 that contained classified information before he sent Memo 7 to his attorneys.  *Compare* the version of Memo 7 in Appendix A *with* Comey's redacted version of Memo 7 in Appendix B.

[102]    Safeguarding Classified NSI PG, ¶ 3.7.

and a host of other threats to national security and public safety.  In the process, the FBI lawfully gains access to a significant amount of sensitive information about individuals, many of whom have not been charged, may never be charged, or may not even be a subject of the investigation.  For this reason, the civil liberties of every individual who may fall within the scope of the FBI's investigative authorities depend on the FBI's ability to protect sensitive information from unauthorized disclosure.

As Comey himself explained in his March 20, 2017 testimony before the House Permanent Select Committee on Intelligence, he was unable to provide details about the nature or scope of the FBI's ongoing investigation into Russian interference in the 2016 presidential election because

> the FBI is very careful in how we handle information about our cases and about the people we are investigating….  Our ability to share details with the Congress and the American people is limited when those investigations are still open, which I hope makes sense.  We need to protect people's privacy….  We just cannot do our work well or fairly if we start talking about it while we're doing it.

However, after his removal as FBI Director two months later, Comey provided a copy of Memo 4, which Comey had kept without authorization, to Richman with instructions to share the contents with a reporter for The New York Times.  Memo 4 included information that was related to both the FBI's ongoing investigation of Flynn and, by Comey's own account, information that he believed and alleged constituted evidence of an attempt to obstruct the ongoing Flynn investigation; later that same day, The New York Times published an article about Memo 4 entitled, "Comey Memo Says Trump Asked Him to End Flynn Investigation."

The responsibility to protect sensitive law enforcement information falls in large part to the employees of the FBI who have access to it through their daily duties.  On occasion, some of these employees may disagree with decisions by prosecutors, judges, or higher ranking FBI and Department officials about the actions to take or not take in criminal and counterintelligence matters.  They may even, in some situations, distrust the legitimacy of those supervisory, prosecutorial, or judicial decisions.  But even when these employees believe that their most strongly-held personal convictions might be served by an unauthorized disclosure, the FBI depends on them not to disclose sensitive information.

Former Director Comey failed to live up to this responsibility.  By not safeguarding sensitive information obtained during the course of his FBI employment, and by using it to create public pressure for official action, Comey set a dangerous example for the over 35,000 current FBI employees—and the many thousands more former FBI employees—who similarly have access to or knowledge of non-public information.  Comey said he was compelled to take these actions "if I love this country…and I love the Department of Justice, and I love the FBI."  However, were current or former FBI employees to follow the former Director's example and disclose sensitive information in service of their own strongly held personal convictions, the FBI would be unable to dispatch its law enforcement

duties properly, as Comey himself noted in his March 20, 2017 congressional testimony.  Comey expressed a similar concern to President Trump, according to Memo 4, in discussing leaks of FBI information, telling Trump that the FBI's ability to conduct its work is compromised "if people run around telling the press what we do."  This is no doubt part of the reason why Comey's closest advisors used the words "surprised," "stunned," "shocked," and "disappointment" to describe their reactions to learning what Comey had done.

We have previously faulted Comey for acting unilaterally and inconsistent with Department policy.[103]  Comey's unauthorized disclosure of sensitive law enforcement information about the Flynn investigation merits similar criticism.  In a country built on the rule of law, it is of utmost importance that all FBI employees adhere to Department and FBI policies, particularly when confronted by what appear to be extraordinary circumstances or compelling personal convictions. Comey had several other lawful options available to him to advocate for the appointment of a Special Counsel, which he told us was his goal in making the disclosure.  What was not permitted was the unauthorized disclosure of sensitive investigative information, obtained during the course of FBI employment, in order to achieve a personally desired outcome.

The OIG has provided this report to the FBI and to the Department of Justice Office of Professional Responsibility for action they deem appropriate.

---

[103] *See* U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*, Oversight and Review Division Report 18-04 (June 2018), at pp. 238, 244-45.



U.S. Department of Justice

Office of Legislative Affairs

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

The Honorable Robert W. Goodlatte          The Honorable Trey Gowdy
Chairman                                   Chairman
Committee on the Judiciary                 Committee on Oversight
U.S. Houses of Representatives               and Government Reform
Washington, D.C. 20515                     U.S. House of Representatives
                                           Washington, D.C. 20515

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence          **APR 1 9 2018**
U.S. House of Representatives
Washington, DC 20515

Dear Messrs. Chairmen:

This supplements our earlier response to your letter of April 13, 2018, requesting access to memoranda prepared by former FBI Director James B. Comey concerning conversations with President Trump. We are sending similar letters to chairmen of the Senate Select Committee on Intelligence, the Senate Committee on Judiciary, and the Senate Committee on Homeland Security and Governmental Affairs, who have also requested access to these documents.

