```
1                    UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
2                         ALEXANDRIA DIVISION

3    UNITED STATES OF AMERICA,      :   Criminal Action
                                    :   No. 1:25-cr-00272-MSN-WEF
4              v.                   :
                                    :
5    JAMES B. COMEY, JR.            :
                                    :
6              Defendant.           :
                                    :
7    ............................:

8    UNITED STATES OF AMERICA,      :   Criminal Action
                                    :   No. 2:25-cr-00122-JKW-DEM
9              v.                   :
                                    :
10                                  :
     LETITIA A. JAMES,              :
11                                  :
               Defendant.           :   November 13, 2025
12                                  :   10:00 a.m. - 11:13 a.m.
     ............................:
13
                     TRANSCRIPT OF MOTION PROCEEDINGS
14               BEFORE THE HONORABLE CAMERON CURRIE,
                     UNITED STATES DISTRICT JUDGE
15
     APPEARANCES:
16
     For the United States:   OFFICE OF THE ATTORNEY GENERAL
17                            Henry Charles Whitaker, AAG
                              950 Pennsylvania Avenue NW
18                            Room 5134
                              Washington, D.C. 20530
19
                              UNITED STATES ATTORNEY'S OFFICE
20                            Lindsey Halligan, U.S. Attorney
                              Nathaniel Tyler Lemons, AUSA
21                            Gabriel J. Diaz, AUSA
                              2100 Jamieson Avenue
22                            Alexandria, VA 22314

23

24

25                            (Continued)
```

```
 1                           (Continued)

 2    For Defendant Comey:    CARMICHAEL ELLIS & BROCK
                              Jessica Nicole Carmichael, Esquire
 3                            108 North Alfred Street, 1st Floor
                              Alexandria, VA 22314
 4
                              COOLEY LLP (DC)
 5                            Ephraim McDowell, Esquire
                              Pro hac vice
 6                            Elias Kim, Esquire
                              Pro hac vice
 7                            1299 Pennsylvania Avenue NW
                              Suite 700
 8                            Washington, D.C. 20004

 9                            COOLEY LLP (NY-NA)
                              Rebekah Donaleski, Esquire
10                            Pro hac vice
                              55 Hudson Yards
11                            New York, NY 10001

12                            PATRICK FITZGERALD (Solo
                              Practitioner)
13                            Patrick Joseph Fitzgerald, Esquire
                              Pro hac vice
14                            P.O. Box 277
                              New Buffalo, MI 49117
15
                              Michael Richard Dreeben, Esquire
16                            Pro hac vice
                              600 New Jersey Avenue NW
17                            Washington, D.C. 20001

18    For Defendant James:   BAUGHMAN KROUP BOSSE PLLC
                              Andrew C. Bosse, Esquire
19                            500 East Main Street
                              Suite 1400
20                            Norfolk, VA 23510

21                            LOWELL & ASSOCIATES, PLLC
                              Abbe David Lowell, Esquire
22                            Pro hac vice
                              John Patrick Bolen, Esquire
23                            Pro hac vice
                              1250 H Street NW
24                            Suite 250
                              Washington, D.C. 20005
25
                                    (Continued)
```

1                        (Continued)

2    Court Reporter:           Diane Salters, B.S., CSR, RPR, RCR
                               Official Court Reporter
3                              United States District Court
                               401 Courthouse Square
4                              Alexandria, VA 22314
                               Email: Dianesalters.edva@gmail.com
5                              Telephone: (301) 338-8033

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings reported by machine shorthand.  Transcript produced
25   by computer-aided transcription.

1          THE COURTROOM DEPUTY:  *United States v. James Comey*,

2    Case Number 25-cr-272.  Will the parties please note their

3    appearances for the record.

4          MR. WHITAKER:  Henry Whitaker for the United States.

5    With me is Lindsey Halligan, Tyler Lemons, and Gabriel Diaz.

6          MR. MCDOWELL:  Ephraim McDowell for the defendant,

7    James Comey.  With me is Michael Dreeben, Pat Fitzgerald,

8    Jessica Carmichael, Bekah Donaleski, and Elias Kim.

9          THE COURT:  Who is here for Ms. James?

10          MR. LOWELL:  Your Honor, Abbe Lowell on behalf

11    of Attorney General Letitia James.  With me is Andrew Bosse and

12    John Bolen.

13          THE COURT:  Thank you, everyone.

14          I would suggest that the way we proceed is to have

15    Mr. Comey's attorney, who is going to speak first, go ahead and

16    do that, and then we'll have Mr. Lowell.  I assume you're

17    speaking for Ms. James?

18          MR. LOWELL:  Yes, ma'am.

19          THE COURT:  And then we'll hear from Mr. Whitaker,

20    who, I assume, you're speaking for the government?

21          MR. WHITAKER:  Yes, Your Honor.

22          THE COURT:  All right.  And then we will have a brief

23    reply from the defense counsel; all right?

24          MR. MCDOWELL:  Thank you, Judge Currie.

25          Ephraim McDowell on behalf of Defendant James Comey.

Proceedings

1              This prosecution should be dismissed with prejudice

2      because of a fundamental defect.  Ms. Halligan, the sole

3      official who obtained the indictment, had no authority to do

4      so.  That result follows from basic constitutional, statutory,

5      and remedial principles.

6              U.S. attorneys wield tremendous power over individual

7      life and liberty.  That's why since the founding of our nation,

8      U.S. attorneys have been confirmed by the Senate, and that's

9      why since 1863, Congress has primarily tasked courts with

10     appointing interim U.S. attorneys.

11             THE COURT:  Mr. McDowell, are you aware of any

12     evidence of whether there was a declination memo prepared in

13     the Comey matter?

14             MR. MCDOWELL:  We are not aware of that at the moment.

15     I think, you know, that would be something that could

16     potentially come out in discovery, but we don't have that as of

17     yet.  But I don't think that that ultimately makes a difference

18     for purposes of the statutory question at issue here under

19     Section 546, and I think the key there is to look -- just

20     starting with the text of the statute, I think the key

21     provisions within 546 are subsection (c)(2) and subsection (d).

22     Subsection (c)(2) is the provision that limits the service of

23     the interim attorney general -- or, excuse me -- interim

24     U.S. attorney for 120 days, and (d) is the provision that says

25     after an appointment expires under (c)(2), the district court

Proceedings

1    gets the opportunity to make the appointment.

2           Under our interpretation, those two provisions make

3    perfect sense together because the attorney general gets the

4    initial 120-day window to make appointments, at which time that

5    authority then shifts to the district courts.  Under the

6    government's reading, I think they read two parts of that

7    provision kind of out of the statute.  Number 1 is the term

8    "expires" because the government is saying that the

9    attorney general can renew, perpetually, a U.S. attorney

10   appointment every 120 days such that it never actually expires.

11   So that's number 1.

12          Number 2, they are also reading the statute so that

13   the attorney general can effectively preclude district courts

14   from picking interim U.S. attorneys at all, and so I think that

15   nullifies subsection (d), the key piece of subsection (d),

16   which is the district court's appointment authority.

17          THE COURT:  Well, doesn't it also nullify the impact

18   on the Senate?

19          MR. MCDOWELL:  It does, and I think that gets me to

20   our next critical point, which is -- and the government

21   characterizes this as a policy argument, and that's just not

22   correct.  This is a statutory structure argument based on

23   Section 541 of the statute which creates the default rule that

24   U.S. attorney nominees must be confirmed by the Senate.  And

25   when Congress passed 546, it was an exception to that default

*Proceedings*

1    rule, and it has to be read narrowly as such an exception.  And

2    under the government's reading, the default rule of Senate

3    confirmation, which dates back to the founding, would be

4    eviscerated because, again, the attorney general could pick

5    someone and reappoint them every 120 days such that the Senate

6    would never have to confirm the person.  And as the government

7    admits on page 7 of its brief, the person could serve

8    indefinitely without Senate confirmation.  And as Your Honor

9    alluded to, that's an end-run around the core Senate

10   confirmation process.

11           THE COURT:  Indefinitely within the president's

12   four-year term.

13           MR. MCDOWELL:  I suppose so, but I think it could

14   actually go beyond that.  If it were the same president, they

15   could theoretically keep reappointing through eight years.  And

16   I think that just highlights how much the government's position

17   is an evasion of the Appointments Clause and the separation of

18   powers.

