1
              UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA

2
               ALEXANDRIA DIVISION

3
UNITED STATES OF AMERICA,    :  Criminal Action
                        :  No. 1:25-cr-00272-MSN-1

4
        v.             :
                        :

5
JAMES B. COMEY, JR.,       :  November 19, 2025
                        :  9:57 a.m. - 11:22 a.m.

6
        Defendant.     :
                        :

7
............................:

8
           TRANSCRIPT OF MOTION PROCEEDINGS

9
    BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,
           UNITED STATES DISTRICT JUDGE

10
APPEARANCES:

11
For the United States:  UNITED STATES ATTORNEY'S OFFICE
                    Lindsey Halligan, U.S. Attorney

12
                    Tyler Lemons, AUSA
                    Gabriel J. Diaz, AUSA

13
                    2100 Jamieson Avenue
                    Alexandria, VA 22314

14

15
For the Defendant:      CARMICHAEL ELLIS & BROCK
                    Jessica Nicole Carmichael, Esquire

16
                    108 North Alfred Street, 1st Floor
                    Alexandria, VA 22314

17
                    PATRICK FITZGERALD (Solo
                    Practitioner)

18
                    Patrick Joseph Fitzgerald, Esquire
                    *Pro hac vice*

19
                    P.O. Box 277
                    New Buffalo, MI 49117

20

21
                    Michael Richard Dreeben, Esquire
                    *Pro hac vice*

22
                    600 New Jersey Avenue NW
                    Washington, D.C. 20001

23

24

25
                    (Continued)

```
 1                          (Continued)

 2   For the Defendant:      COOLEY LLP (DC)
                             Ephraim McDowell, Esquire
 3                           Pro hac vice
                             Elias Kim, Esquire
 4                           Pro hac vice
                             1299 Pennsylvania Avenue NW
 5                           Washington, D.C. 20004

 6                           COOLEY LLP (NY-NA)
                             Rebekah Donaleski, Esquire
 7                           Pro hac vice
                             55 Hudson Yards
 8                           New York, NY 10001

 9   Court Reporter:         Diane Salters, B.S., CSR, RPR, RCR
                             Official Court Reporter
10                           United States District Court
                             401 Courthouse Square
11                           Alexandria, VA 22314
                             Email: Dianesalters.edva@gmail.com
12                           Telephone: (301) 338-8033

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings reported by machine shorthand.  Transcript produced
25   by computer-aided transcription.
```

*Proceedings*

1          THE COURTROOM DEPUTY:  *United States v. James Comey*,

2   Case Number 25-cr-272.  Will the parties please note their

3   appearances for the record.

4          MR. DREEBEN:  Your Honor, good morning.  Michael

5   Dreeben for Mr. Comey.  Mr. Comey is here with me.  Co-counsel

6   include Patrick Fitzgerald, Elias Kim, Rebekah Donaleski,

7   Ephraim McDowell, and Jessica Carmichael.

8          THE COURT:  Good morning.

9          MR. DREEBEN:  Thank you.

10         MR. LEMONS:  Good morning, Your Honor.  Tyler Lemons

11  for the United States government.  I'm joined by Lindsey

12  Halligan and Gabriel Diaz, also for the United States

13  government.

14         THE COURT:  Good morning.

15         All right.  We're here for argument on the defendant's

16  motion to dismiss for vindictive prosecution.  The matter has

17  been fully briefed, and I've reviewed the pleadings at some

18  length, and I will hear argument now.  I'll hear from the

19  defense first.

20         MR. DREEBEN:  Thank you, Your Honor.  Good morning.

21  Michael Dreeben for the defendant, James Comey.

22         This is an extraordinary case, and it merits an

23  extraordinary remedy.  The president of the United States has

24  caused the executive branch to prosecute a perceived political

25  enemy because of that individual's exercise of First Amendment

*Proceedings*

 1   rights and because of personal animus.  The president's use of

 2   the Department of Justice to bring a criminal prosecution

 3   against a vocal and prominent critic in order to punish and

 4   deter those who would speak out against him violates the

 5   Constitution.  The Court should dismiss this case with

 6   prejudice.

 7           Under the Fourth Circuit's binding precedent in *United*

 8   *States v. Wilson*, to sustain a dismissal based on vindictive

 9   prosecution, the defense must make two showings:  First, that

10   the government had a vindictive motive; and, second, but for

11   that vindictive motive, this prosecution never would have been

12   brought.

13           I'm going to focus first on the motive to punish

14   Mr. Comey for speaking out, in violation of his First Amendment

15   rights, and then I will turn to the issue of causation.

16           The question of vindictive motive is established in

17   this case by a pattern of Mr. Comey's speaking out in the

18   public square followed by the president's retaliatory tweets

19   expressing animosity and calling for prosecution.  We detailed

20   in our reply brief and in our opening brief the way that this

21   pattern unfolds, but I want to put a frame around it to make

22   clear what we are saying.

23           When Mr. Comey spoke out in the public sphere,

24   Mr. Trump retaliated and called for prosecution.  When

25   Mr. Comey went silent, so did the president.  This pattern is

1    repeated over and over again during the period of time from

2    when Mr. Comey was fired from the FBI up until the present

3    prosecution.  I would like to highlight three episodes that I

4    think illustrate this pattern, although there are many more

5    detailed in our briefs.

6            First, the president fired Mr. Comey as director of

7    the FBI on May 9, 2017.  The president's initial tweet

8    following Mr. Comey's firing was balanced and modest in its

9    tone.  It did not call out Mr. Comey for anything other than to

10   say that new leadership would be put in place at the FBI.  But

11   shortly after Mr. Comey's firing, calls came from Congress for

12   him to appear and to testify to explain what he had done as FBI

13   director.  The president immediately went to a threatening

14   tweet saying, Mr. Comey better hope that there are no tapes

15   before he starts leaking to the press.

16           This set off a chain reaction of events in which

17   Mr. Comey caused the publication of a memorandum that he had

18   written about an encounter with the president in February 2017

19   at which the president had asked him to drop an investigation

20   into his fired former National Security Advisor Michael Flynn.

21   That memo, when it was published, caused an outpouring of

22   attention.  It was front-page news on *The New York Times*, and

23   the president immediately went into a series of derogatory

24   tweets trying to discredit Mr. Comey in advance of his

25   testimony.

*Proceedings*

1        Mr. Comey then testified on June 8, 2017, and he

2   described a series of troubling interactions that he had with

3   the president of the United States, and the president responded

4   with another series of tweets vilifying Mr. Comey.

5        Now, the first time that the president mentions the

6   prospect of criminal prosecution -- and I want to bring this up

7   because the government has asserted that the president

8   mentioned criminal prosecution before Mr. Comey spoke out in

9   the public sphere -- was on May 30, 2017.  And on that date,

10  the president didn't describe any factual basis for believing

11  that Mr. Comey had committed crimes; instead, he responded to a

12  television program that he had seen in which a former campaign

13  advisor, Carter Page, had accused Mr. Comey of misleading

14  statements and false statements in another hearing that doesn't

15  have anything to do with the May 3, 2017 hearing that the

16  government says was the cause of the president's ire.

17       So just to wrap this up, in this period of time, the

18  president's responses and his statements and implications

19  against Mr. Comey follow when Mr. Comey became a vocal and

20  prominent critic of the president's conduct as president.

21       The next episode that illustrates this is when

22  Mr. Comey published his book, *A Higher Loyalty*, in April of

23  2018.  Again, there had been large blocks of time when the two

24  men were silent about each other and the president didn't tweet

25  anything about Mr. Comey, but when Mr. Comey's book was on the

*Proceedings*

1    brink of being published and he's being interviewed and there

2    are book reviews and it reports his concerns about the

3    president's veracity and his conduct of office, the president

4    again goes back on the attack through a series of tweets and

5    accuses Mr. Comey of lying and leaking, using vituperative

6    language, and again trying to discredit him in the public

7    square for speaking out.

8            And the last episode that I'll mention, although there

9    are others, it was in May of 2024 when Mr. Comey began to talk

10   about -- or continued conversations about whether the president

11   was fit to hold the highest office in the land, and his

12   critiques of the president's fitness for office and the

13   specificity of his objections drew Mr. Trump back into the

14   business of attacking Mr. Comey for his speech.  And the

15   fundamental underlying principle here is that the government

16   cannot use the power of criminal prosecutions to attempt to

17   silence a critic, in violation of First Amendment rights.

18           THE COURT:  Let me just stop you there to clarify, and

19   I think I understand your position, and we're talking about the

20   timeline.  But at a more fundamental level, let me just clarify

21   that your position is that the vindictive prosecution has to

22   relate to retaliating against the expression of a

23   constitutional or statutory right, correct, not simply that the

24   president disliked Mr. Comey or was expressing his negative

25   views of him or his personality; is that right?