As noted in our earlier response, the Department previously allowed certain members to review the memoranda with the understanding that their content would not be further disclosed. In light of the unusual events occurring since the previous limited disclosure, the Department has consulted the relevant parties and concluded that the release of the memoranda to Congress at this time would not adversely impact any ongoing investigation or other confidentiality interests of the Executive Branch. This decision does not alter the Department's traditional obligation to protect from public disclosure witness statements and other documents obtained during an ongoing investigation.

Therefore, pursuant to your request, we are providing the requested memoranda in both redacted and unredacted formats for your convenience. Consistent with your request, we are providing an unclassified version of the documents redacted to remove any classified information. The unclassified version of the documents is enclosed. The unredacted documents are classified, and we will provide those in a separate, secure transmittal to the House Security office tomorrow. Members of your committees will be able to view the classified transmittal in the House Security office.

The Honorable Robert W. Goodlatte
The Honorable Trey Gowdy
The Honorable Devin Nunes
Page Two


     Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.


                      Very Truly Yours,

                      Stephen E. Boyd
                      Assistant Attorney General

Enclosures

cc:    The Honorable Paul Ryan
       Speaker of the House

       The Honorable Nancy Pelosi
       Minority Leader

       The Honorable Jerrold Nadler
       Ranking Member
       Committee on the Judiciary

       The Honorable Elijah E. Cummings
       Ranking Member
       Committee on Oversight and Government Reform

       The Honorable Adam B. Schiff
       Ranking Member
       Permanent Select Committee on Intelligence

SECRET//NOFORN

## RYBICKI, JAMES E. (DO) (FBI)

| | |
|---|---|
| From: | COMEY, JAMES B. (DO) (FBI) |
| Sent: | Saturday, January 07, 2017 1:42 PM |
| To: | MCCABE, ANDREW G. (DO)(FBI); BAKER, JAMES A. (OGC) (FBI); RYBICKI, JAMES E. (DO) (FBI) |
| Cc: | COMEY, JAMES B. (DO) (FBI) |
| Subject: | My notes from private session with PE on 1/6/17 -- SECRET//ORCON/NOFORN |

Classification: SECRET//ORCON/NOFORN

Classified By: Director
Derived From: FBI NSIC dated 20130301
Declassify On: 20271231

What follows are notes I typed in the vehicle immediately upon exiting Trump Tower on 1/6/17.  Although I wrote this less than five minutes after the meeting and have tried to use actual words spoken, including quoting directly in some places, I have not used quotation marks throughout because my purpose was to capture the substance of what was said.  I am not sure of the proper classification here so have chosen SECRET.  Please let me know of it should be higher or lower than that.

Notes begin here:

1.4)(C) During my briefing on the [redacted] material in the main body of the meeting, I mentioned the derog files on
1.4)(C) [redacted]

[redacted] I said we were doing that.

At the conclusion of our session, the COS asked whether there is anything we haven't mentioned that they should know or that might come out.  I said there was something that Clapper wanted me to speak to the PE about alone or in a very small group.  COS asked whether the group of COS, VPL, and PL was okay or whether I wanted to be alone.  I told him it was up to the PL, who quickly said that he and I would meet alone.

After others left the room, we sat at the table.  He began by telling me that I had had one heck of a year but that I had conducted myself honorably and had a great reputation.  He said I was repeatedly put in impossible positions.  He said you saved her and then they hated you for what you did later, but what choice did you have?  He said he thought very highly of me and looked forward to working with me, saying he hoped I planned to stay on.  I assured him I intended to stay.  He said good.

I then executed the session exactly as I had planned.  I told him that I wanted to meet with him to tell him more about
1.4)(C) what is in the reports written by [redacted] although I didn't use that name)  I said that the written reports
1.4)(C) themselves were [redacted] and the content known at IC senior level and that I didn't want him caught cold by some of the detail.  I then explained that the
1.4)(C) [redacted]

NSC Declassification Review [EO 13526]
DECLASSIFIED IN PART
4/19/2018

SECRET//NOFORN

*Classified by: AB CD
Derived from: FBI NSIG,
dated: 20130301
Declassify on: 20421231*

SECRET//NOFORN

I said, the Russians allegedly had tapes involving him and prostitutes at the Presidential Suite at the Ritz Carlton in Moscow from about 2013. He interjected, "there were no prostitutes; there were never prostitutes." He then said something about him being the kind of guy who didn't need to "go there" and laughed (which I understood to be communicating that he didn't need to pay for sex). He said "2013" to himself, as if trying to remember that period of time, but didn't add anything. He said he always assumed that hotel rooms he stayed in when he travels are wired in some way. I replied that I do as well.

I said I wasn't saying this was true, only that I wanted him to know both that it had been reported and that the reports were in many hands. I said media like CNN had them and were looking for a news hook. I said it was important that we **1.4)(c)** not give them the excuse to write that the FBI has the material or [redacted] and that we were keeping it very close-hold. He said he couldn't believe they hadn't gone with it. I said it was inflammatory stuff that they would get killed for reporting straight up from the source reports.