19           By contrast, our interpretation of subsection (d),

20   which is the provision, again, that authorizes district courts

21   to make these appointments, that provision facilitates the

22   Senate confirmation process because after the attorney

23   general's 120-day window, it goes to the district court.  And

24   the president is most likely to prefer his own Senate-confirmed

25   nominee over the district court's selection.  And so the way

1    that this has always worked is that once the district court

2    picks, that's going to provide incentive to the president to

3    put someone through the Senate confirmation process, which is

4    clearly what Congress wanted under the statutory framework.

5    And as between one interpretation that facilitates the Senate

6    confirmation process and one that actively thwarts it, I would

7    submit that Your Honor should pick our interpretation because

8    it's, again, more consistent with the statutory structure, the

9    separation of powers, and the Appointments Clause.

10            THE COURT:  Could you address the harmless error

11    doctrine and its impact here on your argument?

12            MR. MCDOWELL:  Yes, Your Honor.  So that gets us to

13    the remedy question.  So our first order of response on that

14    issue is that the harmless error doctrine shouldn't apply at

15    all, and that's based on the Supreme Court's Appointments

16    Clause cases *Lucia v. SEC* and *Ryder v. United States*.  In those

17    cases, the court simply found the act of an improperly

18    appointed official void *ab initio*.  It was without lawful

19    government authority, so the court set it aside, and it didn't

20    apply harmless error doctrine in those cases.  And I think that

21    it highlights the importance of the Appointments Clause to

22    individual liberty and to the separation of powers, and it

23    shows -- it also highlights one thing that the court has said

24    in those cases, which is that Appointments Clause remedies must

25    be designed to incentivize Appointments Clause challenges.  And

*Proceedings*

```
 1   if you could raise harmless error, that would be kind of an out
 2   for the government in a way that would not incentivize these
 3   Appointments Clause challenges in the way that the Supreme
 4   Court has wanted.
 5          But even if Your Honor were to apply the harmless
 6   error framework, I think we satisfy it, and this is not a
 7   harmless error for two main reasons.  The first is that
 8   Ms. Halligan was the sole prosecutor in the grand jury room;
 9   and when the sole prosecutor in the grand jury room lacks
10   lawful authority to prosecute, that's not going to be a
11   harmless error because the Federal Rules of Criminal Procedure
12   allow only authorized government attorneys to present to the
13   grand jury.  And I think it's notable that all of the
14   government's cited harmless error cases are ones in which there
15   were multiple prosecutors involved in either authorizing the
16   indictment or signing the indictment or being involved in the
17   case, and that is not the case here where only one person was
18   in the grand jury room signing the indictment and presenting
19   the indictment to the grand jury.
20          THE COURT:  Have you found any other case where there
21   was one prosecutor involved other than Judge Cannon's case of
22   United States v. Trump?
23          MR. MCDOWELL:  The best other example I can point you
24   to, Your Honor, is a case we cite in our reply brief called
25   United States v. Garcia-Andrade.  This is from the Southern
```

1    District of California.  There, the court said that there was

2    only one prosecutor before the grand jury, and she was not

3    authorized to practice law, and the court found that that was

4    not a harmless error because she was the only prosecutor before

5    the grand jury.  I think this is even more problematic because

6    we don't just have a violation about whether someone is

7    authorized to practice law; we have an Appointments Clause, a

8    constitutional violation, and so I think harmless error

9    certainly should not apply in that scenario.  So that takes us

10   through the key points on remedy.

11        I guess the one other thing I would say is I think,

12   for purposes of kind of the fundamental defect analysis, I

13   think you can look at that through the lens of *Lucia* and *Ryder*,

14   or you could look at it through more of a criminal law

15   type doctrine, like structural error or fundamental error; but

16   either way, I think you get to the same place, which is that

17   when the only person presenting to the grand jury lacks lawful

18   government authority, that's not going to be an error that --

19   that's always going to be prejudicial.  It's a fundamental

20   error.  It's fundamental to the integrity of the grand jury

21   process and the grand jury proceedings, so a prejudice has to

22   be presumed in that circumstance.

23        THE COURT:  Let's talk about the ratification by the

24   attorney general on October 31st; what's your position on that?

25        MR. MCDOWELL:  So our position on that -- first and

1  foremost, if you're referring to the ratification of the

2  actions before the grand jury themselves, for us, that

3  ratification cannot possibly work because of the statute of

4  limitations.  The ratification came on October 31st after the

5  statute of limitations had expired in Mr. Comey's case, and

6  under ratification doctrine, the ratifying official must have

7  the power to do the relevant act at the time it was done and at

8  the time the ratification was made.  And here when the

9  ratification was made on October 31st, the statute of

10  limitations had expired, and I think that is dispositive of the

11  ratification argument on the other side.

12      If you are referring to their argument that they've

13  now appointed Ms. Halligan in a different way which she wasn't

14  appointed in on the date the indictment was secured, if you

15  look at the original appointment order, it only cites

16  Section 546, and it appoints her as U.S. attorney.  They've now

17  come out and said, well, actually, the whole time, she's been

18  serving as special attorney, but they don't cite any authority

19  for that idea that you can post hoc, retroactively transform an

20  officer into a different position after the fact.  I didn't see

21  anything in their papers supporting that sort of maneuver.  And

22  that also runs counter to the Supreme Court's decision in

23  *Lucia*, the one I mentioned earlier, because, there, the court

24  looked only to whether the relevant official had lawful

25  authority at the time he conducted the relevant adjudication.

1    That was the question, was he a properly appointed officer at

2    the time he took the challenged action.  In footnote 6 of the

3    court's decision, the court explained that, later, the head of

4    the agency had tried to appoint the ALJ there, the

5    administrative law judge, in a different way.  And the court

6    didn't find that material.  It looked only at what the position

7    was, whether the appointment was proper at the relevant time

8    period that the official took the challenged action.  And so,

9    here, the only thing that matters is whether Ms. Halligan had a

10   proper appointment when she stood up in front of the grand

11   jury.  And she did not because, again, her appointment was not

12   authorized by the only statute that that appointment order

13   cited, which is Section 546.

14          THE COURT:  So what do you understand to be the

15   government's position regarding the effect of Section 3288 on

16   that?

17          MR. MCDOWELL:  So, Your Honor, as to 3288, I think

18   their argument for ratification of the actions before the

19   indictment is that because 3288 is out there, somehow

20   Ms. Halligan could have invoked that -- excuse me -- Attorney

21   General Bondi could have invoked that on October 31st.  But

22   3288 applies only when an indictment has been dismissed.  It

23   only comes up after an indictment has been dismissed.

24   Certainly on October 31st, the indictment in this case was not

25   dismissed.  It's still not dismissed, and so at the time of the

1    ratification, that 3288 could not have come into play.  I

2    actually don't think that Your Honor needs to reach anything

3    about 3288 in this case for that very reason.  It only could

4    come into play if the indictment in this case is dismissed

5    without prejudice, which we think it should be with prejudice,

6    but setting that aside, if it's dismissed without prejudice and

7    then the government was going to try to reindict.  At that

8    point, we would raise -- we would say that 3288 doesn't apply,

9    but that's not implicated in the case before Your Honor right

10   now.

11          THE COURT:  But you are asking me to determine or to

12   agree, I guess, that the statute of limitations continued to

13   run after the indictment in this case because it was an

14   invalid, void indictment and, therefore, that affects the

15   ratification portion of the government's position, correct?

16          MR. MCDOWELL:  I don't think so because I think that

17   the statute of limitations clearly has run, clearly stopped

18   running on September 30th.  What 3288 does is if the

19   prerequisites of that provision are satisfied, then the

20   government can get six additional months.  We don't think you

21   need to reach that question here because, clearly, 3288 only

22   could come into play after an indictment is dismissed.  And as

23   I mentioned before, for purposes of ratification, the key

24   question is whether the ratifying official had the authority at

25   the time she did the ratifying act, which was on October 31st.

1    So the only question is whether 3288 had any application on

2    October 31st, and I think, plainly, it did not because on that

3    date, the indictment had not been dismissed, and so that's why

4    we don't think 3288 affects the analysis.

5              THE COURT:  All right.

6              MR. MCDOWELL:  And the last thing I would want to

7    mention is the dismissal with prejudice argument.  So we think,

8    obviously, that dismissal is appropriate for all the reasons

9    I've given, both because the indictment is void *ab initio* and

10   because this is not a harmless error.