Proceedings

1          MR. DREEBEN:  So I think, Your Honor, both theories

2    are valid.  There's a First Amendment protection that exists in

3    law against the government prosecuting somebody because of

4    their expression of their views, and that theory of vindictive

5    prosecution is our central submission to the Court.  But it is

6    also the case that government cannot use the power of criminal

7    prosecution to express animosity or animus to an individual for

8    arbitrary reasons, and this is a theory that finds support in

9    *Wade v. United States*, a 1992 Supreme Court case that involved

10   a challenge to the government's failure to file a motion under

11   5K1.1 for the reduction of sentence.  And the Supreme Court in

12   that case said the government has prosecutorial discretion and

13   can use it to make decisions about whether to move for a lower

14   sentence, but it cannot refuse to move for a lower sentence

15   based on prohibited characteristics, such as race or religion

16   or -- and this is the critical part -- when the government's

17   decision has no relationship to a legitimate government

18   interest.  That premise that the government has to act in a way

19   that is rationally related to a legitimate governmental

20   interest has been echoed by the Fourth Circuit in *United*

21   *States v. Butler*, and it is established as a principle of

22   constitutional law.  The government conceded in *Wade v. United*

23   *States* that it cannot take prosecutorial actions absent a

24   legitimate government interest that is being served.  And the

25   president's peak or irritation or animosity or dislike of James

*Proceedings*

1    Comey arising from his time as -- Mr. Comey's service as FBI

2    director is, perhaps, a justification for the president to fire

3    him from his position; it is not a justification for bringing

4    down the full weight of the criminal justice system on him as

5    someone that he wishes to punish for who he is.

6         So our theory of vindictive prosecution relies on both

7    strands of that analysis.  The First Amendment strand, I think,

8    is the most well-established theory because the very origin of

9    vindictive prosecution cases in the Supreme Court's holdings in

10   *Blackledge* and *Pearce* says the power to prosecute may not be

11   used to punish somebody for the assertion of their rights.

12   And, in *Hartman v. Moore*, the Supreme Court specifically

13   connected that to the assertion of First Amendment rights.  So

14   that's theory one.

15        But if the Court believes that either that theory

16   doesn't have sufficient proof at this stage or that there is a

17   mixture of reasons why the president is going after Mr. Comey,

18   there's an additional due process theory grounded in the

19   arbitrariness of prosecuting somebody purely for personal

20   animosity.  And the government doesn't actually argue that

21   personal animosity is a good reason to prosecute somebody.  I

22   think it would be very difficult to make that kind of a claim.

23   If a government official doesn't like somebody, there might be

24   things that you can do about that, but one of them is not try

25   to put them in jail for offenses.  So that is our basic theory

1    of why a vindictive motive in this case is fatal to the

2    legitimacy of the prosecution.

3            THE COURT:  Let me follow up with another quick

4    question on the First Amendment issue, which is that one of the

5    arguments the government has made is that vindictive

6    prosecution is limited to the exercise of constitutional rights

7    in the criminal context.  What is your response to that

8    argument?

9            MR. DREEBEN:  Well, I don't think it's founded in any

10   precedent.  First of all, *Hartman v. Moore* described First

11   Amendment rights as a source of protection against vindictive

12   prosecutions.  The Supreme Court, more recently in *NRA v.*

13   *Vullo*, said the government cannot use coercive power to

14   threaten a third party in order to punish another party for the

15   exercise of First Amendment rights.  So in that case, what you

16   had was the New York official who had authority over insurance

17   companies, threatening those insurance companies with adverse

18   action unless they cut ties with the NRA because of the NRA's

19   advocacy of gun rights, and the Supreme Court said government

20   can't do that; it cannot use its coercive authority to attempt

21   to punish people for the exercise of First Amendment rights.

22   So I think that springs right from Supreme Court cases and

23   logic.  The only right that counts is not a right in the

24   criminal process.  Other constitutional rights also offer

25   protection for the defendants, and the government offers no

Proceedings

1   argument based on first principles why a retaliatory

2   prosecution for the First Amendment should receive less

3   favorable treatment than a retaliatory prosecution for

4   asserting the right to appeal.  So that would be our submission

5   on why the vindictive prosecution rubric encompasses both First

6   Amendment rights and arbitrary action that's based on personal

7   animosity.

8            If the question of vindictive motive is established,

9   the next question is, Did it cause the prosecution?  And under

10  *United States v. Wilson*, the question is whether the

11  prosecution would have occurred but for the vindictive motive.

12  And here the record is crystal clear that it would not have

13  occurred absent the vindictive motive.  You have, at the

14  outset, federal prosecutors who were tasked with looking at the

15  same kinds of statements that are at issue in the indictment in

16  this case in the Arctic Haze investigation.  And this is not

17  speculative.  We have the FBI's closing memorandum that's

18  released and it's in the record, and we've cited it to the

19  Court, and it's September 2021.  The Arctic Haze investigation

20  concluded by saying there is no basis for criminally charging

21  the defendant here or Professor Daniel Richman, who is the

22  alleged person that was the anonymous source, according to the

23  government's allegations in the indictment.  So prosecutors

24  looked at the facts extensively, and they concluded that there

25  was no basis to prosecute.

Proceedings

1            The interim and court-appointed U.S. attorney in this
2    district reached the same conclusion.  Now, there's abundant
3    newspaper reporting that establishes this, and the government
4    says, Well, that's just newspaper articles.  I'd say two things
5    about that.  One is the government never actually denies the
6    accuracy of the newspaper articles; just says they're
7    speculative.  But, in fact, they are not speculative because
8    the president, in directing that this prosecution be brought in
9    a September 20, 2025 tweet, relied on his belief that Erik
10   Siebert had concluded that, quote, there is no case.  And if
11   it's good enough for the president of the United States in
12   directing that the U.S. attorney leave office and appoint a new
13   one, if it's part of his ingredients of decision-making and he
14   relied on it, I think this Court can also rely on it as a
15   factual basis for looking at how this prosecution evolved.
16            THE COURT:  Let me ask you the same question that was
17   asked last week by Judge Currie.  I take it that you do not
18   have a copy of the declination memo if one was written?
19            MR. DREEBEN:  Correct.
20            THE COURT:  And are you able to say whether or not a
21   declination memo exists?  In other words, has the government
22   confirmed that such a memo exists, or have they told you that
23   you have no right to know one way or the other?
24            MR. DREEBEN:  I don't believe that the government has
25   confirmed it.  Of course, the Court can ask the government.

*Proceedings*

1    The way in which I believe that it doesn't matter for purposes

2    of Your Honor's decision today is that in the September 20th

3    tweet, which directed this prosecution -- and I'd like to walk

4    through why I think that that is true -- the president said

5    about the U.S. attorney that he even lied to the media and said

6    he quit and that we had no case.  So the president of the

7    United States is saying that he's relying on that fact.  And I

8    think that if we're looking at the chain of causation that led

9    to this prosecution, all the Court needs to say is we have an

10   objective fact that the Arctic Haze prosecutors turned this

11   case down, we have an objective fact that the president put out

12   into the public sphere that he believed that the U.S. attorney

13   said we had no case and would not prosecute, and he forced him

14   out of office, and at that point, he replaces the U.S. attorney

15   by having the attorney general appoint the current interim

16   U.S. attorney.  And, of course, as the Court is aware, we've

17   challenged the legality of that appointment.

18        But what happens is that the president takes this

19   step -- and I think it's very important to look at exactly what

20   the president said on September 20th because I think that it is

21   effectively an admission that this is a political prosecution

22   and not one that's based on evidence -- the president begins it

23   by saying that many people are telling him it's the same old

24   story, nobody is prosecuting these cases, and then he links

25   Mr. Comey with two other political enemies, Mr. Comey, Adam

1  "Shifty" Schiff, Letitia, who is Letitia James.  Of course,

2  Ms. James has now been prosecuted.  Public reporting is that

3  there are investigations of Adam Schiff.  But by putting

4  together these three political -- or perceived political --

5  enemies, the president is underscoring what he wants done here.

6  He says that the incumbent U.S. attorney, Erik Siebert, he's

7  not going to do his job, his job which is to prosecute these

8  people; he lied to the media.  And as I said, he said he had no

9  case.  No, I fired him, and there is a great case.

10         Now, what's notable about that statement is it's

11  totally fact-free.  It's not based on investigations.  It's not

12  based on a specific request to the FBI or to the Department of

13  Justice to say:  Tell us what evidence you have, tell us why

14  you think there is or isn't a prosecution.  It's an assertion.

15  Then he follows by saying, you know, We're going to replace the

16  incumbent U.S. attorney with Lindsey Halligan, and says, "We

17  can't delay any longer, it's killing our reputation and

18  credibility"; not statements of, We can't allow a wrongdoer to

19  escape justice.  No; "it's killing our credibility and

20  reputation."