He then started talking about all the women who had falsely accused him of grabbing or touching them (with particular mention of a "stripper" who said he grabbed her) and gave me the sense that he was defending himself to me. I responded that we were not investigating him and the stuff might be totally made up but it was being said out of Russia and our job was to protect the President from efforts to coerce him. I said we try to understand what the Russians are doing and what they might do. I added that I also wanted him to know this in case it came out in the media.

He said he was grateful for the conversation, said more nice things about me and how he looks forward to working with me and we departed the room.

JBC

Classification: SECRET//ORCON/NOFORN

2

SECRET//NOFORN

65

CONFIDENTIAL//NOFORN

1/28/17    ①

I had dinner with President Trump in the Green Room at the White House last night at 6:30 pm. We sat facing each other at a small oval table set for two and placed in the center of the room. There were two servers (who I had the chance to chat with a bit because I arrived about 10 minutes early; they were both retired Navy submariners and we had a fun discussion about height clearance in submarines). The servers were only in the room when they delivered food or retrieved plates.

The conversation, which was pleasant at all times, was chaotic, with topics touched, left, then returned to later, making it very difficult to recount in a linear fashion. Normally I can recall the pieces of a conversation and the order of discussion with high confidence. Here, given the nature of it, there is a distinct possibility that, while I have the substance right, the order was slightly different. It really was conversation-as-jigsaw-puzzle in a way, with pieces picked up, then discarded, then returned to.

The President spoke an overwhelming majority of the time. He never asked me an open-ended question or left it to me to choose a topic of conversation. There were almost no periods of silence during the 1 hour and 20 minutes, except once or twice when the President paused as the servers entered. I felt comfortable throughout, although never relaxed, given the focus conversation required.

At various times, he talked about the inauguration and crowd size, the campaign and his effective use of free media ("earned media"), the extraordinary luxury of the White House (which he favorably compared to Mar-a-lago), his many activities during the day and week, his young son's height, the viciousness of the campaign (where I interjected about Adams and Jefferson; he said he had been given a book about it, which was upstairs), how he had not been mocking a handicapped reporter, had not assaulted any of the women who claimed he did (reviewing in detail several of the allegations), and many other things. I will attempt to recount in some detail only those parts that related in some way to my work.

He touched on my future at various points. The first time he asked "so what do you want to do," explaining that lots of people wanted my job ("about 20 people"), that he thought very highly of me and had heard great things, that the people of the FBI really like me, but he would understand if I wanted to walk away given all I had been through, although he thought that would be bad for me personally because it would look like I had done something wrong, that he of course can make a change at FBI if he wants, but he wants to know what I think. There was no acknowledgement by him (or me) that we had already talked about this twice.

I responded by saying that he could fire me any time he wished, but that I wanted to stay and do a job I love and think I am doing well. I explained that I never expected to be back in government but had found this job hugely rewarding and wanted to serve out my term. I added that I was "reliable" in one way but not in the way political people sometimes use the term. I explained that he could count on me to always tell him the truth. I said I don't do sneaky things, I don't leak, I don't do

NSC Declassification Review [EO 13526]
DECLASSIFIED IN PART
4/19/2018

CONFIDENTIAL//NOFORN

*Classified by: AD CD
Derived from: FBI NSICG
dated 20130301
Declassify on: 20421231*

66

CONFIDENTIAL//NOFORN



weasel moves. But I was not on anybody's side politically and could not be counted on in that traditional political sense, which I said I thought was in the president's best interest. He asked whether the FBI leaks and I answered that of course in an organization of 36,000 we were going to have some of that, but I said I think the FBI leaks far less than people often say. I predicted he, like all Presidents, would discover the entire government leaks like crazy and explained that it often comes from the first or second hop out from those actually working on the sensitive thing.

He replied that he needed loyalty and expected loyalty. I did not reply, or even nod or change my facial expression, which he noted because we came back to it later.

The conversation then swerved into a long discussion of the email investigation (which we returned to at least once more). This was where I spoke the most and laid out for him my thinking (with frequent interruption) in a manner similar to my discussions with Senators Feinstein and Grassley during our one-on-ones. The one detail I added was about the AG directing me not to use the word "investigation."

He knew the sequence of events extremely well, breaking them down in his lexicon into Comey One, Comey Two, and Comey Three developments and he walked through how he saw each played out during the campaign, in great detail. He asked whether it was true "there was a revolt" after Comey One. I said that was nonsense and I had worked hard to see if folks had concerns. I added that I surely didn't need to tell him that the media sometimes gets stuff wrong. I explained that the investigators all agreed there was no case; he said he disagreed and thought there was a case. He asked me at several points how I had held up under all the abuse. I explained the freedom that comes from doing the right thing in the right way, surrounded by people who are helping make the decisions in the same way.

At this point he asked me (and asked again later) whether "your guy McCabe" has a problem with me, explaining that "I was pretty rough on him and his wife during the campaign." I explained that Andy was a true professional and had no problem at all. I then explained what FBI people were like, that whatever there personal views, they strip them when they step into their bureau roles and actually hold "political people" in slight contempt, without regard to party.