11             But the next question, then, would be dismissal with

12   or without prejudice, and we think that this Court should

13   exercise its supervisory powers to dismiss the indictment with

14   prejudice in order to deter and not reward the government's

15   constitutional violation in this case and its manipulation of

16   the statute of limitations because if Your Honor gets to this

17   point of the analysis, you've likely already concluded that

18   there's an Appointments Clause violation.  So we have a

19   constitutional violation, and if you look at the facts of the

20   case, it's pretty clear that the government was trying to find

21   anyone at the last minute before the statute of limitations

22   expired to bring this indictment, perhaps to invoke 3288

23   afterwards.  And I think that sort of conduct, that sort of

24   unconstitutional conduct and manipulation of the statute of

25   limitations, should be deterred, not rewarded.  If you

*Proceedings*

1    dismissed without prejudice, that would reward the government

2    for those sorts of actions because it would allow it to try

3    again, it would allow it to try to invoke 3288, and we don't

4    think that's the appropriate remedy when you have such a

5    serious constitutional violation and a manipulation of the

6    statute of limitations.

7        THE COURT:  So other than an indictment dismissed with

8    prejudice, is there any other relief that you seek regarding,

9    for example, the status of Ms. Halligan or, for example, the

10   situation where the right to appoint goes back to the district

11   court?

12       MR. MCDOWELL:  Your Honor, we've only sought dismissal

13   with prejudice in Mr. Comey's case.  That is all we are

14   seeking.  I think there could be logical ramifications that

15   come from that, particularly if the appellate courts were to

16   uphold that sort of ruling, but all we are seeking is dismissal

17   with prejudice.

18       THE COURT:  All right.  Thank you, sir.

19       MR. MCDOWELL:  Thank you.

20       THE COURT:  All right.  Mr. Lowell.

21       MR. LOWELL:  Good morning, Your Honor.  Thank you for

22   the time.

23       THE COURT:  Good morning.

24       MR. LOWELL:  I'm trying not to be repetitive.  Let me

25   ask the Court to allow me to address three or four ways that

1    you look to see how a statute works and what was intended and

2    how it applies.  I'd start the way the Fourth Circuit always

3    says, which is to look at the text, to look at the text.  The

4    government's reading would require this Court to do the

5    following three things:  First, to insert words into a statute.

6    For example, if they want this to be a perpetual ability to

7    continue to appoint every 119 days, you have to put the words

8    "his or her" before the word "appointment" in (c)(2).  If you

9    want this to be something that a court can do in subsection (d)

10   as well as giving the attorney general that same authority at

11   the same time, you would have to add the words "or the attorney

12   general" after the phrase "the district court."  But as you

13   know, absent provisions are not allowed to be put into a case

14   by a court, according to various Supreme Court cases, and we

15   have briefed those.

16           The second thing they're asking you to do is to,

17   again, in a statutory context, ignore some of the basic tools

18   we use to understand statutes.  One, for example, is the

19   *expressio unius* provision.  If, indeed, they meant that it

20   could be the court or the attorney general, you would say "the

21   court or the attorney general" by pointing out that the power

22   at that point after 120 days belongs only to the court.  They

23   would ask you to look past that.

24           And, last, but certainly not least, is the argument

25   that you're not supposed to interpret a statute which

1    would create numerous issues of superfluidity, and here there

2    are at least two; one you've already heard, which is if this

3    works the way they want, not only does 546 contain certain

4    sections, like the second reference to "under this section" --

5    which I'll come to -- but it also basically makes moot 541

6    because, as you just heard and what they have conceded, a

7    president and an attorney general could do this over and over

8    again, never having to invoke 541.

9          And then the last part of this is that you don't,

10   hopefully, interpret a statute as they're asking that would run

11   that statute's interpretation right into a statutory

12   contradiction that could implicate constitutional issues.  For

13   example, if, indeed, both the court and the attorney general

14   could continue to do what they think it can do, you could very

15   well see that you'd have two different candidates occupying the

16   seat at the same time.  All those statutory issues were raised

17   and addressed by Chief Judge Brown in the case that was brought

18   to challenge the similar appointment of Interim U.S. Attorney

19   Alina Habba in New Jersey.

20         THE COURT:  And I've listened to your argument before

21   the Third Circuit.

22         MR. LOWELL:  And waiting eagerly for its conclusion.

23         The second thing is -- again, I'm looking to the

24   Fourth Circuit, which says look at the words, but also to use

25   the Fourth Circuit statutory context, structure, history, and

1    purpose, and it's been a minute; just supplementing what my

2    colleague said -- their position in structure would have you

3    ignore that the way the statute is structured is to have the

4    reference in (c) which says "a person" to begin, then shifts

5    not to be focusing on the person but to continue to say "a

6    person" in each of the (c) sections, whereas the prefatory

7    language of (c) is about a specific person, but then it shifts,

8    and then it shifts to (c)(2) which puts the action in the hands

9    of the attorney general and has nothing to do with who it is

10   that that attorney general originally had put into place.  And

11   they need you, in order to accept their position, to forget

12   that structure.

13        As my colleague said, the entirety of the government's

14   case in asking you to allow these indictments to go forward is

15   based on simply starting the conversation after they took the

16   act as opposed to seeing that the structure of this statute is

17   supposed to sit side by side with 541.  546 refers to 541;

18   they're in the same chapter.  They were put that way years ago;

19   and because they are supposed to stand side by side, you can't

20   simply say that 546 is the all end of how you can get around

21   541.  Indeed, as they sit side by side, if you accept their

22   position that 546 is an exception to 541, then what you have

23   done is allowed, again, a statutory rule not to be followed,

24   which is you've allowed the exception to swallow the rule.

25        And in terms of the purpose, I don't think you can

19

1    walk away from why it is that we're standing here.  You already

2    know about the change that occurred in that 120 days that was

3    taken out of the statute in 2006, only to be put back later for

4    the very reason that Congress was talking about, the ability

5    of there to be these successive 120s.

6           The framework of 541, Your Honor, and 546 together has

7    a brilliant part to it, and that brilliant part is, the

8    president is given permission for a limited amount of time to

9    get the case -- to get the office moving.  But then two things

10   happen.  541 says find somebody who can be qualified to be

11   confirmed by the United States Senate, and the second says if

12   you can't do it in 120 days, we're going to find a qualified

13   person by getting the courts to have that.  Their

14   interpretation is that the attorney general all by herself can

15   take away those protections that were built in to have other

16   branches of government involved.  And beyond that, the response

17   is, don't worry, the attorney general has to renew, reevaluate

18   every 119 days, and that's a safety check.  That's not the

19   safety check that the statute had in mind when it put those two

20   other branches in the proceeding.  And more importantly than

21   that, there's no rhyme or reason to that review.  And if past

22   is prologue, what do we know?  We can only talk about what

23   happened in this case.  The person who was in office, Erik

24   Siebert, was somebody who was an interim.  The court did re-up,

25   and then what happened?  Because that person, according to the

1    press, and you may know more, would not go ahead with these

2    cases, certainly not the case against Attorney General James,

3    he was forced out of office, and the person who came in, who's

4    sitting to my right, was somebody who said she would do what

5    the president asked.  If that's the kind of review that is

6    going to give us pause not to worry about the successive

7    120 days, that is certainly not a check and balance the statute

8    had in mind.

9         THE COURT:  Let me direct you to another question that

10    I have.  You, in your motion and in the reply brief, contend at

11    different points that the Court lacks jurisdiction to decide

12    the validity of Ms. Halligan's appointment.  That confused me,

13    and I'd like for you to explain that to me.

14         MR. LOWELL:  Yes.  So what we are referring to in the

15    cases that we cite for the jurisdiction is that the proposition

16    exists that if somebody purports to invoke the jurisdiction of

17    a court, then if that person didn't have the authority to

18    invoke the jurisdiction of the court, then the court doesn't

19    have jurisdiction, and the court always has the power to

20    determine its own jurisdiction.  And the cases that we pointed

21    to all talk about it in that fashion.  *Providence Journal* talks

22    about this lack of authority in terms of being without

23    jurisdiction, and the cases following the *Providence Journal*

24    case do exactly the same.