21         And then he pivots to his last tit-for-tat remark,

22  "They impeached me twice and indicted me five times over

23  nothing," then in all caps, "Justice must be served now," with

24  three exclamation points.  And if this is not a direction to

25  prosecute, I really would be at a loss to say what is.  It has

*Proceedings*

1  all the ingredients in there of taking the case out of the

2  career prosecutor mold -- the decision has been made that there

3  isn't a valid prosecution -- putting in a new person in order

4  to carry out the direction, "Justice must be served now."  So

5  that is our case on causation.

6       THE COURT:  Let me ask you a question to follow up on

7  that, which is, you've cited the post, but subsequent to that

8  post, there was another set of statements by the president

9  that were given to the press, and I don't believe they were

10  cited in your materials.  They were cited in the James

11  vindictive prosecution motion.  And let me quote it first

12  because I know the government will want to address it, too, and

13  then ask you whether you think the Court should consider these

14  answers.  This was not a post.  This was reporting that the

15  president said the following in response to questions about the

16  post: "No, I just want people to act.  They have to act and we

17  want to act fast.  You know, they were ruthless and vicious.  I

18  was impeached twice.  I was indicted five times.  It turned out

19  to be a fake deal.  And we have to act fast.  One way or the

20  other.  One way or the other.  They're guilty, they're not

21  guilty, we have to act fast.  If they're not guilty, that's

22  fine.  If they are guilty, or if they should be charged, they

23  should be charged.  And we have to do it now."

24       MR. DREEBEN:  So I think that post reinforces the

25  messages that are in the September 20th post.  It doesn't walk

1    them back.  But I want to say something that's a little bit

2    broader about both that and a September 25th comment to the

3    press, which the government cites in its brief, in which the

4    president is asked, like, Is Mr. Comey going to be indicted?

5    This was on September 25th, the day of the indictment.  And he

6    says, Yeah, well, I have to see what happens.  It's in the

7    hands of the attorney general and Todd Blanche and the

8    U.S. attorney.  I could be involved, but I choose not to be.

9            I think what's significant about that and why it

10   doesn't undercut the chain of causation is that it's a

11   statement made to the press.  It doesn't walk back anything

12   that was previously said to the attorney general.  And

13   particularly of relevance for Mr. Comey, it's said at about

14   noon on September 25th, two hours before the U.S. attorney goes

15   into the grand jury.  This is four days on the job; a White

16   House aide who has no prosecutorial experience has been put

17   into the U.S. Attorney's Office; the statute of limitations

18   clock is ticking.  She goes to seek the indictment on

19   September 25th.  I don't think the president's comments, right

20   on the cusp of seeking that indictment, made to the press, not

21   to the attorney general, do anything to walk back the

22   significance of what he said on September 20th.  And I think

23   that the Court can interpret these comments through a

24   common-sense lens of understanding that goes back to the famous

25   statement in Becket [as quoted]:  Who will rid me of this

17

1    meddlesome priest?

2            Words do not have to be direct, literal, and

3    commanding in order to be rationally understood by all those to

4    whom they are addressed as a command that should be carried

5    out.  And, indeed, when Henry II made those comments, four

6    knights went off, interpreting it as an order, and killed

7    Thomas Becket.

8            So I believe that the Court should read the sequence

9    of events when the president is demanding a prosecution -- We

10   have to get going -- I will not repeat again everything that's

11   in the September 20th tweet -- you can't just walk that back

12   with a few comments to the press that are not addressed to the

13   Justice Department at all.

14           THE COURT:  Let me be clear -- and I think we

15   all agree Henry II can't be binding precedent on this Court,

16   but I understand your point -- is your position -- I think it

17   is in your papers -- that these statements are, in fact, direct

18   evidence and that any inferential leaps or any common sense, I

19   think as you've characterized it, don't turn this into an

20   indirect claim of a presumption of vindictiveness, but that

21   this is showing the vindictiveness itself; is that correct?

22           MR. DREEBEN:  Absolutely.  I think that this is direct

23   evidence.  I also think two other principles are relevant here.

24   One is in *NRA v. Vullo*, when the question was, Did Vullo coerce

25   the insurance companies into cutting ties with the NRA?  The

*Proceedings*

1  Supreme Court faulted the Second Circuit for cherry-picking

2  individual statements and looking at them in isolation, and

3  said, No, you have to look at the context of the communications

4  between Vullo and the insurance companies; you have to look at

5  them in sequence and take them together.

6          I don't think that takes it out of the realm of direct

7  evidence.  I just think it applies the fundamental principle

8  that evidence has to be taken in context, and all statements,

9  all language has to be considered as a totality rather than

10  isolating it.

11          And the second principle is -- and I don't think this

12  is inconsistent with the idea that the September 20th tweet is

13  a direct admission -- but as Your Honor knows, and I think

14  recently wrote in the *INOVA Health* case -- intent and purpose

15  can be inferred from circumstantial evidence.  So it's not like

16  circumstantial evidence is inconsistent with conducting the

17  analysis that the Court has to conduct of whether there was a

18  vindictive motive, whether it caused the prosecution.  But we

19  think that on the record that is before the Court, all public

20  statements, an objective interpretation of what the president

21  said and what the president did reveals a vindictive motive,

22  and the chain of causation from September 20th to the

23  indictment in this case shows that it is the president's motive

24  that counts.

25          Now, the government has attacked the very idea of

1    imputation, and it has suggested that the only intent that is

2    relevant is of the United States attorney, and I don't think

3    that the anti-imputation rule that the government is offering

4    the Court is valid as a matter of law.  I mean, first of all,

5    taking this Circuit in *United States v. Wilson*, the court

6    conducted a fairly extensive and detailed analysis of whether

7    any vindictive motive by the South Carolina United States

8    attorney was transferred to the North Carolina United States

9    attorney before the escape prosecution in that case was

10   brought.  And there would have been no need whatsoever to ask

11   that question unless the Court had recognized that an

12   imputation of motive could be done if the facts supported it.

13   The facts did not support it there, but that's not a holding of

14   law.

15          THE COURT:  Well, one U.S. attorney can't tell another

16   U.S. attorney what to do, can they?

17          MR. DREEBEN:  That is certainly correct, and that is

18   an additional obstacle that supported the court's factual

19   conclusion that imputation was not appropriate on the facts of

20   the case.  But we, of course, have a very different situation.

21   In the hierarchy, the president stands at the top, and he has

22   declared himself to be the chief law enforcement officer of the

23   United States.  He has vested in him executive power, which

24   includes supervision of the Department of Justice.  The U.S.

25   attorneys help him carry out his responsibility to see that the

1    laws are faithfully executed, and as we argued in the brief,

2    that is not just a theoretical constitutional structural

3    argument; it is actually an argument that applies to the facts

4    of this case because the president has taken on the

5    responsibility and the authority to direct the Justice

6    Department to take actions in the investigatory and

7    prosecutorial realm that he thinks should be taken, and he has,

8    in effect, substituted himself for the U.S. attorney as the

9    decision-maker, and the facts of this case reveal that that's

10   why his vindictive motive is imputed to the prosecution.  No,

11   he didn't go into the grand jury, but exercising the authority

12   that's vested in him, he brought about the prosecution through

13   the chain of causation that we described earlier.

14          THE COURT:  So your view is that Ms. Halligan is a

15   stalking horse or a puppet, for want of a better word, doing

16   the president's bidding?

17          MR. DREEBEN:  Well, I don't want to use language about

18   Ms. Halligan that suggests anything other than she did what she

19   was told to do.  The president of the United States has the

20   authority to direct prosecutions.  She worked in the White

21   House.  She was surely aware of the president's directive.  She

22   didn't have prosecutorial experience, but she took on the job

23   to come to the U.S. Attorney's Office and carry out the

24   president's directive, and this was a directive to the attorney

25   general.  I think we know that the attorney general is highly

21

1    responsive to the president's directives.  She doesn't say,

2    Excuse me, Mr. President, this is my job.

3         Most recently -- and I realize that it is an event

4    that's not directly pertaining to this case -- but most

5    recently, the president directed the attorney general to carry

6    out an investigation of Democrats connected with Epstein.  In

7    July, the attorney general had issued a memo and said, There is

8    no basis for investigation; we in the FBI have looked at this

9    very thoroughly; no investigation is warranted of anybody.  The

10   president tweets out that, No, I want an investigation to

11   happen.  And that very same day, the attorney general says,

12   Thank you, Mr. President; I've appointed the U.S. attorney for

13   the Southern District of New York to conduct that

14   investigation.

15        So we don't have just an abstract record that suggests

16   that the president says things and then the Justice Department

17   carries out its job independently.  It is incredibly

18   implausible to think that anyone could have come from the White

19   House with no prosecutorial experience, with the shadow of a

20   presidential directive to the attorney general, entered the

21   U.S. Attorney's Office, and four days later sought an

22   indictment in a complicated case where earlier career

23   prosecutors had said, We don't have a case.  We believe that

24   the same was true for the Eastern District of Virginia.  No

25   career prosecutor accompanies the attorney general [*sic*] into

1   the grand jury, which is contrary to the custom in this

2   district that the line AUSA would come.