At about this point, he asked me to compare AG Holder and AG Lynch. I said I thought AG Holder was smarter and more sophisticated and smoother than AG Lynch, who I added is a good person. He said Holder and President Obama were quite close. I replied that they were and it illustrated, in my view, a mistake Presidents make over and over again: Because they reason that problems for a President often come from Justice, they try to bring Justice close, which paradoxically makes things worse because an independent DOJ and FBI are better for a President and the country. I listed off John Mitchell, Ed Meese, an Al Gonzales as examples of this mistake and he added Bobby Kennedy.

CONFIDENTIAL//NOFORN

CONFIDENTIAL//NOFORN

③

At about this point, he turned to what he called the "golden showers thing" and recounted much of what he had said previously on that topic. He repeated that it was a complete fabrication and "fake news." I explained again why I had thought it important that he know about it. I also explained that one of the reasons we told him was that the media, CNN in particular, was telling us they were about to run with it. He said it bothered him if his wife thought there was even a one percent chance it was true in any respect. He said he had spoken to people who had been on the Miss Universe trip with him and they had reminded him that he didn't stay over night in Russia for that. He said he arrived in the morning, did events, then showered and dressed for the pageant at the hotel (he didn't say the hotel name) and left for the pageant. Afterwards, he returned only to get his things because they departed for New York by plane that same night. He said he thought maybe he should ask me to investigate the whole thing to prove it was a lie. I did not ask any questions. I replied that it was up to him, but I wouldn't want to create a narrative that we were investigating him, because we are not and I worried such a thing would be misconstrued. I also said that it is very difficult to disprove a lie. He said "maybe you're right," but several times asked me to think about it and said he would also think about it.

We returned to the topic of my job and in response to his question I explained how I had ended up with the position and that I had been pleasantly surprised that President Obama thought of the role the way I did: He wanted competence and independence and didn't want the FBI involved in policy. He wanted to be able to sleep at night knowing the FBI was well run.

The President then spoke again about being glad I wanted to stay. He said Mattis said great things about me, as did Sessions. He explained he had asked a lot of people about me and heard great things. He then returned to loyalty, saying "I need loyalty." I replied that he would always get honesty from me. He paused and said that's what he wants, "honest loyalty." I replied "you will get that from me." (It is possible we understood that phrase differently, but I chose to understand it as consistent with what I had said throughout the conversation: I will serve the President with loyalty to the office, the country, and the truth. I decided it would not be productive to push the subject further.)

At about this point he asked again about "your guy McCabe" and whether he was "going to be okay." I again affirmed Andy's ability and professionalism and said the President would come to see and benefit from both.

He then asked who I though I should "deal with" and he suggested Reince Priebus. I explained that in the prior administration my WH contacts were with the COS, or the people in Mike Flynn's job and Tom Bossert's job. He said "Reince doesn't know we are having dinner," but he will tell him and that I should deal with Reince. He then went on to explain that he has serious reservations about Mike Flynn's judgment and illustrated with a story from that day in which the President apparently discovered during his toast to Teresa May that ▓▓▓▓▓▓▓ had called four days

(1.4)(d)

CONFIDENTIAL//NOFORN

(4)

1.4)(d)

1.4)(d)
1.4)(d)
1.4)(d) //NP

ago. Apparently, as the President was toasting PM May, he was explaining that she had been the first to call him after his inauguration and Flynn interrupted to say that ████ had called (first, apparently). It was then that the President learned of ████ call and he confronted Flynn about it (not clear whether that was in the moment or after the lunch with PM May). Flynn said the return call was scheduled for Saturday, which prompted a heated reply from the President that six days was not an appropriate period of time to return a call from the ████ of a country like ████ ("This isn't ████ we are talking about."). He said that if he called ████ and didn't get a return call for six days he would be very upset. In telling the story, the President pointed his fingers at his head and said "the guy has serious judgment issues." I did not comment at any point during this topic and there was no mention or acknowledgment of any FBI interest in or contact with General Flynn.

As we got up, he said we should have my family back for dinner. When I didn't reply, he added, "or a tour, whatever you think is appropriate." As we stepped from the Green Room, he said "Reince knows were are having dinner" (the opposite of what he said earlier) "deal with him; I will tell him." He then walked me into the East Room. I said I had been there before when President Obama held a big dinner for senior staff and appointees around Christmas. We then shook hands and parted.

JBC

*JBC* 1/28/17

CONFIDENTIAL//NOFORN

69

SECRET//NOFORN

I went to the White House today for a 4 pm "meet and greet" with COS Reince Priebus. As I walked in from West Exec, I saw and briefly chatted with Bill Priestap and Jen Boone, who were there to do a defensive briefing █████████████

(1.4)(c)

As I waited in the West Wing lobby, Mike Flynn stopped by and sat down. We chatted for about five minutes about his new job, the challenges in building a staff, and working with folks who had never been in government before, how he maintains fitness, etc. There was no mention by either of us of ████████████████

(1.4)(c)

COS Priebus's assistant came and got me and took me to his office. He greeted me and we sat with his desk between us.   He explained that this was a chance to get acquainted, and he guided the conversation in a variety of directions.