25         By the way, *Durham* was another case.  You asked my

*Proceedings*

1    colleague is there another case besides *Andrade* -- well, he

2    talked about *Andrade* -- *Durham* is another case in which the

3    court, using the word "jurisdiction," said the inquiry would be

4    to see if there was somebody else in the process who

5    participated or supervised the unauthorized actor.

6            THE COURT:  They remanded for that, so we don't know

7    the answer.

8            MR. LOWELL:  But you may have the answer already if

9    I've read the order correctly, and you'll have the grand jury

10   transcripts -- we do not -- so that may be an answer that

11   doesn't need a remand or, in your case, to ask for anything

12   more than you probably -- than you have already.

13           THE COURT:  No.  All the evidence in my review is that

14   Ms. Halligan acted alone in the grand jury in both cases.

15           MR. LOWELL:  And in that case, it would fit into those

16   cases in which that single fact was dispositive of whether or

17   not you could save the unauthorized action by some other

18   vehicle, as in *Durham* and as in the case of *Garcia-Andrade*.  So

19   when you ask me why is it a jurisdictional matter, an

20   indictment doesn't live by itself.  It's returned by a grand

21   jury.  And what's the very first thing that happens?  It's

22   handed up to a judge, and then things happen because the court

23   orders things to happen, including a summons, including an

24   order to come do an arraignment or initial appearance.  So if

25   that vehicle, that indictment, was void *ab initio* because it

1    was done in a way that is not prescribed either by statute or

2    the Appointments Clause, then it does affect the jurisdiction.

3    That's what *Providence Journal* said; that's what *Durham* said;

4    that's what *Garcia-Andrade* said.  And their reference to a case

5    to try to defeat that point, that *Kelley* case, is just off.

6    We're not saying that the lack of a signature on a case

7    otherwise properly brought would be a jurisdictional issue, so

8    said *Kelley*, but that's not what happened in this case, as you

9    just indicated what you saw in the transcript and what I

10   believe to be the case as well.  That's the jurisdictional

11   part, but it's not dispositive.

12          We've given the Court three vehicles for the relief we

13   seek.  One is, of course, that if the Court has no

14   jurisdiction, then we shouldn't even be here today.  The second

15   is a violation of the Appointments Clause by itself requires a

16   remedy, and the violation of the statute requires a remedy.

17   And within those three, the Court, as you know, has wide

18   discretion under its supervisory authority to form a relief, a

19   remedy that meets the harm.  So even if the Court were to

20   decide that somehow this weaves through those cases on

21   jurisdiction, there are two other legs that support the relief

22   we're asking.

23          THE COURT:  Do you have anything to add to what

24   Mr. McDowell said about the ratification?

25          MR. LOWELL:  I do, partially because his position on

1   behalf of his client is slightly different than ours.

2          So I think there are three things that we can

3   say about the ratification argument the government has put

4   forward.  Sometimes you create a hypothetical that goes to the

5   extreme just because that's how you can see whether someone's

6   argument makes sense.  And the government's argument literally,

7   taken to its absolute words, would indicate that even a person

8   like Steve Bannon or Elon Musk could have come into the grand

9   jury in this courthouse without any authority to do so, go into

10  the grand jury, ask for an indictment without either being a

11  government attorney or a government employee or any sense of

12  government anything, and then afterwards, the attorney general

13  could bless it, could ratify it.  They can point to no case

14  that does that.  Every case of ratification they point to has

15  at least a government employee in the same agency or related to

16  that agency taking the action to which a supervisor later does

17  that.

18          Second point:  They are applying, or asking you to

19  apply, the general agency notion of ratification, which is an

20  administrative or agency law in a criminal context, and there's

21  been no Supreme Court case that allows the retroactive

22  application of ratification in either a civil or in a criminal

23  case where there's an Appointments Clause violation.  But more

24  importantly, we have some guidance, and the guidance comes from

25  the very case that the government has put forward to support

1    this notion that they can do this ratification, the --

2         THE COURT:  The dolphin case?

3         MR. LOWELL:  Yes.  No, no -- yes, the dolphin case.

4    And then the question becomes this -- they cite to *Lutnik*, the

5    dolphin case, for a promulgation of irregulation.  Now, to

6    begin with, we ask the Court to take into consideration the

7    Second Circuit's prism in *Neaderland*, which is one where it

8    sets out why, generally speaking, cases that protect criminal

9    rights should be applied more strongly than those in any other

10   context.  And I don't need to tell you all the things that in

11   the Constitution give defendants those protections, which the

12   court called the bundle of legal principles that protect a

13   defendant from an improper process, everything from the rules

14   of secrecy in 6(c) to, of course, the proof beyond a reasonable

15   doubt.  All of those set criminal cases separate from admin law

16   cases.  But even so, they said, please, we can do this under

17   *Lutnik*, because the Fourth Circuit had a promulgation,

18   delegation, ratification, you know, that kind of policy issue.

19   But what I didn't hear them point out is what the district

20   court said that got the case to the Court of Appeals.  It is

21   not only instructive, it's dispositive.  And what the lower

22   court said was this:  Plaintiffs also assert that the court

23   should not find that the ratification cures any Appointments

24   Clause defect because the structural errors cannot be cured.

25   It goes on to say, But on this point, Plaintiff's analogy,

1  criminal law structures to those of administrative law, such as

2  saying that a petit jury's conviction was essentially a

3  ratification of an improper indictment, this is not, however, a

4  criminal case.  And the concerns, namely, a criminal

5  defendant's liberty interest, that motivate courts to find

6  structural errors in criminal context infect the entire process

7  even absent a showing of prejudice simply do not apply here.

8  That's what separates this case from the general ratification

9  cases in which the government cites and asks you to rely on.

10  And the context, therefore, is while we -- and we don't profess

11  to have the statute of limitations prohibition; we have

12  something that equally is powerful, and that is that there is

13  no case that allows this ratification process to be done as the

14  ratifications of a private person.

15           And, secondly -- oh, and by the way, at the point at

16  which she walked into the grand jury, Ms. Halligan was a

17  private person.  She was no longer in the White House.  She

18  was pretending or purporting to be interim.  She wasn't

19  actually interim, which means she was no, for purposes of the

20  ratification process, other than a private person.

21           And, secondly, we do away with all these criminal law,

22  criminal process protections if we allow what the Supreme Court

23  has never said allowable, which is to apply this in

24  the criminal law context.

25           THE COURT:  So in your first motion, you asked me to

1    disqualify Ms. Halligan from acting any further as interim

2    U.S. attorney.  In the second, your reply brief, you indicate

3    you want an injunction regarding her actions.  What specific

4    relief are you seeking regarding that?

5            MR. LOWELL:  Can I start just by saying that we also

6    move for a dismissal --

7            THE COURT:  Yes.  I understand.

8            MR. LOWELL:  -- of the case?

9            THE COURT:  I got that.

10            MR. LOWELL:  Okay.  Now I can move on from there.

11            In a certain way, the verbs "disqualify"

12   and "injunction" are not terribly different, but they have one

13   specific difference in this case.  One of the cases that you

14   saw was the case mentioned about the administrative law judge,

15   and what was interesting about that was when the court said you

16   did it wrong, the ALJ had no authority and, therefore, we're

17   sending it back, said that that ALJ could no longer participate

18   even if they tried to do it right the next time.  Now, I

19   realize it's not a perfect analogy because they said it was

20   because the judge had already made up his mind.  Well, in that

21   case, it is a perfect analogy because if a U.S. attorney is

22   supposed to do anything, it's supposed to be a filter as to

23   what is and is not a good case to bring, as we saw with Erik

24   Siebert.  So, here, using the same flavor, we believe that the

25   relief, among others depending on what happens to the case

1    dismissed, would be that she cannot continue to do what other

2    courts have said an improperly appointed interim or acting or

3    special attorney could do, which is to continue to participate

4    or supervise on the case, and heavy emphasis on the word

5    "participate" because if this case goes back, she did not have

6    authority.  Consequently, those cases we cite indicate that a

7    proper remedy would be that she should be enjoined from

8    participating.

9          Now, who else might participate if, somehow, this case

10   isn't dismissed with prejudice is for another day.  I suspect

11   there could be somebody in the future that has the right

12   authority.  So the relief we're asking for has two parts.

13   Part 1 is to dismiss.  We believe the conduct of the

14   government, within your discretion, allows that to be with

15   prejudice because of the affront to the Appointments Clause,

16   because of the track record.  In fact, you asked Mr. McDowell

17   in his first question, if I remember you asking, was how does

18   the harmless error fit in, and I'd like to address that for

19   15 seconds.