3          So I don't think this is a difficult case on the

4   direct objective evidence before the Court, and that's what I

5   think the Court should look at to conclude that vindictive

6   motive from the president led to the directive to the attorney

7   general, led to the prosecution, and those events violate the

8   First Amendment, and I submit also due process under the

9   principle that the government must act in a way that is

10  rationally related to a legitimate government interest, not one

11  that is tit-for-tat, not one that is based on personal

12  animosity or personal dislike.

13         The next question would be the remedy.  The remedy for

14  a prosecution that has been brought in violation of the First

15  Amendment should be dismissal of that prosecution.  The

16  government should not be permitted to use the awesome weight of

17  threatening to deprive somebody of liberty as a means of

18  deterring somebody from speaking out, punishing their speech

19  and expressing personal animosity.  So the proper remedy is

20  dismissal.

21         And the next question would be, Is it dismissal with

22  prejudice or without prejudice?  That inquiry is guided by

23  three factors:  the flagrancy of any violation, prejudice to

24  the defendant, and whether any lesser sanction would do.  Here,

25  all three of those factors point in favor of dismissal with

1   prejudice for the following reasons:  first, an attack by the

2   president of the United States on a perceived political enemy

3   because of their speech is unprecedented in this country and

4   represents a grievous violation of bedrock constitutional

5   values.  We believe in free speech in this country, and the

6   government can engage in it as well as private individuals, but

7   what the government cannot do is attempt to silence its

8   opponents by using unrelated criminal charges as a means of

9   deterring and punishing them.

10          And I think the Court should ask itself does anyone

11  believe that we would be in this courtroom today litigating

12  about testimony that Mr. Comey gave in September 2020 referring

13  to testimony that was earlier given on May 3, 2017 if Mr. Comey

14  had not been a vocal, powerful, and prominent critic in the

15  public square.  His First Amendment speech is why we are here

16  today.  I think that is a flagrant violation, and the first

17  factor, therefore, tips in favor of dismissal with prejudice.

18          On the second factor, Mr. Comey is clearly prejudiced.

19  The statute of limitations would have expired five years after

20  his September 30, 2020 testimony that forms the basis for the

21  charges today.  The statute of limitations was almost over.

22  Two sets of prosecutors had concluded no case should be

23  brought, and the president swooped in and immediately arranges

24  for the prosecution to be brought right before the statute of

25  limitations runs.  It should not be able to end-run the statute

1  of limitations by manipulating the machinery of prosecution

2  for vindictive, retaliatory means and, thereby, prejudicing

3  Mr. Comey personally.

4         And I think the third factor, will any lesser sanction

5  do, points to the larger stakes that are at issue in this case.

6  We have never before seen in this country a blatant use of

7  criminal justice to achieve political animus.  Yet, that is

8  what we are seeing with Mr. Comey.  We are seeing it in other

9  cases in which the president has called for prosecution.  He

10  tweeted just yesterday, retweeted a picture of a variety of

11  political opponents with an X over Mr. Comey, with the obvious

12  implication that more are to come, and he has said as much.

13         This has to stop, and this Court is the first to

14  confront the issue of whether a message needs to be sent to the

15  executive branch that you can prosecute for legitimate

16  prosecutorial reasons, and you can strike hard blows so long as

17  they are fair, but what you cannot do is allow the president to

18  take advantage of his authority over the executive branch, to

19  use it as a cudgel to damage and intimidate his political

20  opponents, and only a dismissal with prejudice will serve that

21  aim.  Only a dismissal with prejudice will protect Mr. Comey

22  against further retaliatory efforts either because of these

23  motions or because the president is not yet satisfied that he

24  has had his pound of flesh.  If the Court dismisses without

25  prejudice, it leaves open all of those avenues.  This is not a

1    case in which any sanction lesser than dismissal with prejudice

2    would be warranted.

3    　　　　THE COURT:  All right.  Thank you.  But before you sit

4    down, let me just ask you, do you think that the other pending

5    motions, including the issue of literal truth and ambiguity and

6    the other matters that are yet to be litigated, are so wrapped

7    up in vindictive prosecution that the Court should deal with

8    them all at one time, or do you think that the Court can and

9    should deal with vindictive prosecution separately?

10   　　　　MR. DREEBEN:  I think vindictive prosecution, like our

11   motion based on the appointment of the U.S. attorney, are

12   threshold matters that the Court should resolve as a threshold.

13   Mr. Comey would like to see both of those motions resolved

14   because they both go to the very heart of whether a prosecution

15   in this case is permissible, one by virtue of a challenge to

16   the official who brought it, the other by virtue of whether it

17   complies with the Constitution to bring a prosecution at all.

18   　　　　Our other motions are very important, and we have a

19   series of them that challenge other aspects of the prosecution.

20   As I'm sure the Court is well aware, there are issues relating

21   to the conduct of the prosecutor in the grand jury.  But this

22   one and the appointments issue stand at the threshold.  They're

23   the gateway to all further motions, and those should be

24   resolved at the outset of the case, in our view.

25   　　　　THE COURT:  All right.  Thank you.

*Proceedings*

1          MR. DREEBEN:  Thank you.

2          THE COURT:  Mr. Lemons.

3          MR. LEMONS:  May it please the Court.  Good morning,

4    Your Honor.

5          I want to be very clear, the defendant in this case

6    was indicted because he lied to the grand -- the Senate

7    Judiciary Committee in 2017, and then he lied and obstructed

8    the Senate Judiciary Committee in 2020.  That is why he was

9    indicted.  He was indicted by a properly constituted grand jury

10   in the Eastern District of Virginia after they received the

11   evidence and returned a true bill.

12         THE COURT:  Well, we'll have some questions about

13   that --

14         MR. LEMONS:  That's correct, Your Honor.

15         THE COURT:  -- but I'll let you get through your

16   argument.

17         MR. LEMONS:  A grand jury of the defendant's peers

18   indicted him, not the U.S. attorney and certainly not the

19   president.  He was not indicted as retaliation for exercising

20   his First Amendment rights.  The defendant was not indicted

21   based on any unlawful personal animus, and the defendant was

22   not indicted at the direction of the president of the United

23   States or any other government official.  But in an attempt to

24   thwart the grand jury and to prevent a jury of his peers

25   deciding the issue of guilt or innocence, he files these

1    motions that are supported -- the vindictive prosecution and

2    selective prosecution motion, from the government's

3    perspective, are supported only by resort to newspaper

4    articles, anonymous sources, innuendo, conjecture, and

5    interpretations of past statements and events that are not --

6    that are not consistent with what was said --

7          THE COURT:  Well, let me stop you there.  With regard

8    to the words of the president, whether it's the post from

9    September 20th or his answers to questions from reporters,

10   you're not suggesting that those aren't things the president

11   has said, are you?

12         MR. LEMONS:  No, not in any way, Your Honor.

13         THE COURT:  So to the extent there are newspaper

14   reports, but they are reporting the words of the president, you

15   would agree that that would be a fair item for consideration by

16   this Court?

17         MR. LEMONS:  Absolutely, Your Honor.  What I'm

18   referring to is the newspaper reports that are relying

19   on anonymous sources as to the machinations of former

20   U.S. Attorney Siebert or to other decisions that essentially

21   are not directly quoting the president or someone else.

22         THE COURT:  Well, let me stop you there.

23         MR. LEMONS:  Yes, sir.

24         THE COURT:  I'm not sure what machinations you're

25   referring to.  Are you referring to the fact that Mr. Siebert

*Proceedings*

 1  was the interim U.S. attorney and then appointed by the Court,

 2  and then either resigned on September 19th or was fired by the

 3  president on September 19th?

 4        MR. LEMONS:  Yes, Your Honor.  And I guess more

 5  specifically referring to any sort of -- across, it sounds like

 6  multiple cases, not just this case -- any reluctance or

 7  willingness to pursue cases in this Court.

 8        THE COURT:  Well, was there a declination memo?

 9        MR. LEMONS:  Your Honor, as -- in the course of -- in

10  the course of a prosecution, there are -- as Your Honor is well

11  aware, there's multiple discussions of the propriety of

12  charges, the overall investigation, and what specific charges

13  are appropriate.  At this point, my position would be that

14  the -- whether a declination memo existed or not is something

15  that would be a privileged matter that I have not gotten

16  permission from my client, the Department of Justice, to

17  disclose one way or another.

18        THE COURT:  Well, let me make sure I'm understanding

19  your answer.

20        MR. LEMONS:  Yes, sir.

21        THE COURT:  My question was, Was there a declination

22  memo?  That could be answered yes or no without revealing

23  anything about the substance of what's in the memo.  Are you

24  telling me that you are not permitted by somebody to answer

25  that question "yes" or "no"?