Early in our conversation he brought up the immigration order and asked if I was a lawyer. He asked if I agreed that the order appear facially valid. I said I did, as I believed OLC had; the President has broad authority in the area. I added that because immigration was not an FBI issue, I had not followed the court discussion carefully and did not know what considerations there might be beyond the face of the order.

(1.4)(c)

We touched on a variety of subjects, including "how the █████████████ ended up in the report." I explained that the analysts from all three agencies agreed it was relevant and that portions of the material were corroborated by other intelligence. They discussed whether ████████████████████████ and decided it made most sense to █████████ I said I agreed with that decision and thought it very important that it be included and briefed to a select audience. He pressed again and said that the material was ███████ I explained that the primary source █████████ much of it was consistent with and corroborative of other intelligence, and that the incoming president needed to know the rest of it was out there.

(1.4)(c)
(1.4)(c)
(1.4)(c)
(1.4)(c)

I explained to him that at our dinner the President had expressed interest in having me investigate the Golden Showers thing. I repeated what I had told the President about not wanting to create a narrative that we were investigating him.

(1.4)(c)

He then asked about leaks of the fact of █████████ and that it was briefed to the incoming president. I said I didn't know where it came from but I suspect it came from folks who have left government. He asked whether it could have come from the FBI. I said it was possible but extremely unlikely in view. We talked about leaks in general and I explained my view that they almost always come from one or two hops out and that every president is plagued by them. He asked if we had ever caught an FBI leaker. I said we had, but it was a rare thing because it almost always turned on our willingness to go after reporter records. He then recalled the Obama administration conflict with James Rosen of Fox. He also mentioned the leak of the read-outs of the Presidents calls with foreign leaders.

*Classified by : AD CD*
*Derived from : FBI NSICG dated ███*
*Declassify on : 20421231*

SECRET//NOFORN

NSC Declassification Review [EO 13526]
DECLASSIFIED IN PART
4/19/2018

SECRET//NOFORN

He then asked me if this was a "private conversation." I replied that it was.
He then said he wanted to ask me a question and I could decide whether it was
appropriate to answer. He then asked, "Do you have a FISA order on Mike Flynn?" I
a paused for a few seconds and then said that I would answer here, but that this
illustrated the kind of question that had to be asked and answered through
established channels. I said the answer ▮▮▮▮▮▮▮I then explained that the normal
channel was from DOJ leadership to the WH counsel about such things. ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮I would normally make sure the AG and DAG were
aware and they would likely inform the WH Counsel and he could decide whether to
inform the COS. I explained that it was important that communications about any
particular case go through that channel to protect us and to protect the WH from
any accusations of improper influence.

He said he understood and then asked me what I would talk to Denis
McDonough about. I said two kinds of things: policy, like Going Dark, and particular
operational issues if we were facing a terror threat or there was an intelligence
operation that was sensitive. He would call me to cut through the clutter and find
out directly what he needed to know. Reince responded that that was helpful and
he hoped I would call him to offer thoughts whenever I thought they would benefit
from them, whether not it related to the FBI. He said they would welcome the
feedback. I said I would.

He said he understood my dinner with the President had gone very well and
that he was interested in my staying on. I repeated what I had told the President,
including that we had agreed not to announce anything. Reince asked me how it
worked and I explained that I had a ten-year term and, although the President could
fire me anytime he liked, I would just continue my term. There was nothing to
announce.

During the conversation, Reince also touched the email investigation, offering
his view that the Clinton team had misplayed my final announcement and should
have pushed it harder as good news. He also said, reflectively, that it wasn't the
Russians' fault that she failed to campaign in Michigan, and it wasn't my fault that
she set up her email the way she did. He then pressed me on why it wasn't
chargeable "gross negligence," and I took him through the facts and the law. At
some point I added that it also wasn't my fault that Huma Abedin forwarded emails
to Anthony Weiner.

Reince then took me to the Oval Office to greet the President on my way out.
The President was seated behind his desk, speaking to Sean Spicer. He introduced
me to Mr. Spicer, who shook my hand and departed. Reince stayed, seated to my
right as I sat in a chair facing the President.

The President then spoke about a variety of topics, touching on the email
investigation (wondering aloud what it would have been like to run against Bernie

SECRET//NOFORN

71

SECRET//NOFORN

Sanders if I had recommended charging Hillary Clinton). He asked (as he had at our dinner) whether my deputy had a problem with him, and recounting how hard he had been on the campaign trail, saying "the number 2 guy at the FBI took a million dollars from the Clintons." I again explained that Andy McCabe was a pro. He asked whether he had ever mentioned to me the campaign attacks. I said "never," and again explained he was a true pro and you would come to value him. I said if he had it to do over again I'm sure he would urge his wife not to run, but that the guy put everything aside and did his job well.