20          THE COURT:  Go ahead.

21          MR. LOWELL:  That's where it goes to the remedy side

22   as well because harmless error, it's their burden to show

23   that -- this is harmless error beyond a reasonable doubt, by

24   the way -- also has the requirement to say that but for what

25   had happened in the unauthorized way, et cetera, and the "but

1    for" here is obvious.  The "but for" here is that we have good

2    reason to believe that every career prosecutor that was

3    involved in the process realized that this was not a proper

4    case against the attorney general, and then they left or they

5    were forced out or some combination, and now the one person who

6    would do it at the direction of the president with a text that

7    was probably meant to be a text, but went out to Attorney

8    General Bondi, to the world, basically, commanded that what

9    happened happened.  If that's not a good definition of "but

10   for" and against the harmless error, I couldn't make up a

11   better one myself.

12            THE COURT:  Thank you, sir.

13            MR. LOWELL:  Thank you.

14            THE COURT:  All right.  Mr. Whitaker.

15            MR. WHITAKER:  Henry Whitaker for the United States.

16            The defendants here are attempting to elevate what is,

17   at best, a paperwork error, and to the extraordinary remedy

18   of dismissing duly returned indictments with prejudice.  That

19   request should be rejected on its merits and because dismissal

20   of the indictment would in any event not be a proper remedy.

21   And I'll turn first to the merits unless the Court would like

22   me to start somewhere else.

23            Section 546 permits the attorney general, with one

24   exception that's clearly inapplicable here, to appoint a

25   U.S. attorney for the district in which the office of the

1   United States Attorney is vacant.  The office here is vacant,

2   and there is nothing in the other subsections of 546 that in

3   any way suggests that the attorney general, under that

4   unqualified language, is limited to only one appointment.  On

5   the contrary, subsection (c) of the statute refers to a person

6   appointed as United States attorney under this section, and the

7   defendants agree that multiple persons can be appointed by the

8   attorney general under that section, which makes sense because

9   "a" has an indefinite article.  And so the question that the

10  Court has to decide on the merits is whether the attorney

11  general is forced to cram those multiple appointments into one

12  120-day period, and subsection (c)(2) of the statute refutes

13  that notion because it says -- well, let's just read the whole

14  statute in its entirety -- "A person appointed as United

15  States attorney under this section may serve until the earlier

16  of the expiration of 120 days after appointment by the attorney

17  general under this section."

18          Ms. Halligan is a person appointed as United States

19  attorney, and she may serve until the expiration of 120 days

20  after appointment by the attorney general under this section.

21  That last bit, "appointment by the attorney general under this

22  section," refers to the person who was appointed, that

23  particular person.  It does not refer to some other person.

24  That is not an actual way of reading that language.

25          And so the plain language of the statute fully

1    supports that the attorney general is entitled to multiple

2    120-day appointments there.  And that principle, that

3    proposition is consistent with the way we normally read

4    appointments, term appointments.  And we cite in our brief the

5    Mechem treatise and attorney general opinions going back to the

6    19th century that say that as a general matter, when you have a

7    person appointed to a term, that term is personal to the

8    appointee, and they get a full term.  For example, for example,

9    in this very context.  Under 28 U.S.C. 541, which provides for

10    U.S. attorneys to be appointed for four-year terms by and with

11    the advice and consent of the Senate, you get a four-year term.

12    If a U.S. attorney leaves before the expiration of that

13    four-year term, it is clear as day that a new appointee would

14    get a new four-year term, and that person would not be limited

15    to simply serving out the remainder of that predecessor's term.

16    Now, there's an exception to that principle for multi-member

17    commissions who serve staggered terms and the like, and that's,

18    of course, entirely inapplicable here, nor is there anything --

19    and, of course, this is a case where the district court's

20    authority under subsection (d) was triggered.  There is

21    likewise no indication that once an appointment expires under

22    subsection (d), that the district court's authority that is

23    triggered under subsection (d), that that is exclusive of the

24    attorney general's authority.

25         The attorney general's authority under 546(a) does not

1  contain an exception for 546(d); and 546(d), when it defines

2  the district court's appointment authority, is expressly

3  phrased in permissive terms.  It says the district court may

4  appoint, and there is absolutely no incongruity in reading both

5  appointment options to be available.  In this particular

6  context, that's actually a very common structure that exists

7  when it comes to temporary appointments.

8          THE COURT:  If you are correct that the 120-day

9  repetition is fostered by this statute, then what effect did

10 the 2007 amendment do?

11         MR. WHITAKER:  Well, what the 2007 amendment did,

12 Your Honor, is it repealed the prior structure that Congress

13 had put in place in 2006, which was to allow the attorney

14 general an indefinite one-time-only appointment, and that's not

15 what -- and, instead, what they did was they restored the prior

16 structure of the statute that had existed in 1986.

17 That history -- so we certainly agree that the attorney general

18 does not have a fire and forget, so to speak, one-time-only

19 appointment authority where she can appoint someone and never

20 think about it again.

21         Now, of course, the district court is fully empowered

22 to do just that under subsection (d).  So I think that --

23 certainly, Congress got rid of that, but what it didn't get rid

24 of was the idea that the attorney general is not limited to one

25 120-day appointment; and, in fact, the history suggests exactly

1   the opposite because prior to the 2007 restoration of the

2   statute, Congress knew that the executive branch's practice had

3   been to make successive 120-day appointments.  That's exactly

4   how the executive branch had construed the statute --

5           THE COURT:  Only eight of them.

6           MR. WHITAKER:  That's -- fair enough, Your Honor;

7   that's true, there weren't a lot of them.  And one of the

8   reasons -- let me just address that.  There weren't a lot them,

9   but they, nonetheless, existed and, in fact, were referred to

10  by Congress in the House reports.  So they were very well aware

11  of them.  And if Congress really wanted to abolish that

12  practice, it would have been a very strange way of doing it by

13  reenacting the exact same statutory language that the executive

14  branch had previously construed to allow that.  But one of the

15  reasons why this actually doesn't come up all that much is the

16  way this statute normally works -- and Your Honor may be

17  familiar to some degree with this -- is that the Department of

18  Justice and the district court work together to find an

19  appointee who is mutually agreeable.  Generally speaking, what

20  has happened under this statute over the years is that the

21  attorney general appoints someone for a 120-day period, and the

22  district court will ratify, in effect, that appointment.

23          THE COURT:  Well, we have about 200 years where the

24  judges made the appointments.

25          MR. WHITAKER:  That's true, Your Honor, and I think,

1    actually, that history is pretty telling because my friends

2    talk about evading Senate confirmation.  Well, the one thing we

3    know about this statute is that Congress didn't have any

4    problem with allowing the district court, certainly, to have an

5    appointment authority that allowed an interim U.S. attorney to

6    serve until a PAS nominee is confirmed and appointed.  And so I

7    think the idea that -- it's sort of baked into the statute that

8    these appointments can exist for a long time, and we cite some

9    examples in our brief where interim appointments sometimes have

10   lasted for a very long time.  And, look, that's certainly not

11   the preferred course.  The executive branch has very strong

12   reasons to want to have PAS nominees despite the --

13   appointees despite the fact that, yes, there are sort of

14   stopgaps where you can have temporary appointees that serve in

15   the interim, but it is very useful to the executive branch to

16   have PAS appointees who have imprimatur of ordinate branch of

17   government and, in many instances, the approval of the home

18   state senators.  So this idea that we're just going to sort of

19   evade the Senate confirmation just because we have this

20   appointment authority is, I think, kind of fanciful and does

21   not fit with the way this has worked over the years because

22   there has been this indefinite appointment authority that the

23   district court, as Your Honor pointed out, has had for a long

24   time, and, yet, we've seen plenty of PAS U.S. attorneys over

25   the years.  So I think that concern is kind of fanciful.  And

1    it is a small step, I think, from that to construe the statute

2    to allow the attorney general a similar but lesser, in fact,

3    type of appointment authority, namely, the authority to appoint

4    interim U.S. attorneys to successive 120-day terms.  And that

5    is not -- and that is a real limit because it is obviously not

6    the preferred course to have to re-up the appointment every

7    120 days.  And, obviously, we don't -- it creates some

8    uncertainty in office if, basically, the situation is that an

9    interim appointee needs to be ratified 120 days.  You may not

10   know who is going to be your boss the next 120 days, and that's

11   a situation that, certainly, the executive branch would not

12   prefer, and I can assure you from experience with the attorney

13   general that a reappointment is not a rubber stamp.  She cares

14   very much about the documents she signs.