*Proceedings*

1    MR. LEMONS:  Your Honor, I am not aware of a --

2  standing here before you, I have to make sure all of my answers

3  are -- I always endeavor my answers to be as accurate as

4  possible, and so I don't know the world of documents that might

5  exist or not -- that exist or don't exist in this case on that

6  topic.

7    THE COURT:  So you are counsel of record in this case;

8  is that correct?

9    MR. LEMONS:  That's correct, Your Honor.

10    THE COURT:  And you did not seek to find out whether

11  there was a declination memo before you came on to the case or

12  immediately after becoming counsel of record in the case?

13    MR. LEMONS:  I am aware of -- I am aware of written

14  correspondence debating the -- the -- whether charges should be

15  sought against this defendant.

16    THE COURT:  Okay.  My question was not what you're

17  aware of; my question is what you did, and my question is, When

18  you became counsel of record in this case, did you seek out a

19  declination memo to see if one existed?

20    MR. LEMONS:  Yes, Your Honor.

21    THE COURT:  All right.  And did you find out the

22  answer to that question?

23    MR. LEMONS:  I reviewed -- yes, Your Honor, I did.

24    THE COURT:  All right.  And is someone that you can

25  identify for me instructing you not to answer that question of

1    the Court right now as to what you found out?

2              MR. LEMONS:  In conversations with the Office of the

3    Deputy Attorney General, yes, Your Honor.

4              THE COURT:  And what is it that the Office of the

5    Deputy Attorney General told you that you cannot say?

6              MR. LEMONS:  That any discussion of the details of

7    privileged information, work product, or deliberative process,

8    if ordered, that is a decision, whether to waive that

9    privilege, that has not been made yet.  I can tell Your

10   Honor -- and I don't want -- I don't want -- Your Honor, I

11   don't want you to think in any way I'm trying to avoid

12   answering your questions as directly as I can.  What I can tell

13   you is that I did seek out prior memorandums or opinions on

14   whether this prosecution should go forward and what charges

15   could or could not be appropriate.  There were draft

16   memorandums that I have reviewed on that topic, but in terms

17   of -- in terms of an official declination memo, that's kind of

18   my response to your question, Your Honor.  And I hope you

19   understand that I'm trying to answer your questions as

20   robustly, but also as accurately, as possible.

21             THE COURT:  I understand.

22             Did you seek out and determine whether or not a

23   prosecution memo had been prepared?

24             MR. LEMONS:  Yes, Your Honor.

25             THE COURT:  And had one been prepared?

1              MR. LEMONS:  My understanding is that a draft

2    prosecution memo had been prepared.

3              THE COURT:  All right.  And did you review that?

4              MR. LEMONS:  I -- yes, Your Honor, I did.

5              THE COURT:  All right.  Go ahead with your argument.

6              MR. LEMONS:  Thank you, Your Honor.

7              Your Honor, the government's position is that mutual

8    political rhetoric is not enough to override the constitutional

9    import and independence of a federal grand jury, and that the

10   designated province of the executive in making charging

11   decisions.  The defendant cannot talk his way into an immunity

12   or engage in sparring with the executive that somehow prevents

13   his prosecution.  I think it's extremely important to look at

14   the lion's share of the cases that are cited by both the

15   government and the defense, and these cases typically arise in

16   situations that are post -- somewhat post-trial, and numerous

17   cases said assertion of vindictive prosecution in the pretrial

18   setting is especially difficult for a court to weigh and to

19   consider.  That's because in the post-trial setting, there's a

20   very clear delineation between the defendant exercising some

21   right -- typically, an appeal that he's won on -- and then the

22   government's response with more severe charges or additional

23   charges.  And that's obviously not the case here.

24             I would also argue that, even in the pretrial setting,

25   this case and the defendant's allegations are unique in the

1   sense that in so many other cases in the pretrial setting, the

2   defendant is being prosecuted for the exercising of his First

3   Amendment rights.  It's either not possessing a draft card or

4   it is distributing pornographic material or something of that

5   nature.  The actual First Amendment rights of the defendant are

6   what they are being put on trial for, and that's not the case

7   here.  The defendant is not being put on trial for anything

8   he's said about the president.  And the president has been

9   consistent on that point.  And I would push back on

10  Mr. Dreeben's timeline of events and highlight the fact that

11  May 31st is the first point that the president,

12  President Trump, highlights the fact that Mr. Comey is lying

13  and misleading Congress.  His tweets --

14          THE COURT:  Are you referring to the Carter Page

15  statement that was --

16          MR. LEMONS:  Yes, Your Honor.

17          THE COURT:  -- repeated by the president?

18          MR. LEMONS:  Yes, Your Honor.  And I think it was

19  just -- my understanding is it was May 31st.  I think in our

20  motion, we cited it in one place as May 21st, and I think

21  Mr. Dreeben maybe said May 30th, but it's a May 31st post, and

22  that precedes any sort of criticism or self-appointed vocal

23  critic of the president that the defendant engaged in.  And

24  that's important because the *Wilson* case that Mr. Dreeben

25  discussed a great deal talks about this, that when you get to

1    causation, the causation will be belied by the record.  And

2    what that means and what they were saying is that, if the

3    motive, if the inclination, and if, possibly, the investigation

4    to prosecute the defendant predates the exercising of the

5    aggrieved -- or the perceived and aggrieved right, then it

6    can't possibly be vindictive because before there was ever any

7    exercise of the First Amendment right, the president already

8    had in his mind's eye to prosecute him for breaking the law.

9            THE COURT:  Let me just ask you -- and I understand

10   what you're saying -- you've cited, and I think you made

11   reference to the pornography case, which is the *PHE* case --

12           MR. LEMONS:  Yes, Your Honor.

13           THE COURT:  -- and you've made reference to the draft

14   and census cases, I think, or at least maybe one of them.  So

15   those are all First Amendment-related cases.  Your papers seem

16   to indicate that you were taking the position that vindictive

17   prosecution was limited to the exercise of criminal rights,

18   such as succeeding on appeal and then facing higher charges.

19   Are you conceding that First Amendment rights can be the basis

20   of an exercised constitutional right that could lead to a

21   vindictive prosecution claim?

22           MR. LEMONS:  We would absolutely agree with that

23   sentiment.  I think the primary point that we would make is --

24   are twofold.  One, the courts have been clear that -- and it's

25   no offense to Your Honor -- that courts are ill-suited and are

 1   not good -- are not well-suited or well-placed at reviewing the

 2   prosecutorial decisions, which is the province of the

 3   executive, and are so multifaceted, and it can have such a

 4   variety of factors that play into them.  For example, if the

 5   courts have favorably reviewed the fact that a charging factor

 6   for a defendant was their prominence because in terms of a

 7   deterrent effect, the more prominent a person that you

 8   prosecute, the greater the deterrent effect, that may seem a

 9   little awkward, and I think at first blush, the average person

10   may take issue with that, but, I mean, that's what the courts

11   have said.

12             THE COURT:  Well, let me ask you the second part of

13   that question.  When I asked Mr. Dreeben about that, he said

14   there are two arguments here; the first is the exercise of the

15   First Amendment rights, but the other is the notion -- and he

16   cited the *Wade* case -- that arbitrary or, you know, totally

17   irrational reasoning could also be the basis for a vindictive

18   prosecution claim.  Do you agree that that is an alternative

19   and valid basis for seeking a vindictive prosecution claim?

20             MR. LEMONS:  Yes, Your Honor.  It would never enter

21   the conversation or the reason for whether to prosecute

22   somebody whether I like them or I don't like them.  It's an

23   inappropriate consideration.  But the main thing -- I think the

24   important thing with that is there has to be some proof that

25   that is actually the reason they were prosecuted.  There are

1    plenty of defendants -- now, saying that, there are plenty of

2    defendants that -- there's no other way to say it -- I don't

3    like.  I don't like terrorists, I don't like child rapists, but

4    that has nothing to do with why they were prosecuted.  And so I

5    think that that would be --

6         THE COURT:  And let me stop you there.  You've just

7    given some examples and talked about your own experience.  So

8    if there was a defendant you were prosecuting who you didn't

9    like, but they had, in fact, engaged in a serious crime of

10   terrorism, your personal feelings about them would not play a

11   role in the decision to prosecute them; it would be their

12   actions violating the law that motivated you to bring an

13   indictment against them, correct?

14        MR. LEMONS:  That's precisely my point.  And, Your

15   Honor, I don't want to -- in no way am I comparing this

16   defendant --

17        THE COURT:  I understand.

18        MR. LEMONS:  That was just an extreme example that,

19   basically, everybody can agree on.

20        THE COURT:  I didn't take it that way.  But I do want

21   to turn your attention to the answer that the president gave on

22   September 20th after the posting that he made regarding the

23   termination of Mr. Siebert, and Ms. Halligan potentially --

24        MR. LEMONS:  Yes, Your Honor.

25        THE COURT:  -- coming in, and he said -- and I quoted

1    it, but I'll just ask you about it again in case it's not right

2    in the front of your mind -- he says, "And we have to act fast.