The President talked about the leak of the "read-outs" from his calls with Australia and Mexico, explaining that the leaks couldn't have come from the "other side," and he understood we were helping look into that. Reince interjected that "Kellogg" was looking at it and we were helping. I said I would follow up to find out what was going on.

The President brought up the "Golden Showers thing" and said it really bothered him if his wife had any doubt about it. He then explained, as he did at our dinner, that he hadn't stayed overnight in Russia during the Miss Universe trip. Twice during this part of the conversation, Reince tried to interject a comment about the ▮▮▮▮▮▮▮ and "why it was even in there," but the President ignored him. The President said "the hookers thing" is nonsense but that Putin had told him "we have some of the most beautiful hookers in the world." (He did not say when Putin had told him this and I don't recall ▮▮▮▮▮▮▮▮▮▮▮▮▮)

He then pivoted to the Russians wanting an apology from Bill O'Reilly. I said I had seen that and O'Reilly's reply, which was to "call him in 2023." The President then said that O'Reilly's question about whether he respected Putin had been a hard one. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He said he does respect the leader of a major country and thought that was the best answer. He then said, "You think my answer was good, right?" I said the answer was fine, except the part about killers, because we aren't the kind of killers that Putin is. When I said this, the President paused noticeably. I don't know what to make of it, but he clearly noticed I had directly criticized him.

The conversation then moved to other pleasantries and we wrapped up with a handshake.

JBC 2/8/2017

SECRET//NOFORN

UNCLASSIFIED//FOUO

I attended an Oval office homeland threat briefing for the President today. The
meeting was scheduled for 4 pm but was delayed by a prior meeting, which was
apparently related to the ongoing litigation over the immigration executive order.
The AG and Sec DHS were in the earlier meeting and remained in the Oval when my
meeting began, at about 4:15.

There were about a dozen people in the Oval for the homeland session. I sat facing
the President over the Resolute Desk in a semi-circle of 6 chairs. DD/CIA sat to my
left and D/NCTC to my right. Staff members occupied the couches and chairs behind
me. Tom Bossert perched on the arm of a couch to steer the session. I noticed Jared
Kushner and Stephen Bannon by face. Mike Dempsey and the VP's NSA were also
there, and two or three others (I think including Reince Priebus).

At the completion of the session, the President thanked everyone and said he
wanted to speak with me alone. The AG lingered momentarily by my chair, but the
President thanked him and said he wanted to meet with Jim. He repeated this at
least one more time to usher people out. Everyone left except Jared Kushner, who
stopped by my chair to shake hands and exchange pleasantries, including a few brief
words about the challenges of the email investigation. The President joined in this
brief exchange but then told Mr. Kushner that he wanted to meet with me. That left
the two of us alone.

He began by saying he wanted to "talk about Mike Flynn." He then said that,
although Flynn "hadn't done anything wrong" in his call with the Russians (a point
he made at least two more times in the conversation), he had to let him go because
he misled the Vice President, whom he described as "a good guy." He explained that
he just couldn't have Flynn misleading the Vice President and, in any event, he had
other concerns about Flynn, and had a great guy coming in, so he had to let Flynn go.

He asked me if I had seen Sean Spicer's press briefing today and I replied that I
hadn't. He said he had done a great job of explaining why they did what they did.
He then asked if "you saw my Tweet this morning," and quickly added that "it is
really about the leaks." He then reviewed in some detail the leaks of his calls with
the leaders of Mexico and Australia, including how the calls had gone, how he
assumed that calls he made on "this beautiful phone [touching the gray phone on the
desk]" were confidential, how it couldn't have come from the Mexicans or
Australians, how the transcripts actually include things he doesn't remember saying
("and they say I have one of the world's greatest memories"), and that it makes us
look terrible to have these things leaking. He then referred at length to the leaks
relating to Mike Flynn's call with the Russians, which he stressed was not wrong in
any way ("he made lots of calls"), but that the leaks were terrible.

I tried to interject several times to agree with him about the leaks being terrible, but
was unsuccessful. When he finished, I said I agreed very much that it was terrible
that his calls with foreign leaders leaked. I said they were classified and he needed
to be able to speak to foreign leaders in confidence. [NOTE: because this is an

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

unclassified document. I will be limited in how I describe what I said next]. I then explained why leaks purporting to be about FBI intelligence operations were also terrible and a serious violation of the law. I explained that the FBI gathers intelligence in part to equip the President to make decisions, and if people run around telling the press what we do, that ability will be compromised. I said I was eager to find leakers and would like to nail one to the door as a message. I said something about it being difficult and he replied that we need to go after the reporters, and referred to the fact that 10 or 15 years ago we put them in jail to find out what they know, and it worked. He mentioned Judy Miller by name. I explained that I was a fan of pursuing leaks aggressively but that going after reporters was tricky, for legal reasons and because DOJ tends to approach it conservatively. He replied by telling me to talk to "Sessions" and see what we can do about being more aggressive. I told him I would speak to the Attorney General.