15          THE COURT:  Well, Mr. Whitaker, let's cut to the

16   chase.  What about your ratification; why do you need that?

17          MR. WHITAKER:  Well, I don't think we do need it,

18   Your Honor.  I'm happy to talk about it, but I definitely think

19   that the arguments the other side has made about why it's

20   invalid are completely wrong.  And let me begin with Mr. Comey.

21          Mr. Comey says that the statute of limitations has run

22   because you have not yet dismissed the indictment, which sort

23   of elevates form over substance.  I guess we could just redo

24   the ratification once the indictment gets dismissed, and that

25   would fall away.  But in any event, even right now, the return

1    of the indictment tolled the statute of limitations.  And so

2    it's not the case that the statute of limitations has expired

3    right now, and I would point you to *United States v. Ojedokun*,

4    which is 16 F. 4th 1091, 1109, which is the Fourth Circuit,

5    2021, which says, quote [as quoted]:  The return of the

6    indictment tolls the statute of limitations, and a superseding

7    indictment which supplants a timely filed indictment, still

8    pending, is itself to be regarded as timely so long as it

9    neither materially broadens nor substantially amends the

10   charges against the defendants.

11         THE COURT:  So, Mr. Whitaker, if you're wrong and both

12   Section 546 and the Appointments Clause violate or violated,

13   then why wouldn't you need a ratification?

14         MR. WHITAKER:  Well, we certainly don't think they

15   were violated, and I'm happy --

16         THE COURT:  I know that, but if you assume for the

17   moment hypothetically if they were violated, then how would

18   that affect the relief that Mr. Comey would be entitled to and

19   Ms. James?

20         MR. WHITAKER:  Well, if the ratification is valid,

21   he's certainly not entitled to dismissal of the indictment.  I

22   mean, it's possible that you could enter some kind of

23   prospective remedy here which --

24         THE COURT:  Let me ask you this.  I was involved in

25   receiving *in camera* provisions of the grand jury transcripts

1    and tapes, and it became obvious to me that the attorney

2    general could not have reviewed those portions of the

3    transcript of the Comey presentation by Ms. Halligan which

4    preceded and came after her presentation of the witness

5    testimony in the case.  There also is a missing section of what

6    occurred between 4:28 and the return of the grand jury

7    indictment, and it appears to me that there was no court

8    reporter present, or if he or she was present, did not take

9    down what happened during that time period.

10            So how does the attorney general ratify and say that

11   she has reviewed the grand jury transcripts when they did not

12   exist in the records of the Justice Department at that time?

13            MR. WHITAKER:  Well, it's true that -- it is true,

14   Your Honor, you're right, that we didn't have the intro and

15   back end of the grand jury transcripts when we presented that.

16            THE COURT:  What the sole prosecutor and the grand

17   jury said.

18            MR. WHITAKER:  But I think all that's necessary -- but

19   that is not what ratification doctrine requires for a principal

20   to ratify.

21            THE COURT:  It may not require it, but she's done it.

22   She said that she reviewed it and that on the basis of her

23   review, she ratifies it.

24            MR. WHITAKER:  Well, she said she reviewed the

25   proceedings.

1           THE COURT:  She could not have.

2           MR. WHITAKER:  She reviewed the material facts,

3     certainly, of the proceedings.  She reviewed -- she had before

4     her all of the witness testimony, and she reviewed that, and

5     it's not necessary for a principal to ratify all this.  And the

6     Fourth Circuit said this in the *Wille* case, the dolphin case

7     that Your Honor mentioned, that all that's necessary for

8     ratification is that the principal know of the material facts

9     of the transaction, and she knew those.  And so there's no

10    problem with ratification for the fact that there was a

11    mismatch in those transcripts, and the other side hasn't

12    disputed that.

13          On the point that Mr. Lowell makes about the criminal

14    context, that has to be wrong.  In *NRA Victory Fund* [*sic*], the

15    Supreme Court applied ratification doctrine to the certiorari

16    deadline which applies to civil and criminal cases alike.  And

17    in the *Wille* case -- in the dolphin case -- the Fourth Circuit

18    indicated that ratification doctrine is that Congress

19    legislates against the common law backdrop of ratification

20    doctrine, and I think that would apply to criminal statutes no

21    less than civil statutes, so there's --

22          THE COURT:  Didn't Judge Richardson's footnote

23    specifically say that the ratification would not apply as to

24    the office but could only apply as to the acts?

25          MR. WHITAKER:  Well, first of all, as to the act --

1    well, that's what we're saying.

2         THE COURT:  Your first page of your ratification

3    document is ratifying the office.

4         MR. WHITAKER:  Well, it is, and I'm happy to talk

5    about that, but if I could just finish off --

6         THE COURT:  Go ahead.

7         MR. WHITAKER:  -- with the ratification of the

8    indictments, that is a ratification of the acts, and that's

9    valid, and that in and of itself, quite apart from the

10   ratification of the office, would be sufficient to deny the

11   defendants any kind of a retrospective remedy.

12        With respect to the ratification --

13        THE COURT:  Do you have any case saying that?

14        MR. WHITAKER:  Well, there are many cases that --

15        THE COURT:  In a criminal context?

16        MR. WHITAKER:  I don't have a specific case in the

17   criminal context, although the other side does not have a

18   specific case rejecting the application of the doctrine in the

19   criminal context specifically, but I don't think that that

20   distinction should matter because, again, I don't think that

21   *NRA Victory Fund* -- the Supreme Court would have said that just

22   because it's a criminal case implicating the certiorari

23   deadline, that that would have somehow meant that you shouldn't

24   apply normal agency principles to that.

25        But let me just address the ratification of the

*Proceedings*

1    appointment for one second, and that comes into this case in a

2    little bit of a different way because our contention is that

3    even if you thought that there was a 546 error here, that does

4    not mean that Ms. Halligan was not an authorized attorney, an

5    authorized assistant of the attorney general for purposes of

6    the grand jury rules.  And, you know, the ratification, we

7    don't think that's necessary for that argument to succeed, but

8    certainly the ratification document of her appointment supports

9    the idea that the attorney general did want Ms. Halligan to be

10   an attorney for the government as of the time she was appointed

11   U.S. attorney under 546.  And the Federal Rules of Criminal

12   Procedure -- and, by the way, the defendants' argument here is,

13   basically, well, she was equivalent to a private citizen when

14   she went there in the grand jury room, which would result, I

15   think, in some pretty odd consequences if that were really

16   true.  It would mean, for example, I suppose, that Ms. Halligan

17   wouldn't be bound by grand jury secrecy, which is applicable to

18   attorneys for the government, and, certainly, that's not the

19   way that she's conducted her business.  But in any event, she

20   was an authorized assistant despite the fact that the

21   appointment order may have cited the wrong statute.

22         And, you know, there's no requirement in the relevant

23   appointment statutes that any particular statute be cited when

24   an appointment is made.  I mean, if this appointment had simply

25   said, I hereby appoint Lindsey Halligan to be the chief

1    prosecutor in the Eastern District of Virginia, we would have

2    to cite statutes if that appointment were challenged to say

3    what the basis of that was, but the fact that no statutes were,

4    in particular, cited wouldn't invalidate the appointment.