3    One way or the other.  One way or the other.  They're guilty,

4    they're not guilty, we have to act fast.  If they're not

5    guilty, that's fine.  If they are guilty, or if they should be

6    charged, they should be charged.  And we have to do it now."

7            Tell me how that is consistent with your practice in

8    deciding whether to bring a case before the grand jury.

9            MR. LEMONS:  Yes, Your Honor.  I think that that is an

10   appropriate prosecutorial motive.  And the precise province of

11   the executive from one administration to the next, there are

12   obviously going to be, and for good reason, not casting

13   aspersion on prior administrations.  There's different

14   priorities in terms of who should be prosecuted.  And the case

15   talks about this in terms of -- this is more on the selective

16   prosecution argument side -- but responding quickly to crimes

17   or making sure that --

18           THE COURT:  Well, it's difficult to say this was

19   responding quickly since --

20           MR. LEMONS:  Yes, Your Honor.

21           THE COURT:  -- the alleged crime occurred on

22   September 30, 2020, and the indictment was sought on

23   September 25, 2025, and it references another proceeding that

24   occurred in 2017.  So I'm not sure the quickly part of it I

25   get.  But what I'm asking about is the notion that a person

*Proceedings*

1  could be guilty or it's possible they're not guilty, and then

2  the decision is made or the command is given to go into the

3  grand jury and secure an indictment.  Is that consistent with

4  your own practice?

5          MR. LEMONS:  I think in the context of the timeline of

6  events and the president's prior statements, I think it's

7  consistent with appropriate prosecutorial discretion and

8  direction.  The president, from May 31st and throughout his

9  posts, has been very consistent.  He does not say, I wish the

10  defendant would stop talking.  He does not say, I don't think

11  he has a right to talk.  What he has said is that he broke the

12  law.  He said that he lied, that he misled, and that he leaked,

13  and that has always been -- in the context of any calls for

14  prosecution, that has been the focus of the president's

15  statements, and that is appropriate.  It is fine for the

16  president to say, Based on what I understand, these crimes were

17  committed and I want them investigated, and they should be

18  investigated, and they should not be given a pass.  And I think

19  that's especially the case --

20          THE COURT:  Well, let me just stop you there --

21          MR. LEMONS:  Yes, Your Honor.

22          THE COURT:  -- because I quoted the language, and the

23  language was:  We have to act fast, and either if they are

24  guilty or if they should be charged, they should be charged, or

25  if they're not guilty, they're not guilty.

1            How is that consistent with the Justice Manual that

2    you are required to follow and that every federal prosecutor is

3    required to follow that requires that before they enter the

4    grand jury and seek an indictment, they must believe that the

5    person will more likely than not be found guilty beyond a

6    reasonable doubt and that the conviction will be upheld on

7    appeal?  How do you square those?

8            MR. LEMONS:  I square that, Your Honor, because

9    there's been no proof that anybody but U.S. Attorney Halligan

10   made the decision to prosecute and present this case to the

11   grand jury.  There's a lot of innuendo and conjecture and

12   assumptions that are required, but there's been no -- and I

13   think Mr. Dreeben at one point mentioned this.  There was a

14   question in a conversation you had with Mr. Dreeben about

15   whether it's direct evidence or not, and his response was,

16   essentially, This is not direct evidence, but it's evidence.

17   And the standards and burdens of proof in the vindictive

18   prosecution and selective prosecution require direct and

19   objective evidence.  And so I think that would be -- the

20   government's primary response to that is, even assuming that's

21   an improper prosecutorial motive or statement, they would have

22   to show -- it's their burden to show that that somehow was what

23   U.S. Attorney Halligan had in her mind when she was

24   prosecuting, and that she was given this direction and that she

25   was given this charge explicitly.  And that has not been proven

1    based on the evidence that they've put forward.

2         THE COURT:  Well, the argument Mr. Dreeben has made is

3    that the direction was given, literally, by the president on

4    September 20th in the posting --

5         MR. LEMONS:  Right.

6         THE COURT:  -- and then reiterated in his answers to

7    the reporters, and then subsequently affirmed after the

8    indictment was returned.

9         MR. LEMONS:  Yes, Your Honor.  And we take a different

10   reading of that post.  It involves -- one, it involves quotes

11   in terms of, I've spoken with other people; and then, two, it

12   involves multiple individuals.  And so in terms of saying it's

13   not a case -- and it's completely appropriate and right for the

14   president.  That is his prerogative to have the people he wants

15   leading the Department of Justice and prosecuting in the

16   districts across this nation, and that is the way that the

17   government reads that post, and there's been no proof that

18   U.S. Attorney Halligan took that as a charge or as a

19   requirement to go and seek this indictment.

20        The other thing I would point out, Your Honor, is that

21   while there's those statements, but there's also the direct

22   statements from the president.  So where there may be room for

23   that interpretation as to the September -- the post we've been

24   talking about, there's also statements directly in

25   contradiction to that.  September 25th, before there's any

1    indictment that's been obtained, the president clearly states,

2    I don't have anything to do with this; I'm not involved; I

3    think I could be if I wanted to, but I'm not.  The professional

4    people in place and the leadership and U.S. Attorney Halligan

5    are the ones that are going to make this decision.  And then he

6    reiterates that post-indictment when he's asked, Did you direct

7    the Department of Justice?  And he says, No way, nohow.  That

8    is not what happened here.

9          And so the government's perspective is, from the

10   defense's argument, there's necessarily some inferential leaps

11   that are required, and under their burdens of proof and the

12   standards for vindictive prosecution and, to some extent,

13   selective prosecution, those are not permissible for the Court

14   in making a decision.  And that's especially the case where

15   there's direct evidence to the contrary in the president's

16   statements to the press and publicly.

17         Your Honor, the -- I think the -- even assuming the

18   animus from the president or some intent to -- intent to punish

19   First Amendment rights, which we do not concede and do not

20   think there's any reference to in his public statements, the

21   defense still has to show that that somehow was imputed to

22   Ms. Halligan.  I touched on this a little bit earlier, but that

23   has not been shown by the defense.  And as I stated in my

24   opening statements to Your Honor, Ms. Halligan was not directed

25   to seek this prosecution.  It was her decision and her decision

1    only, and that's what -- and in terms of showing imputation,

2    they have not been able to do that.  And I also point to the

3    fact that in the Fourth Circuit in cases where -- and I

4    understand there's the discussion of whether one U.S. attorney

5    can even possibly direct another U.S. attorney to do it -- but

6    the Fourth Circuit's decision there was that, even with a

7    request for prosecution, that any sort of unlawful animus is

8    not imputed automatically.  So if there is any sort of personal

9    animus or other unlawful animus, the defense still has to show

10   that, one, it was imputed to U.S. Attorney Halligan, and then

11   also that is the reason, that is the cause.  And I think this

12   is where we probably have the largest delta with the defense,

13   among others, is that under *Wilson*, while there is discussion

14   of but-for causation, our view of the Supreme Court case in

15   *Goodwin* and then also the footnotes themselves in footnote 11

16   and 12 in *Wilson* refer to a sole -- that the animus was the

17   sole basis for seeking the prosecution.  And that's a

18   completely different standard than the but-for causation.

19   Again, the government's perspective under either standard, we

20   have -- they have not made the showing that they have to under

21   the burden and the standards, but that the sole causation is

22   the correct framework and the correct way for the Court to be

23   thinking about this issue.

24          Your Honor, their motion is unique and is equally, I

25   think, unique as Mr. Dreeben describes the circumstances.

1   They're asking the judiciary to intervene at the pretrial

2   setting and deny a grand jury what was their decision.

3   Ms. Halligan was not a puppet.  We would reject any sort of

4   reference to that.  And I understand Your Honor was just

5   speaking about it in a colloquial nature -- "stalking horse" is

6   really an ill-suited term for this when you're not actually

7   hiding behind anything -- but she was not a stalking horse; she

8   was not a puppet.  She was put in as a U.S. attorney, and she

9   made independent decisions to prosecute this defendant.

10          THE COURT:  Well, that's why I was asking you the

11  questions about the declination memo and the prosecution memo,

12  because she was appointed on September 22nd, and she went into

13  the grand jury on the 25th, and I believe what you're saying is

14  that she made an independent evaluation of the case and

15  concluded to move forward with it in that time period, in those

16  couple of days.  And so my question is, what independent

17  evaluation could she have done in that time period?

18          MR. LEMONS:  Your Honor, I think that -- that

19  discussion is inevitably one that we would have if you order

20  expanded discovery.  I don't think -- our position at this

21  stage is that the defense has not made their preliminary

22  showing that they need to for expanded discovery, and I think

23  that is a topic that we would discuss at that point, but would

24  be prepared to, pending conversations with supervisors and

25  people that make decisions way above my head.  After those

1    conversations are had, I think that would be the time to have

2    that discussion.