At about this point, Reince Priebus opened the wall door by the clock and the President sent him away, saying he would be another minute or two and he knew people were waiting.

He then returned to the topic of Mike Flynn, saying that Flynn is a good guy, and has been through a lot. He misled the Vice President but he didn't do anything wrong in the call. He said, "I hope you can see your way clear to letting this go, to letting Flynn go. He is a good guy. I hope you can let this go." I replied by saying, "I agree he is a good guy," but said no more.

The President then wrapped up our conversation by returning to the issue of finding leakers. I said something about the value of putting a head on a pike as a message. He replied by saying it may involve putting reporters in jail. "They spend a couple days in jail, make a new friend, and they are ready to talk." I laughed as I walked to the door Reince Priebus had opened.

As I walked out the Vice President was standing just outside the door, waiting. We shook hands. There was a large group with him, including Priebus and the newly sworn-in Secretary of HHS, Tom Price. I walked through the group and away from the Oval office, went downstairs, and exited onto the West Executive Drive. On the way out downstairs, I saw John Kelly gathered with staff. I stopped to greet him and he told me he has previously accepted an invitation to speak to HRT at Quantico about leadership and wondered if it was still okay to do it. I said by all means; that would be great.

JBC
2/14/17

*[signature]* 2/14/17

UNCLASSIFIED//FOUO

74

UNCLASSIFIED//FOUO

## Rybicki, James E. (DO) (FBI)

| | |
|---|---|
| **From:** | James B. Comey |
| **Sent:** | Wednesday, March 01, 2017 12:06 PM |
| **To:** | Rybicki, James E. (DO) (FBI) |
| **Subject:** | Call from POTUS |
| **Categories:** | D Followup |

Just called to check in and see how I'm doing. I said I'm doing great, have a lot going on. I added that Jeff Sessions has hit the ground running with a great speech on violent crime. He talked about Sessions a bit, then last night's speech. Said he heard I'm doing great. Hopes I take good care of myself and come by to say hello when I'm at WH. That's it.

1

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

3/30/17

The President called me on my CMS phone at 8:13 am today (March 30, 2017).
The call lasted 11 minutes (about 10 minutes when he was connected). We were
connected by Royal Crown switchboard.

He began by joking that I was getting more publicity than he. I replied that I hate
it. He then said he was trying to run the country and the cloud of this Russia business
was making that difficult. He said he thinks he would have won the health care vote but
for the cloud. He then went on at great length, explaining that he has nothing to do with
Russia (has a letter from the largest law firm in DC saying he has gotten no income from
Russia), was not involved with hookers in Russia (can you imagine me, hookers? I have
a beautiful wife, and it has been very painful), is bringing a personal lawsuit against
Christopher Steele, always advised people to assume they were being recorded in Russia,
has accounts now from those who travelled with him to Miss Universe pageant that he
didn't do anything, etc.

He asked what he could do to lift the cloud. I explained that we were running it
down as quickly as possible and that there would be great benefit, if we didn't find
anything, to our Good Housekeeping seal of approval, but we had to do our work. He
agreed, but then returned to the problems this was causing him, went on at great length
about how bad he was for Russia because of his commitment to more oil and more nukes
(ours are 40 years old).

He said something about the hearing last week. I responded by telling him I
wasn't there as a volunteer and he asked who was driving that, was it Nunes who wanted
it? I said all the leadership wanted to know what was going on and mentioned that
Grassley had even held up the DAG nominee to demand information. I said we had
briefed the leadership on exactly what we were doing and who we were investigating.

I reminded him that I had told him we weren't investigating him and that I had
told the Congressional leadership the same thing. He said it would be great if that could
get out and several times asked me to find a way to get that out.

He talked about the guy he read about in the Washington Post today (NOTE: I
think he meant Sergei Millian) and said he didn't know him at all. He said that if there
was "some satellite"(NOTE: I took this to mean some associate of his or his campaign)
that did something, it would be good to find that out, but that he hadn't done anything
and hoped I would find a way to get out that we weren't investigating him.

As the conversation ended, he said that he hadn't brought up the McCabe thing
because I had said he was an honorable guy (NOTE: I think he meant that he "hadn't
brought it up" in this conversation, but he could have meant something else). I repeated
that he was. He then said he hadn't brought it up but that McAuliffe is close to the

UNCLASSIFIED//FOUO

76

UNCLASSIFIED//FOUO 

Clintons and had given him money but I had said he was an honorable guy.  I repeated that he (Andy) was an honorable person.

He finished by stressing that he was trying to make deals for the country, the cloud was hurting him (and mentioned going to G-7 with it hanging over him), and he hoped I could find a way to get out that he wasn't being investigated.

I told him I would see what we could do and that we would do the work well and as quickly as we could.