5          And I think there is very little dispute here in this

6    case that the attorney general has broad authority to, quite

7    apart from 546, authorize attorneys to conduct criminal

8    proceedings; for example, under 28 U.S.C. 515, 510, 543, 542,

9    and so on.  And so in contrary to, I think, what Mr. McDowell

10   said, we do cite a case that suggests that the fact that the

11   government might have cited a wrong statute is not in and of

12   itself a basis for invalidating the government action.  We cite

13   the *Massachusetts Trustees* case at page 21 of our brief, and

14   the quote from -- you know, a good quote from that case is that

15   you can disregard a mis-citation when the error is, quote, one

16   that clearly had no bearing on the procedure used or the

17   substance of decision reached.  That's 377 U.S. 248, and I

18   think that is some authority for the idea that merely citing

19   the wrong statute isn't a basis for saying that the action was

20   unauthorized.  And I think the contrast between the *Providence*

21   *Journal* case that the defendants rely on and this case is

22   pretty instructive.  So they say *Providence Journal* for the

23   idea that an unauthorized government representative can't

24   conduct legal proceedings.  But what happened in *Providence*

25   *Journal* was that somebody -- basically, a prosecutor who was

1    appointed to prosecute a contempt -- tried to file a certiorari

2    petition without authorization by the solicitor general, and

3    the solicitor general said, no, thank you, we don't want that

4    to be done on behalf of the United States.  Here, though, the

5    relevant actor who is responsible for authorizing people like

6    Ms. Halligan is the attorney general, and she did authorize

7    Ms. Halligan to do this, and if there were any doubt about the

8    fact that she did so, the attorney general has now ratified

9    that appointment, both the appointment and, indeed, the

10   underlying action.

11        Mr. McDowell cited *Lucia,* footnote 6.  Well, *Lucia* was

12   not a case to begin with where the government had ratified the

13   underlying adjudications in fact, and that is not what we did

14   in *Lucia*.  And, in fact, the government never intended that the

15   ratification of the appointments in any way deprived the

16   challengers of a remedy in that case.  And so I don't think

17   *Lucia* -- and, in fact, in *Lucia*, the court did not reach

18   whether the ratification -- what the effect the ratifications

19   had on the case, so I think that case is quite irrelevant.

20        THE COURT:  Mr. Whitaker, let me ask you one last

21   question.  Do you believe that *U.S. v. Trump*, decided by

22   Judge Cannon in, I believe, 2021, was wrongly decided?

23        MR. WHITAKER:  Well, I think it's certainly not

24   controlling here, Your Honor, because in *United States v.*

25   *Trump*, Judge Cannon held that various statutes that existed,

1   some of which I've cited here today, did not authorize the

2   appointment of a special counsel.  But here, in a very

3   important distinction between this case and *Trump*, is that we

4   have available to us a number of statutes that the United

5   States did not have available in making those arguments.  For

6   example, you know, you couldn't have appointed Jack Smith as an

7   AUSA under 542.  I mean, we could have -- we certainly could

8   have done that with Ms. Halligan.  You couldn't have appointed

9   Jack Smith as an assistant to a United States attorney under

10  543.  We certainly could have done that with regard to

11  Ms. Halligan.

12          But, I mean, look, to the extent that -- and I do

13  think that mostly what was driving Judge Cannon's decision in

14  that case was sort of the unique and broad authority that the

15  special counsel possessed sort of free of supervision, which,

16  of course, is an element that we do not have here.  But I will

17  say this:  Like, look, to the extent you can read Judge

18  Cannon's decision as suggesting that the Department of Justice

19  does not have authority under, for example, 28 U.S.C.,

20  Section 510 to appoint Main Justice attorneys, which would

21  basically knock out most of the Department of Justice as it

22  existed for the past, like, 50 years, yes, we certainly do

23  disagree with that, and we agree that the attorney general has

24  full authority to make appointments under statutes like

25  28 U.S.C., Section 510 and 509, and that source of authority

*Proceedings*

1    would fully support Ms. Halligan being an authorized attorney

2    to the government even though there may have been a paperwork

3    error, a citation error in her appointment order.

4            I did want to briefly touch on harmless error if I

5    may, Your Honor.

6            THE COURT:  All right.

7            MR. WHITAKER:  I do think the harmless error question

8    here is somewhat different from how the defendants are framing

9    it.  The question is what effect did the fact that the attorney

10   general cited -- mis-cited 546 and gave Ms. Halligan a title

11   that the defendants claim she was not entitled to, whether that

12   affected the proceedings before the grand jury.  I think that's

13   the basic question.  Your Honor has the grand jury transcripts,

14   and so -- you know, and obviously we can't talk about them now,

15   but when you're reviewing the transcripts and asking whether

16   that particular error -- I would urge you to focus on that

17   question:  What was the effect of her title on the proceedings?

18   And I would respectfully submit that what the grand jury

19   transcript shows is that, in fact, the grand jury made a

20   decision based on the facts and the law, and they followed

21   their oath, and they returned duly constituted indictments

22   against these defendants.  And the fact that there may have

23   been a paperwork error had absolutely no effect on that

24   particular decision.

25           THE COURT:  Thank you, sir.

1          Mr. McDowell.

2          MR. MCDOWELL:  Yes.  Thank you, Your Honor.  I would

3   like to make a few points in response to Mr. Whitaker.

4          THE COURT:  Go ahead.

5          MR. MCDOWELL:  So he repeatedly called this a

6   "paperwork error" or a "citation error."  We think that is just

7   completely incorrect.  This was a violation of the Appointments

8   Clause which is designed to protect individual liberty, and

9   that is particularly true in the criminal context, as my

10  colleague Mr. Lowell was saying.  This is a criminal case where

11  protections have to be at their apex; and to have someone who

12  comes in with a title as U.S. attorney -- which, by the way,

13  there was no other way to try to appoint Ms. Halligan as

14  U.S. attorney -- I think that could be very different for a

15  grand jury to see this is the U.S. attorney, this is the chief

16  prosecutor in the district.  That comes with some weight.  That

17  comes with credibility that may not be there when you're

18  talking about a special attorney or an assistant U.S. attorney,

19  and particularly where the indictment in Mr. Comey's case was

20  by a razor-thin margin.  It was by a very, very close margin,

21  and the grand jury no true billed one of the counts.  I do

22  think that that could have made a significant difference in the

23  context of this grand jury proceeding.  But I don't even think

24  you get there because under the Appointments Clause cases that

25  we cite -- and we also wanted to add one other additional

*Proceedings*

1    citation for Your Honor which applies a statutory violation

2    argument, *Nguyen v. United States*, 539 U.S. 69.  This stands

3    for the proposition that the same sort of remedial analysis

4    would apply to a statutory appointments violation as a

5    constitutional appointments violation where the court there did

6    not engage in harmless error review.  It didn't apply the

7    *de facto* officer doctrine even though it was a statutory

8    violation.  So even if you thought that this was purely a

9    statutory violation and not a constitutional violation, you

10   still wouldn't get into harmless error review or the *de facto*

11   officer doctrine.

12          The second point I wanted to make is about the merits.

13   So I didn't hear my colleague on the other side give

14   subsection (d) any real meaning.  That's the provision that

15   transfers the authority to the district courts.  As Your Honor

16   mentioned, for 120 years, district courts were the sole

17   appointors of interim U.S. attorneys.  If Congress, in 1986,

18   had wanted to change that, it would have spoken far more

19   clearly.  Instead, Congress gave the attorney general a limited

20   role up-front for 120 days and then kept subsection (d) in the

21   statute.  We also know that from the Justice Alito memo, which

22   hasn't come up yet today.  Three days after the 1986 law,

23   Justice Alito, writing on behalf of the Office of Legal Counsel

24   when he was deputy assistant attorney general, interpreted

25   subsection (d) in the exact way we interpreted it here.  He

1    said the attorney general gets 120 days, and then after that,

2    it goes to the district court, and the attorney general does

3    not get another bite at the apple.

4         Your Honor also mentioned the 2007 law.  I think that

5    is critical because I didn't hear any meaning that the other

6    side was giving to that particular amendment, because under

7    their view both before and after the 2007 law, interim

8    U.S. attorneys could serve indefinitely without Senate

9    confirmation even though the entire purpose behind the 2007

10   amendment was to stop bypass -- stop the executive branch from

11   bypassing Senate confirmation.  That is all over the House

12   report.  It was the clear impetus for this law, because in 2006

13   when the 120-day limit in the district court provision was

14   taken out of the statute, we saw executive branch abuses of

15   that power where they fired Senate-confirmed U.S. attorneys and

16   installed interim U.S. attorneys who were going to serve

17   indefinitely.  So we know that the 2007 statute was designed to

18   prevent exactly the sort of result that the government is

19   advocating here.