3         But I would also say that, assuming for the sake of

4    argument, that there is a declination memo or that other

5    individuals did not think this was appropriate for a

6    prosecution, unless there's some -- unless there's some

7    unlawful or inappropriate reason for pursuing a prosecution,

8    there's nothing wrong with that.  And, actually, the Court

9    should take solace, and so should the defendant, in the fact --

10   and take comfort in the fact that there was a robust

11   discussion, that there was a review of all possible sides and

12   views of the propriety of a prosecution, and that that is

13   expected and natural in the course of a prosecution on cases

14   large and small.

15        THE COURT:  All right.

16        MR. LEMONS:  Thank you, Your Honor.

17        THE COURT:  Well, I have a couple more questions

18   before you sit down.

19        MR. LEMONS:  Okay.

20        THE COURT:  At the beginning of your remarks, you said

21   that the grand jury had returned an indictment and there's a

22   presumption of regularity with what happened, but as we know

23   from other litigation in this case, there have been some

24   questions and some attempts to resolve those issues, and

25   Ms. Halligan submitted a declaration on Friday that explained,

1  in part, in response to the question from Judge Currie about

2  what happened after the grand jury began to deliberate, and

3  then what went on --

4        MR. LEMONS:  Yes, Your Honor.

5        THE COURT:  -- after that.  And I'll ask you these

6  questions, but it may be more direct to ask Ms. Halligan

7  directly.

8        What I'm trying to understand is that, looking at that

9  declaration and looking at the transcript of the grand jury

10  return, and looking at the grand jury materials themselves, I'm

11  having a hard time understanding when the second indictment was

12  drafted and when it was presented to the entire grand jury.

13  Can you answer those questions?  And, again, I'm not asking you

14  to divulge any information from inside the grand jury --

15        MR. LEMONS:  Of course.

16        THE COURT:  -- from the proceeding.

17        MR. LEMONS:  Yes, Your Honor.

18        Your Honor, the way the grand jury proceedings

19  occurred is that the initial three-count indictment was

20  presented to the grand jury.  It was presented, I think -- we

21  lay out the times.  I don't want to misquote the times, but

22  essentially around 4:30, 4:38 is when the presentation of the

23  grand jury -- the presentation of the case to the grand jury

24  stopped; and from that point forward, no government personnel

25  appeared in front of the grand jury again.  It was a

*Proceedings*

1    three-count indictment, and after approximately two hours of

2    deliberation, U.S. Attorney Halligan was informed by another

3    person in the office that they had returned a true bill, but

4    the original Count One of the indictment was no true billed.

5    And concurrent with being informed that the grand jury had

6    returned a true bill as to counts -- original Counts Two and

7    Three, Ms. Halligan was handed a drafted -- a revision to the

8    indictment that essentially just reflected what the grand

9    jury's vote was.  Instead of, I guess, putting two -- you know,

10   an X or scribbling out Count One that was no true billed, the

11   indictment was then redrafted to reflect the grand jury's vote

12   and be consistent with that.

13          THE COURT:  So to be clear, that redrafting of the

14   indictment, or the second indictment, happened before

15   Ms. Halligan was informed of what the grand jury had done?

16          MR. LEMONS:  Yes, Your Honor.  It was essentially

17   concurrent with that.  As the announcement -- as the person --

18   as another person in the office entered and said there's a true

19   bill, it was, Here's the version that's consistent with their

20   findings, sign this, and then we'll go up and receive the

21   returns with the magistrate judge.

22          THE COURT:  So my question is, how could the person

23   who told Ms. Halligan that this had happened and redrafted the

24   second indictment have known what the grand jury did without

25   some communication between the grand jury and some member of

1    the government?

2          MR. LEMONS:  My understanding is it was communicated

3    to the grand jury coordinator for the Eastern District of

4    Virginia, Your Honor.  That's how the communication -- that's

5    how the communication flowed.  I think, if I remember

6    correctly, this was the sole indictment presented to the grand

7    jury for that day, and it was the only matter that was on the

8    grand jury calendar.  And, essentially, that was communicated

9    to the Eastern District of Virginia, the U.S. Attorney's

10    Office.

11          THE COURT:  So in the record and the docket -- and I'm

12    sure you've seen it -- is the report of a grand jury's failure

13    to concur in an indictment.  That document is in the record

14    because it was handed up to Judge Vaala at the grand jury

15    return.  And that document, which is a preprinted form, says

16    that there was a failure to return a true bill because there

17    was no concurrence in finding an indictment in this case.

18    There was no reference to Count One or Count Two or

19    Count Three.  That was addressed later before Judge Vaala, and

20    now there's an interlineation that says as to Count One only,

21    which is what Judge Vaala instructed the foreperson to write in

22    in the courtroom.

23          And so this report seems to indicate that the

24    indictment was rejected.  What I'm trying to understand is, was

25    that second indictment then given back to the grand jury for

1    consideration and voting, or was it simply presented in the

2    courtroom and signed by the foreperson in the courtroom?

3         MR. LEMONS:  My understanding is the latter, Your

4    Honor, that essentially the -- I don't think the grand jury had

5    ever encountered the situation before where they had no true

6    billed a specific count in the overall indictment, and that

7    there was essentially a, if anything, what the government would

8    describe as a paperwork or clerical error in how it was

9    returned, and they really had no other way to return it.

10        THE COURT:  And what you've just expressed is

11   consistent with the signatures because the signature of the

12   foreperson and Ms. Halligan on the second, or the operative

13   indictment, is in black ink.  All of the other materials from

14   the foreperson were in blue ink, including the report of the

15   grand jury's failure to concur in the indictment and the

16   signature on the original three-count indictment as well as the

17   record of the number of grand jurors that concurred.

18        So what you're telling me is that that second

19   indictment was drafted after 4:28 p.m. and after the grand jury

20   coordinator had spoken with the foreperson or the grand jury

21   and learned, in contrast to the documents here, that there was

22   a no true bill as to only Count One, and then someone in the

23   U.S. Attorney's Office drafted a new indictment, but that new

24   indictment was never presented to the entire grand jury in the

25   grand jury room; is that correct?

1          MR. LEMONS:  Your Honor, may I have a moment to speak

2    with co-counsel?

3          THE COURT:  You may.

4      (Whereupon, there was a brief pause in the proceedings.)

5          MR. LEMONS:  Thank you, Your Honor.

6          Your Honor, the government's position and

7    understanding of the way things proceeded is that there was

8    only one indictment presented and that the -- I guess what Your

9    Honor is referring to is the new indictment was, in fact, not a

10   new indictment.  The grand jury, through the entire course of

11   events, had said, and was maintained and consistent, that they

12   only no true billed Count One and they true billed Counts Two

13   and Three, and that the edits to the indictment were only to

14   reflect the voting of the grand jury and were not an actual new

15   indictment in any way whatsoever.

16         THE COURT:  All right.  So now let me ask you the

17   question again.  Let me be clear that the second indictment,

18   the operative indictment in this case that Mr. Comey faces, is

19   a document that was never shown to the entire grand jury or

20   presented in the grand jury room; is that correct?

21         MR. LEMONS:  Standing here in front of you, Your

22   Honor, yes, that is my understanding.  Now, I don't -- I was

23   not there, but that is my understanding, yes, Your Honor.

24         THE COURT:  And so that the record is clear, when the

25   grand jury return was taken, only the foreperson was in the

*Proceedings*

1    courtroom, correct, the rest of the grand jurors were not

2    present; is that right?

3              MR. LEMONS:  Can I have a moment, Your Honor?

4              THE COURT:  You can.

5              Ms. Halligan, you can come to the podium.  You're

6    counsel of record.  You can address the Court.  It might be

7    easier.

8              Good morning.

9              MS. HALLIGAN:  Good morning.

10              THE COURT:  So am I correct that, as is the usual --

11              MS. HALLIGAN:  No, Your Honor.

12              THE COURT:  -- practice, that the grand jurors were

13    not present, just the foreperson?

14              MS. HALLIGAN:  The foreperson and another grand juror

15    was also present, and Judge Vaala corrected the record in open

16    court, and the foreperson said in open court, We only no true

17    billed Count One, we want to true bill Count Two and Three, and

18    the foreperson signed that indictment.

19              THE COURT:  I'm familiar with the transcript.

20              MS. HALLIGAN:  Okay.

21              THE COURT:  But I just wanted to make sure that the

22    entire grand jury never had the opportunity to see the second

23    indictment.

24              You may sit down.  Thank you.

25              All right.  Is there anything else, now that I've

1  asked those questions, that you'd like to present?

2         MR. LEMONS:  Not on the vindictive prosecution claim,

3  Your Honor.

4         I will say -- I apologize, I misspoke there.  Because

5  the defense brought it up in their reply, I anticipate that

6  there will be something that they discuss here in their reply.