10:05:  I called the Acting Attorney General and relayed the substance of the above and said I was telling him so he could decide what guidance to give me, if any.

JBC

*JBC*  3/30/17

UNCLASSIFIED//FOUO

CONFIDENTIAL//NOFORN

I returned the president's call this morning at 8:26 am EDT. We spoke for about four minutes. He said he was following up to see if I did what he had asked last time -- getting out that he personally is not under investigation. I replied that I had passed the request to the Acting AG and had not heard back from him. He spoke for a bit about why it was so important: He is trying to do work for the country, visit with foreign leaders, and any cloud, even a little cloud gets in the way of that. They keep bringing up the Russia thing as an excuse for losing the election. I explained that Dana Boente was now the acting AG on this after Jeff Sessions recused himself. He said maybe he would have his people reach out to Dana. I said that that was the way to handle it -- he should have the White House Counsel call the Acting Attorney General and make the request. He said that was what he would do. He then added, "Because I have been very loyal to you, very loyal, we had that thing, you know."[2] I did not reply, or ask him what he meant by "that thing."[3] Instead I said again that the way to handle it was to have the White House Counsel call Dana Boente. He said that's what he would do.

He then switched topics and began to talk about Egypt and its leader,  saying Obama didn't like the guy███████████████████ He mentioned the Coptic church bombings and how horrible they were. He said that three Americans had been killed by an Egyptian soldier and the Egyptian leader had raised it with him. I interrupted to say that I thought he meant ███ ███ and an incident in Jordan. He agreed and said███████ had told him he wanted to bring the soldier to justice quickly, but that the FBI was in some way asking them to delay. He said███████████████████████ I replied that I would dig into it but that I did not believe it to be true that the FBI was delaying a Jordanian prosecution. In fact, we were working very closely with the American families and had told them that we wanted the Jordanians to bring justice and if they did not we would try to bring the killer to the United States. He asked me to follow up and make sure that we were working well with the Jordanians and helping them quickly bring the killer to justice. I told him I would. He then said that I was doing a great job and wished me well. The call ended.

*JBC 4/11/17*

---

[1] I don't know the President well enough to give a high-confidence read here from a phone call, but I perceived him to be slightly annoyed by my reply.

[2] His use of these words did not fit with the flow of the call, which at that point had moved away from any request of me, but I have recorded it here as it happened.

[3] I assumed when he said this that he was reaching back in his memory to our conversation about loyalty at our private dinner, which was sufficiently awkward to make it difficult for him to say I had promised to be loyal, which is where I thought he was headed in the comment.

*Classified by: ADCD
Derived from: FBI NSICG
dated 20130301
Declassify on: 20421231*

NSC Declassification Review [EO 13526]
DECLASSIFIED IN PART
4/19/2018

CONFIDENTIAL//NOFORN

78

I returned the president's call this morning at 8:26 am EDT. We spoke for about four minutes. He said he was following up to see if I did what he had asked last time -- getting out that he personally is not under investigation. I replied that I had passed the request to the Acting AG and had not heard back from him. He spoke for a bit about why it was so important: He is trying to do work for the country, visit with foreign leaders, and any cloud, even a little cloud gets in the way of that. They keep bringing up the Russia thing as an excuse for losing the election. I explained that Dana Boente was now the acting AG on this after Jeff Sessions recused himself. He said maybe he would have his people reach out to Dana. I said that that was the way to handle it -- he should have the White House Counsel call the Acting Attorney General and make the request. He said that was what he would do.[1] He then added, "Because I have been very loyal to you, very loyal, we had that thing, you know."[2] I did not reply, or ask him what he meant by "that thing."[3] Instead I said again that the way to handle it was to have the White House Counsel call Dana Boente. He said that's what he would do.

He then switched topics a~~~~~~~~~~~~~~~~~~~~~~~



~~~~~~~~ He then said that I was doing a great job and wished me well. The call ended.

*JBC 4/11/17*

---

[1] I don't know the President well enough to give a high-confidence read here from a phone call, but I perceived him to be slightly annoyed by my reply.

[2] His use of these words did not fit with the flow of the call, which at that point had moved away from any request of me, but I have recorded it here as it happened.

[3] I assumed when he said this that he was reaching back in his memory to our conversation about loyalty at our private dinner, which was sufficiently awkward to make it difficult for him to say I had promised to be loyal, which is where I thought he was headed in the comment.

R - 7



The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.

To report allegations of waste, fraud, abuse, or misconduct regarding DOJ programs, employees, contractors, grants, or contracts please visit or call the **DOJ OIG Hotline** at oig.justice.gov/hotline or (800) 869-4499.

**U.S. DEPARTMENT OF JUSTICE OFFICE OF THE INSPECTOR GENERAL**
950 Pennsylvania Avenue, NW
Washington, DC  20530 0001

| **Website** | **Twitter** | **YouTube** |
| oig.justice.gov | @JusticeOIG | JusticeOIG |

Also at Oversight.gov