20        That also brings me to one final point about the

21   merits, which is that Mr. Whitaker kept saying that we haven't

22   seen this happen before, the executive branch has always gone

23   through Senate confirmation.  He thinks that everything is

24   going to be okay.  But if the judiciary blesses this

25   interpretation now from the government, which is the first time

1    they've offered this interpretation in nearly 40 years since

2    the statute was passed, they would never have any reason to go

3    through Senate confirmation again.  The district courts would

4    never have another opportunity to appoint.  So I just don't

5    think that past practice can possibly help the government when

6    it's their position that would be a dramatic departure from

7    that practice.  Our position is the one that is consistent with

8    40 years of practice, and we've seen this statute generally

9    work well where district courts make reasonable decisions, and

10   then the presidents submit their U.S. attorney nominees to the

11   Senate, and the Senate gets to weigh in.  Those important and

12   critical checks have long made sure that U.S. attorneys are not

13   simply installed to be personal allies of the president, but,

14   instead, are people who are well-qualified, adhere to the rule

15   of law, and are committed to our system of justice.

16           As to the remedy for purposes of ratification, I think

17   there are a few moving parts here.  With respect to ratifying

18   the indictment itself, we agree with Mr. Lowell that Your Honor

19   could draw a very compelling distinction between the civil

20   context and the criminal context in light of the ramifications

21   of the argument that ratification applies in the criminal

22   context.  What that would mean is that, again, the government

23   could send in any private person to the grand jury just before

24   the statute of limitations is about to expire, get the

25   indictment, and then have the attorney general come out

*Proceedings*

1    afterwards and ratify it, and I just think that that would be

2    a dramatic extension of ratification doctrine to an area where

3    individual liberty is at stake and due process interests are at

4    stake in a way that is very different from the regulatory

5    context.

6            Mr. Whitaker mentioned *FEC vs. NRA Political Victory*

7    *Fund*.  Actually, the certiorari deadline that was at issue

8    there doesn't apply as a statutory matter in criminal cases.

9    So that ratification case does not support the idea that

10   ratification can apply in criminal cases.  As a statutory

11   matter, the cert deadline only applies to civil cases, and it's

12   not jurisdictional in the criminal context.  For precisely some

13   of these same reasons, everyone recognizes that the procedural

14   interests are more compelling in the criminal case than in the

15   civil case.

16           Again, their ratification argument would have no

17   limiting principle.  It would allow the attorney general to

18   come after the fact and ratify any indictment.  As for

19   ratifying the office of what was the U.S. attorney at the time,

20   now, supposedly, the special attorney ratifying that office

21   retroactively, they have not cited a single case that allows

22   that.  I still haven't heard any case be offered that allows

23   that sort of post hoc ratification of an office.  And I think

24   that that would be, again, very, very difficult to square with

25   the fact that there was no other citation available.  There was

1    no other source of authority to appoint Ms. Halligan as

2    U.S. attorney.  That's very different for purposes of a grand

3    jury proceeding when you're coming in as the U.S. attorney as

4    opposed to a special attorney.

5           And I just want to close with the following point:

6    Stepping back, this case is the latest in a pattern of this

7    administration trying to evade the Appointments Clause as well

8    as other structural safeguards of the Constitution, but this

9    case is also unique because if the government was to prevail

10   here, it would never need to go through Senate confirmation

11   again for U.S. attorneys.  And I think that is just a critical

12   consequence that Your Honor has to be grappling with when you

13   decide this case.  And for that reason, we think that you

14   should reject the government's flawed interpretation of

15   Section 546 and dismiss with prejudice.

16           THE COURT:  Thank you, sir.

17           Mr. Lowell.

18           MR. LOWELL:  Again, sensitive not to be repetitive, I

19   think I have seven points to respond to what government counsel

20   said.

21           The first was when he asked you to parse out the

22   clauses of 546(c).  And then I looked back to see if what he

23   said was correct.  So I ask the Court when it's thinking of it,

24   to do, again, what I just did.  And in (c), it says [as

25   quoted]:  A person appointed as U.S. attorney under this

1  section -- and then has two limitations -- clause (1) if a

2  person is confirmed in the normal 541; and then, (2) the

3  expiration of 120 days after appointment.  You could consider

4  that word to be "action," but the key is that it says "under

5  this section."  Their interpretation would basically mean that

6  you should have ended the sentence after "attorney general"

7  because there would be no reason to have the second "under this

8  section" if the first "under this section" carried the weight

9  that learned government counsel said it would.

10        Second, I'm glad -- again, Mr. McDowell sort of stole

11  some of my points, so I'm not going to repeat them, but it is

12  interesting that the government asked you to consider the

13  attorney general opinions since the 19th century, and yet not

14  the one that is bearing, not the attorney general, but the

15  attorney general's counsel in the Office of Legal Counsel on

16  what this 120-day prohibition really means.  And, of course,

17  that was now Justice Alito's.

18        In terms of his saying how 541 and 546 meld or don't

19  meld in his case, nobody has pointed out -- and I better make

20  sure I do it before I sit down again -- this 541, 546 was

21  something that they gave allegiance to in the first

22  administration.  Indeed, President Trump submitted and got

23  confirmed 85 U.S. attorneys out of whatever there are, 90, by

24  doing it the way the statutes envisioned, by submitting a

25  candidate to the United States Senate for advice and consent.

1    And the difference in this administration appears that the

2    administration has different criteria by which they are going

3    to install people to carry out the directions of the president.

4            In terms of the Appointments Clause issue, seeking to

5    go around 546 by going beyond the 120 days is as much a

6    violation of the statute with ramifications to the

7    constitutional order of things as if in that 200 or however

8    many years where only the courts could do it.  So if it was in

9    that era and Attorney General Bondi said, I still want

10   Ms. Halligan to be the U.S. attorney, everybody would say that

11   violates, that's not powerful.  Well, the statute has that

12   second provision now.  The 120-day limit is no different than

13   what (d) used to be in terms of who could do it after always.

14   So you can't parse the statute in some way and say, well, sure,

15   we would have never even dreamed of appointing an interim

16   U.S. attorney under 546 when the statute only allowed the court

17   to do it, but that's no different when the statute says only

18   the attorney general could do it for 120 days.

19           About ratification, a lot has been said.  The

20   government's response is, well, what are the ramifications of

21   Mr. Lowell's argument that when Ms. Halligan stepped into the

22   grand jury, she was a private person?  And their example was

23   she wouldn't even have been bound by 6(a) -- 6(e).  I'm not

24   going to be the only one who noticed that one of the motions we

25   made in this case was that, for whatever reason, in her

1   interchange with a journalist named Bower, we believe that

2   that's exactly what she did.  And those aren't the boundaries

3   by which you determine anyway as to whether at that moment --

4   to use the phrase of the *Nguyen* case that my colleague already

5   mentioned, I think there's an important clause in there.  In

6   that case, remember, there is a district court judge sitting in

7   an appellate panel with no authority to do that, and what they

8   said was that even if it's not an Appointments Clause problem,

9   the statutory problem still required them to determine it was

10  null and void.  And this was the language because they are

11  talking about this being, I think his phrase was, a paperwork

12  error.  The court said this is not a mere technicality because

13  it goes to whether a person was competent to sit at the time

14  the person was taking the action.  And that defines exactly

15  what happened in this case.

16          And last for me is the *Ryder* case, which is in the

17  issue of the Appointments Clause as well, talked about the

18  importance of why we are asking you to consider the relief

19  under the Appointments Clause.  The Supreme Court in *Ryder* said

20  that you can distinguish the exceptions to the *de facto* cases

21  because the claim here becomes a, quote, trespass upon the

22  constitutional power of appointment, not merely a

23  misapplication of a statute.  It went on to say -- and it's

24  better words that I can conclude with myself -- [as quoted]:

25  The clause is a bulwark against one branch aggrandizing its

*Proceedings*

1    power at the expense of another branch, but it is more:  It

2    preserves another aspect of constitutional structural integrity

3    by preventing the diffusion of the appointment power as a

4    whole.

5             THE COURT:  That was Justice Rehnquist.

6             MR. LOWELL:  Yes.  Thank you.

7             THE COURT:  All right.  Thank you, everyone, for your

8    arguments and your attention to this matter.  I will have an

9    order out prior to Thanksgiving.  We'll be adjourned.

10                   *       *       *       *       *

11                   <u>CERTIFICATE OF REPORTER</u>

12             I, Diane Salters, hereby certify that the foregoing

13   transcript is a true and accurate record of the stenographic

14   proceedings in this matter.

15                            /s/ Diane Salters

16                   _____

17                            Diane Salters, CSR, RCR, RPR
                              Official Court Reporter

18

19

20

21

22

23

24

25