7  There is reference to, essentially, the Herculean efforts of

8  the government in the *Abrego Garcia* case.  What we would

9  point -- we would point out the fact that those Herculean

10 efforts are taking place at a separate and

11 further-down-the-road procedural point than this case.  The

12 historic Herculean efforts to provide the background or

13 evidence was after the judge had found that the burden had been

14 shifted and that the defense was entitled to expanded

15 discovery.  So from the government's perspective, that sort

16 of -- that effort to provide expanded discovery is not due at

17 this juncture, and the government is prepared to meet that if

18 Your Honor sees fit.

19        THE COURT:  All right.  Thank you.

20        MR. LEMONS:  Thank you, Your Honor.

21        THE COURT:  Mr. Dreeben.

22        MR. DREEBEN:  Thank you, Your Honor.

23        Briefly on the colloquy that you had with counsel on

24 the indictment, it appears that counsel is acknowledging that

25 the operative indictment in this case was never shown to the

1    grand jury and that there is no indictment that Mr. Comey is

2    facing that was returned before the elapse of the statute of

3    limitations.  And to the extent that Your Honor so concludes,

4    that's an additional basis, threshold basis, for dismissing

5    this case and for concluding that no indictment was returned

6    before the statute of limitations expired, and that would be

7    tantamount to a complete bar of further prosecution in this

8    case.

9            Now, on the vindictive prosecution motion, the

10   government conceded that retaliatory prosecutions for First

11   Amendment speech and irrational prosecutions based on animosity

12   are arbitrary and not constitutional.  So the legal framework

13   here, I think, is agreed upon between Mr. Lemons and me.  The

14   government has offered several reasons or suggested several

15   reasons why it thinks that the dismissal is not warranted.  One

16   of them turns on the fact that the grand jury returned an

17   indictment.  Leaving aside that the presumption of regularity

18   concerning that indictment has been called into question, and

19   even whether there is an indictment has been called into

20   question, the Supreme Court in *NRA v. Vullo* made crystal clear

21   that whether there is a basis for proceeding legally against a

22   party doesn't mean that you can do that when the purpose of it

23   objectively is to punish someone for First Amendment rights,

24   and the Supreme Court wrote, "The conceded illegality of the

25   NRA-endorsed insurance programs does not insulate Vullo from

1    First Amendment scrutiny."  So I don't think the fact that the

2    grand jury indictment exists means that the doctrine of

3    vindictive prosecution is out the door.

4              And, of course, the *Wilson* case, which both sides have

5    discussed, involved a grand jury.  The court in that case said

6    there was strong probable cause for escape prosecution, and it,

7    nonetheless, conducted the vindictive prosecution analysis that

8    we're asking this Court to conduct.  So the mere fact of an

9    indictment, I do not think, takes this case out of the realm of

10   judiciary scrutiny for constitutional violations.

11             Now, on the question of declination memos and

12   prosecution memos, I don't think this Court needs to see them

13   in order to find that all the elements are met.  They would

14   bolster that conclusion if there were a declination memo that

15   concluded that there was no probable cause or that the standard

16   applicable in the Justice Manual meant that no prosecution

17   should be brought.  But I did want to comment on the *Abrego*

18   *Garcia* case.  My colleague is correct that Judge Crenshaw there

19   had found that a presumption of vindictiveness arose, but in

20   that case, the government has had no difficulty whatsoever in

21   putting together an affidavit from the U.S. attorney, signed by

22   four other career prosecutors that described the independent

23   process that they went through in accord with the usual way

24   that prosecution decisions are made.  And he furthermore

25   attested that he had had no communication with the deputy

1    attorney general, the attorney general, or the White House.  So

2    the government had given Judge Crenshaw things that it has

3    stood here today and told you it is not authorized to tell you.

4    Maybe it will be down the road, but I think it is quite notable

5    that we have no factual assertion on the record that the

6    U.S. attorney acted independently, and I think, given the

7    sequence of events in the short time, it would be very

8    difficult for the Court to make a finding of true independence

9    objectively regardless of the subjective assertion of the

10   U.S. attorney if she were to say that.

11          Now, the question that my colleague raised about

12   prosecutorial decision-making normally being not a fit subject

13   for judicial review is completely correct, but the corollary to

14   that is there are some factors that are impermissible for a

15   prosecutor to look at.  And all of the cases -- *Armstrong*,

16   *Wayte*, *Wade* -- that go through the limitations of courts in

17   reviewing ordinary prosecutorial decisions had the exception

18   that not if there is a constitutional violation.

19          And in addition to all of the other First Amendment

20   factors that I've pointed to -- my opponent says that they're

21   not direct -- there is direct evidence that General Kelly, who

22   served as President Trump's chief of staff, as reported in a

23   book by Michael Schmidt, said that the president wanted Comey

24   prosecuted because he's out there writing things, and it was

25   in reference to his book, *A Higher Loyalty*.  So there's a

1    direct connection that's drawn in that book.  Again, I don't

2    think that we need it to win this case, but I think it is

3    additional circumstantial evidence that comes from third-party

4    sources that's consistent with everything else that Your Honor

5    has.

6           Finally, the question of what the standard of

7    causation is; is it but for, is it solely?  I think they're

8    essentially equivalent, and the Fourth Circuit has treated them

9    as interchangeable, because if you read the *Wilson* case, the

10   court quotes *Goodwin* in the footnotes 11 and 12 -- I think my

11   colleague attributed them to *Wilson*; they're in *Goodwin* -- and

12   it uses the word "solely."  It wasn't the issue that was at

13   stake in that case.  There was no, really, dictum describing

14   *Bordenkircher v. Hayes* and other factual circumstances,

15   counterfactuals that were not before the court, but the Fourth

16   Circuit has looked at the entirety of jurisprudence on this

17   issue from other circuits and from the Supreme Court, and it

18   uses the phrase "but for" in *Wilson* -- but for the vindictive

19   animus, would *Wilson* have been prosecuted -- uses "solely" in

20   other paragraphs, and later Fourth Circuit cases have continued

21   to use the but-for formulation, and I think that that's

22   singularly appropriate here for the following reason:  I find

23   it very difficult to believe that anyone, any prosecutor

24   operating under the Justice Manual and reviewing the things

25   that career prosecutors typically do, would say, Aha, I'm going

*Proceedings*

1    to reach back to testimony given on September 30, 2020 that

2    refers to testimony that was given on May 3, 2017, and I'm

3    going to bring a prosecution right before the statute of

4    limitations ran.  No.  But for the president's animus, we would

5    not be here today, and I think it's fair to say that in

6    colloquial language, we are here solely because the president

7    of the United States has directed that this prosecution be

8    brought.  It violates the Constitution, and Mr. Comey asks this

9    Court to dismiss the case with prejudice.

10            THE COURT:  All right.  Thank you.

11            Well, this matter comes before the Court on

12    Defendant's motion for vindictive prosecution.  I am not going

13    to rule on the matter today.  The issues are too weighty and

14    too complex for the Court to issue, as it often would, a ruling

15    from the bench.  So I will take it under advisement.

16            I have some housekeeping matters to address.  I would

17    like, especially in light of our argument today, both parties

18    to address the case of *Gaither v. United States*, 413 F.2d 1061

19    (D.C. Cir. 1969), and it addresses this issue regarding the

20    foreperson signing an indictment.  And I know you have your

21    objections due at 5:00 p.m. today, so I wanted to make sure the

22    government was aware of the Court's interest in addressing that

23    case, and, of course, the defense can address it in turn when

24    they file their response.

25            There's also a motion to move up the next oral

*Proceedings*

1    argument, which is set on December 9th.  I commend everyone's

2    enthusiasm for trying to move this even faster, but the Court

3    is reluctant to do that.  I believe that it was Ms. Carmichael

4    that had a conflict, and I will permit counsel to appear

5    without Ms. Carmichael, who's local counsel, so that she

6    doesn't have that issue, but I will keep the current schedule

7    that we have.

8         And, finally, I understand with regard to CIPA-related

9    issues, I know that there had been a motion filed and that

10   Mr. Fitzgerald has now received his clearance, as I understand

11   it.  I would ask the parties to confer and submit a schedule,

12   in light of his access now, to all material.  If I'm correct --

13   and let me confirm, Mr. Lemons -- there was no Section 4 filed,

14   and the government doesn't intend to rely on any classified

15   information or go through the CIPA process for the government's

16   case in chief; is that correct?

17        MR. LEMONS:  That is correct, Your Honor.

18        THE COURT:  All right.  Thank you.

19        Are there any other administrative matters I need to

20   deal with this morning before we recess court?

21        MR. LEMONS:  Nothing from the government, Your Honor.

22        MR. DREEBEN:  Nothing from the defense, Your Honor.

23        THE COURT:  Thank you for your arguments this morning.

24   Court will be in recess.

25              *        *        *        *        *

1                    CERTIFICATE OF REPORTER

2            I, Diane Salters, hereby certify that the foregoing

3    transcript is a true and accurate record of the stenographic

4    proceedings in this matter.

5                              /s/ Diane Salters

6                         _____

                          Diane Salters, CSR, RCR, RPR
7                         Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25